## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STICHTING PENSIOENFONDS ABP, | Civil Action No. 10-6637 (LAK) |
| *Plaintiff*, | **Amended Complaint** |
| v. | |
| MERRILL LYNCH & CO., INC.; MERRILL LYNCH MORTGAGE LENDING, INC.; MERRILL LYNCH MORTGAGE INVESTORS, INC.; MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED; FIRST FRANKLIN FINANCIAL CORPORATION; FINANCIAL ASSETS SECURITIES CORPORATION; GREENWICH CAPITAL ACCEPTANCE, INC.; GREENWICH CAPITAL MARKETS, INC. A.K.A RBS GREENWICH CAPITAL; GREENWICH CAPITAL FINANCIAL PRODUCTS, INC.; MATTHEW WHALEN; PAUL PARK; BRIAN T. SULLIVAN; MICHAEL M. MCGOVERN; DONALD J. PUGLISI; LANA FRANKS; RICHARD MCKINNEY; JAMES J. SULLIVAN; EDWARD GRIEB; KRISTINE SMITH; ROBERT J. MCGINNIS; CAROL P. MATHIS; JOSEPH N. WALSH III; JOHN C. ANDERSON; MARK L. ZUSY; SAMIR TABET; AND JAMES ESPOSITO, | JURY TRIAL DEMANDED |
| *Defendants*. | |

GRANT & EISENHOFER P.A.
485 Lexington Avenue, 29th Floor
New York, New York 10017
Jay W. Eisenhofer, Esq.
Geoffrey C. Jarvis, Esq.
Deborah A. Elman, Esq.
Robert D. Gerson, Esq.
Telephone: (646) 722-8500
Facsimile: (646) 722-8501

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

SUMMARY OF ALLEGATIONS ....................................................................... 2

JURISDICTION AND VENUE .......................................................................... 7

PARTIES ............................................................................................................ 8

    **A.**    PLAINTIFF ........................................................................... 8

    **B.**    CORPORATE DEFENDANTS ............................................... 8

    **C.**    INDIVIDUAL DEFENDANTS ............................................ 11

    **D.**    BANKRUPT LEHMAN ENTITIES ..................................... 15

SUBSTANTIVE ALLEGATIONS ..................................................................... 17

**I.**    THE SECURITIZATION PROCESS GENERALLY ................................ 17

**II.**    THE SECURITIZATIONS ASSOCIATED WITH ABP'S CERTIFICATES AND ABP'S INVESTMENTS IN THE CERTIFICATES .................................... 20

**III.**    IMPORTANT FACTORS IN THE DECISION OF INVESTORS SUCH AS ABP TO INVEST IN THE CERTIFICATES ............................................. 27

**IV.**    DEFENDANTS KNEW THAT A LARGE PERCENTAGE OF THE MORTGAGE LOANS UNDERLYING PLAINTIFF'S CERTIFICATES WERE MADE AS A RESULT OF THE SYSTEMATIC ABANDONMENT OF PRUDENT UNDERWRITING GUIDELINES AND APPRAISAL STANDARDS ................................................................................. 31

    **A.**    DEFENDANT MERRILL LYNCH ABANDONED ITS UNDERWRITING GUIDELINES AND APPRAISAL STANDARDS .............................. 37

        1.    First Franklin Financial Corporation ....................... 39

        2.    Mortgage Lenders Network USA, Inc. ..................... 42

        3.    Ownit Mortgage Solutions, Inc. ............................... 44

    **B.**    DEFENDANT GREENWICH CAPITAL ABANDONED ITS UNDERWRITING GUIDELINES AND APPRAISAL STANDARDS .............................. 46

    **C.**    LEHMAN BROTHERS ABANDONED ITS UNDERWRITING GUIDELINES AND APPRAISAL STANDARDS ........................................... 47

1.      Lehman Brothers Bank ........................................................ 48

2.      BNC Mortgage LLC ............................................................ 52

**D.**     THE THIRD PARTY ORIGINATORS OF THE MORTGAGE LOANS UNDERLYING
         ABP'S CERTIFICATES ABANDONED THEIR UNDERWRITING GUIDELINES
         AND APPRAISAL STANDARDS .................................................. 54

    1.      Accredited Home Lenders Inc. ............................................. 55

    2.      Aegis Mortgage Corporation .............................................. 56

    3.      Ameriquest Mortgage Company ............................................ 57

    4.      Argent Mortgage Company, L.L.C. ........................................ 61

    5.      Bank of America ........................................................ 63

    6.      Countrywide Home Loans, Inc. ........................................... 65

    7.      EquiFirst Corporation .................................................. 66

    8.      First National Bank of Nevada .......................................... 68

    9.      First NLC Financial Services, LLC ...................................... 69

    10.     GreenPoint Mortgage Funding ............................................ 70

    11.     IndyMac Bank F.S.B. .................................................... 73

    12.     NovaStar Mortgage Inc. ................................................. 75

    13.     Option One Mortgage Corporation ........................................ 77

    14.     People's Choice Home Loan, Inc. ........................................ 81

    15.     Residential Funding Company, LLC ....................................... 82

    16.     ResMAE Mortgage Corporation ............................................ 85

**E.**     DEFENDANTS KNEW THE LOANS THEY ACQUIRED FROM THE THIRD PARTY
         ORIGINATORS AND PACKAGED AND SOLD TO INVESTORS SUCH AS ABP
         WERE DESTINED TO FAIL ...................................................... 85

**V.**     DEFENDANTS SYSTEMATICALLY MISREPRESENTED THAT
         APPRAISALS FOR THE SECURITIZED MORTGAGES WERE
         CONDUCTED IN ACCORDANCE WITH INDUSTRY APPROVED
         APPRAISAL STANDARDS ........................................................ 89

| VI. | THE CREDIT RATINGS ASSIGNED TO THE CERTIFICATES MATERIALLY MISREPRESENTED THE CREDIT RISK OF THE CERTIFICATES | 94 |
|---|---|---|
| VII. | DEFENDANTS' "CREDIT ENHANCEMENTS" DID NOT PROVIDE SECURITY | 98 |
| VIII. | A SIGNIFICANT NUMBER OF THE MORTGAGE LOANS WERE MADE TO BORROWERS WHO DID NOT OCCUPY THE PROPERTIES IN QUESTION | 100 |
| IX. | DEFENDANTS FAILED TO ENSURE THAT TITLE TO THE UNDERLYING MORTGAGE LOANS WAS EFFECTIVELY TRANSFERRED | 102 |
| X. | DEFENDANTS' SPECIFIC MATERIAL MISSTATEMENTS AND OMISSIONS IN THE OFFERING DOCUMENTS | 104 |
| | A.  DEFENDANTS MADE FALSE AND MISLEADING STATEMENTS REGARDING UNDERWRITING STANDARDS AND PRACTICES | 104 |
| | B.  DEFENDANTS MADE FALSE AND MISLEADING STATEMENTS REGARDING QUALITY CONTROL PROCEDURES | 107 |
| | C.  DEFENDANTS MADE FALSE AND MISLEADING STATEMENTS REGARDING UNDERWRITING EXCEPTIONS | 108 |
| | D.  DEFENDANTS MADE FALSE AND MISLEADING STATEMENTS AND OMISSIONS REGARDING LOAN-TO-VALUE RATIOS AND APPRAISALS | 111 |
| | E.  DEFENDANTS MATERIALLY MISREPRESENTED THE ACCURACY OF THE CREDIT RATINGS ASSIGNED TO THE CERTIFICATES | 116 |
| | F.  DEFENDANTS MADE UNTRUE STATEMENTS REGARDING THE CREDIT ENHANCEMENTS APPLICABLE TO THE CERTIFICATES | 119 |
| | G.  DEFENDANTS MADE UNTRUE STATEMENTS REGARDING OWNER-OCCUPANCY STATISTICS | 124 |
| | H.  DEFENDANTS MADE UNTRUE STATEMENTS REGARDING THE TRANSFER OF TITLE TO THE ISSUING TRUSTS | 126 |
| XI. | DEFENDANTS KNEW THAT THE OFFERING DOCUMENTS CONTAINED MATERIAL MISSTATEMENTS AND OMISSIONS | 130 |
| XII. | PLAINTIFF ABP  RELIED ON DEFENDANTS' MISREPRESENTATIONS TO ITS DETRIMENT | 131 |
| XIII. | PLAINTIFF ABP HAS SUFFERED LOSSES AS A RESULT OF ITS PURCHASES OF THE CERTIFICATES | 133 |

**XIV.**   THE LIABILITY OF THE CONTROL PERSON DEFENDANTS ............................. 140

    **A.**   DEFENDANT MERRILL LYNCH ................................................................. 140

    **B.**   DEFENDANT GREENWICH CAPITAL .......................................................... 142

    **C.**   INDIVIDUAL DEFENDANTS ..................................................................... 144

        1.   McGovern ............................................................................... 144

        2.   Park ......................................................................................... 144

        3.   Puglisi .................................................................................... 144

        4.   B. Sullivan ............................................................................. 145

        5.   Whalen ................................................................................... 145

        6.   Franks ..................................................................................... 145

        7.   Grieb ...................................................................................... 146

        8.   McKinney ............................................................................... 146

        9.   Smith ...................................................................................... 147

        10.   J. Sullivan .............................................................................. 147

        11.   Tabet ...................................................................................... 147

        12.   Zusy ....................................................................................... 147

        13.   Anderson ................................................................................ 148

        14.   Esposito ................................................................................. 148

        15.   Mathis .................................................................................... 149

        16.   McGinnis ................................................................................ 149

        17.   Walsh ..................................................................................... 149

**XV.**   TOLLING OF THE SECURITIES ACT OF 1933 CLAIMS ....................................... 150

CAUSES OF ACTION ......................................................................................... 152

FIRST CAUSE OF ACTION
Violation of Section 10(b) of the Exchange Act and Rule 10b-5
(Against the Corporate Defendants) .......................................................... 152

SECOND CAUSE OF ACTION
Violation of Section 20(a) of the Exchange Act
(Against Merrill Lynch, MLML, First Franklin, GCFP, and the Individual
Defendants) ................................................................................................ 154

THIRD CAUSE OF ACTION
Common Law Fraud
(Against the Corporate Defendants) ........................................................... 155

FOURTH CAUSE OF ACTION
Fraudulent Inducement
(Against the Corporate Defendants) ........................................................... 156

FIFTH CAUSE OF ACTION
Aiding & Abetting Fraud
(Against All Defendants) ............................................................................ 157

SIXTH CAUSE OF ACTION
Violation of Section 11 of the Securities Act
(Against All Defendants) ............................................................................ 158

SEVENTH CAUSE OF ACTION Violation of Section 12(a)(2) of the Securities Act
(Against the Underwriter Defendants) ........................................................ 160

EIGHTH CAUSE OF ACTION
Violation of Section 15 of the Securities Act
(Against Merrill Lynch, MLML, First Franklin, GCFP, and the Individual
Defendants) ................................................................................................ 162

NINTH CAUSE OF ACTION
Negligent Misrepresentation
(Against All Defendants) ............................................................................ 163

PRAYER FOR RELIEF ....................................................................................... 163

JURY DEMAND ................................................................................................... 164

## INTRODUCTION

Plaintiff Stichting Pensioenfonds ABP ("ABP"), by its undersigned counsel, brings this action pursuant to Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"), and Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a); Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§77k, 77l(a)(2), and 77o, and the common law.  This action is brought against Defendants Merrill Lynch & Co., Inc. ("Merrill Lynch"); Merrill Lynch Mortgage Lending, Inc. ("MLML"); Merrill Lynch Mortgage Investors, Inc. ("MLMI"); Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPFS"); First Franklin Financial Corporation ("First Franklin"); Financial Asset Securities Corporation ("FAS"); Greenwich Capital Acceptance, Inc. ("GCA"); Greenwich Capital Markets, Inc. a.k.a. RBS Greenwich Capital ("GCM"); Greenwich Capital Financial Products, Inc. ("GCFP"); Matthew Whalen ("Whalen"); Paul Park ("Park"); Brian T. Sullivan ("B. Sullivan"); Michael M. McGovern ("McGovern"); Lana Franks ("Franks"); Donald J. Puglisi ("Puglisi"); Richard McKinney ("McKinney"); James J. Sullivan ("J. Sullivan"); Edward Grieb ("Grieb"); Kristine Smith ("Smith"); Mark L. Zusy ("Zusy"); Samir Tabet ("Tabet"); Robert J. McGinnis ("McGinnis"); Carol P. Mathis ("Mathis"); Joseph N. Walsh III ("Walsh"); John C. Anderson ("Anderson"); and James Esposito ("Esposito") (collectively, the "Defendants").

Plaintiff makes the allegations in this Complaint based upon personal knowledge as to matters concerning Plaintiff and its own acts, and upon information and belief as to all other matters.  This information is derived from the investigation by Plaintiff's counsel, which has included a review and analysis of annual reports and publicly filed documents, reports of governmental investigations by the United States Securities and Exchange Commission (the

"SEC"), the Financial Crisis Inquiry Commission (the "FCIC"), the United States Department of Justice (the "DOJ"), the United States Senate Permanent Subcommittee on Investigations, and numerous investigations by other federal and state governmental units, as well as press releases, news articles, analysts' statements, conference call transcripts and presentations, and transcripts from speeches and remarks given by Defendants.  In addition, Plaintiff's counsel conferred with counsel for other plaintiffs who have filed other complaints against these Defendants based on the same or similar activities.  All allegations not included in original complaint are based on the same transactions and occurrences as original claims, placing Defendants on notice of their existence. Additional allegations relate back to the date of the filing of the original complaint. Based on the foregoing, Plaintiff believes that substantial additional evidentiary support exists for the allegations herein, which Plaintiff will find after a reasonable opportunity for discovery.

## SUMMARY OF ALLEGATIONS

1.      This action arises out of ABP's purchases of certain residential mortgage-backed securities ("RMBS"), as evidenced in the form of "Certificates", in reliance on the false and misleading statements that were made by Defendants.  Based on these material misrepresentations and omissions, ABP purchased securities that were far riskier than had been represented, backed by mortgage loans worth significantly less than had been represented, and that had been made to borrowers who were much less creditworthy than had been represented.

2.      The securities purchased by ABP were collateralized against mortgages originated and/or acquired by Defendant First Franklin and non-defendants such as Mortgage Lenders Network USA, Inc. ("MLN"); Ownit Mortgage Solutions, Inc. ("Ownit"); Lehman Brothers Bank, F.S.B. ("Lehman Bank"); Accredited Home Lenders Inc. ("Accredited"); Aegis Mortgage Corporation ("Aegis"); Ameriquest Mortgage Company ("Ameriquest); Argent Mortgage Company, LLC ("Argent"); Bank of America, N.A. ("Bank of America"); Countrywide Home

Loans, Inc. ("Countrywide"); EquiFirst Corporation ("Equifirst"); First National Bank of Nevada ("FNBN"); First NLC Financial Services LLC ("First NLC"); GreenPoint Mortgage Funding ("Greenpont"); IndyMac Bank F.S.B. ("IndyMac"); NovaStar Mortgage Inc. ("NovaStar"); Option One Mortgage Corporation ("Option One"); People's Choice Home Loan, Inc. ("People's Choice"); Residential Funding Company, LLC, ("Residential Funding"); and ResMAE Mortgage Corporation ("ResMAE") (collectively the "Originators").[1]

3.      These Originators did not, however, hold the mortgage loans they originated and/or acquired.  Rather, taking advantage of an unprecedented boom in the securitization industry, these Originators flipped their mortgage loans to investment banks, which then repackaged the loans and sold the loans as RMBS.  In the case of the loans underlying ABP's Certificates, the banks were Merrill Lynch, Lehman Brothers Holdings, Inc. ("Lehman Brothers") and RBS Holdings USA Inc., f.k.a. Greenwich Capital Holdings, Inc. ("Greenwich Capital").  Specifically, each of these investment banks pooled the mortgage loans made by the Originators; deposited the loans into special purpose entities or "trusts"; and then repackaged the loans for sale to investors in the form of RMBS.  Underwriters – in each case, affiliates of Merrill Lynch, Lehman Brothers and Greenwich Capital – sold the RMBS to investors such as ABP.

4.      The Certificates entitled investors to receive monthly distributions of interest and principal on cash flows from the mortgages held by the trusts.  The Certificates issued by each trust were divided into several classes (or "tranches") that had different seniority, priorities of payment, exposure to default, and interest payment provisions.  Rating agencies, such as

---

[1]  Other non-party originators and/or acquirers of mortgage loans pooled into the Issuing Trusts included ABN Amro Mortgage Group, Inc., Fieldstone Mortgage Company, Fremont Investment & Loan, Lenders Direct Capital Corporation, Paul Financial LLC, Residential Mortgage Assistance Enterprise LLC, Silver State Financial Services, Inc., Suntrust Mortgage, Inc., and Weichert Financial Services.

Moody's Investors Service, Inc. ("Moody's"), Standard & Poor's Ratings Services ("S&P"), DBRS, Ltd. ("DBRS") and/or Fitch, Inc. ("Fitch"),[2] rated the investment quality of all tranches of the Certificates based upon information provided by the Defendants about the quality of the mortgages in each mortgage pool and the seniority of the Certificate among the various Certificates issued by each trust.  These ratings, in part, determined the price at which these Certificates were offered to investors.

5.      In selling the Certificates, the Defendants prepared and filed with the SEC certain registration statements (the "Registration Statements"), prospectuses (the "Prospectuses") and prospectus supplements (the "Prospectus Supplements", and together with the Registration Statements and Prospectuses the "Offering Documents").   In these Offering Documents, Defendants repeatedly touted the strength of the Originators' underwriting guidelines and standards; the fact that the underwriting guidelines and standards were designed to ensure the ability of the borrowers to repay the principal and interest on the underlying loans and the adequacy of the collateral; and that the mortgages underlying the Certificates were originated in accordance with those underwriting guidelines and standards.   In addition, in the Offering Documents, Defendants repeatedly assured investors as to the soundness of the appraisals used to arrive at the value of the underlying properties and, specifically, that the real estate collateralizing the loans had been subjected to objective and independent real estate appraisals that complied with Uniform Standards of Professional Appraisal ("USPAP").   Defendants emphasized their quality control procedures such as re-underwriting of a random selection of mortgage loans to assure asset quality.

---

[2]  Moody's, S&P, DBRS and Fitch are approved by the SEC as "Nationally Recognized Statistical Rating Organizations" and provide credit ratings that are used to distinguish among grades of creditworthiness of various securities under the federal securities laws.

6.      Merrill Lynch, Lehman Brothers and Greenwich Capital were obligated to perform due diligence on the mortgage loans they acquired from third parties, and the Offering Documents contain material representations, relied upon by Plaintiff, that Merrill Lynch, Lehman Brothers and Greenwich Capital did perform such due diligence and undertook certain quality control measures to ensure that shoddily underwritten mortgages were ***not*** included in the Certificates they underwrote and sold.  *See*, *e.g.*, Prospectus Supplement for Merrill Lynch Mort. Investors Trust, Series 2006-HE4 (Form 424B5) at S-45 (Jul. 26, 2006):  "Quality control reviews are conducted to ensure that all mortgage loans meet quality standards."

7.      As set forth below, the Offering Documents in fact contained material misstatements and omitted material information.  Contrary to Defendants' assurances, the Originators of the underlying loans had not followed their touted underwriting guidelines and standards when originating and/or acquiring the mortgage loans.  To the contrary, the Originators had engaged in a wholesale and systematic abandonment of their underwriting guidelines, thereby granting mortgage loans to borrowers who did not satisfy the eligibility criteria as described in the Offering Documents.  In addition, the mortgages underlying the Certificates had been extended based on collateral appraisals that were not performed in accordance with USPAP, so that the value of the underlying properties had been overstated, thereby exposing investors such as ABP to additional losses in the event of foreclosure.  Defendants did not apply rigorous quality control procedures to uncover these lapses, and when they learned of such lapses, they deliberately overlooked them.

8.      The practices of financial institutions such as Merrill Lynch, Lehman Brothers, and Greenwich Capital, and their role in inflating the housing bubble, are now the subject of intense regulatory scrutiny.  Merrill Lynch's conduct with respect to mortgage-backed securities

was detailed in both the January 27, 2011, Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States (the "FCIC Report") and the April 13, 2011, report issued by the United States Senate's Permanent Subcommittee on Investigations, chaired by Senator Carl Levin, entitled WALL STREET AND THE FINANCIAL CRISIS: ANATOMY OF A FINANCIAL COLLAPSE (the "Levin Report").  Both reports and their supporting testimony brought to light the extent to which Merrill Lynch, Lehman Brothers and Greenwich Capital intentionally securitized bad mortgage loans and sold them to investors such as Plaintiff ABP.  For example, as discussed *infra*, all three firms utilized the company Clayton Holdings ("Clayton") as a provider of due diligence services to identify whether loans pooled for securitization met the originators' stated underwriting guidelines.  The FCIC Report noted that, "Because of the volume of loans examined by Clayton during the housing boom, the firm had a unique inside view of the underwriting standards that originators were actually applying – and that securitizers were willing to accept."  As the FCIC Report and documents released by Clayton have revealed, Clayton warned Merrill Lynch, Lehman Brothers and Greenwich Capital that many of the loans it reviewed did not meet underwriting guidelines and lacked compensating factors to justify making exceptions.  However, Merrill Lynch, Lehman Brothers and Greenwich Capital ignored these warnings and waived large numbers of loans that they knew to be defective into their securitizations.  The FCIC Report quoted Clayton's former president Keith Johnson as saying that the high waiver rate told him that there was "a quality control issue in the factory" for RMBS.  Johnson concluded that Clayton's clients often ignored the company's due diligence findings in order to preserve their business relationships with loan originators.

9.     Numerous other investigations have been launched by the DOJ, the SEC, and various state Attorneys General, including New York Attorney General Eric Schneiderman.  On

May 21, 2011, the WALL STREET JOURNAL reported that the New York AG has requested informal meetings with executives from several financial firms, including Bank of America Corp., which acquired Merrill Lynch in 2008, as part of an investigation by his office into mortgage practices and the packaging and sale of loans to investors.

10.     The SEC is gathering information in connection with an investigation of Merrill Lynch, related in part to whether the firm inflated prices of mortgage bonds.   The U.S. Attorney's office in Manhattan has requested that the SEC share its findings.

11.     As a result of the untrue statements and omissions in the Offering Documents, ABP purchased Certificates that were far riskier than represented and that were not equivalent to other investments with the same credit ratings.   In purchasing Certificates in the highest rated tranches, Plaintiff ABP believed it was making a low-risk investment in which it would receive a modest return.   The rating agencies have now downgraded the Certificates, all of which were represented in the Offering Documents to be investment-grade instruments at the time of ABP's purchases, to significantly lower ratings.   The Certificates, therefore, are no longer marketable near the purchase prices paid by ABP.   As a consequence, ABP has suffered losses on its purchases of the Certificates.

**JURISDICTION AND VENUE**

12.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5; Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2), and 77o and the common law.

13.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, Section 22 of the Securities Act, 15 U. S.C. § 77v, and 28 U.S.C. §§ 1331, 1337(a) and 1367.

14.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, Section 22 of the Securities Act, and 28 U. S.C. § 1391(b), (c) and (d).  Many of the acts and omissions charged herein, including the preparation and dissemination of materially false and misleading statements in the Offering Documents, occurred in substantial part in the Southern District of New York.

## PARTIES

### A.   PLAINTIFF

15.     Plaintiff ABP is an independent administrative pension fund established under the laws of the Kingdom of the Netherlands.  ABP serves as the pension fund for public employees in the governmental and education sectors in the Netherlands.  With assets under management of approximately € 250 billion, ABP is one of the three largest pension funds in the world. ABP purchased the Certificates from the trusts listed in the table in paragraph 64 below.

### B.   CORPORATE DEFENDANTS

16.     Defendant Merrill Lynch is a Delaware Corporation with its principal executive office located at 250 Vesey Street, 4 World Financial Center, New York, New York.  As an investment bank, Merrill Lynch is a global trader and underwriter of securities and derivatives across a broad range of asset classes and serves as a strategic advisor to corporations, governments, institutions and individuals worldwide.  Merrill Lynch and its affiliated entities structured and sold to ABP the Certificates issued by the "Merrill Trusts" (as defined in paragraph 51).

17.     Merrill Lynch acted as an "underwriter", within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11), of the Certificates issued by the Merrill Trusts.  As an underwriter, Merrill Lynch participated in the drafting and dissemination of the Prospectus Supplements pursuant to which the Certificates were sold to ABP.

18.     Defendant MLML is a Delaware corporation with its principal place of business located at 250 Vesey Street, 4 World Financial Center, New York, New York. MLML is an indirect, wholly owned subsidiary of Merrill Lynch.  MLML is an affiliate of MLMI, First Franklin, and MLPFS.  MLML served as a "sponsor" and/or "seller" for purposes of the offerings of Certificates by the Merrill Trusts, meaning that it sold to the trusts the pools of mortgage loans upon which the Certificates were based (as described further below).   In coordination with MLPFS, MLML worked with loan sellers and servicers in structuring the securitizations.

19.     Defendant MLMI is a Delaware corporation and a limited purpose, indirect wholly owned subsidiary of Merrill Lynch, with its principal place of business located at 250 Vesey Street, 4 World Financial Center, New York, New York.  MLMI is an affiliate of MLML, First Franklin and MLPFS.  MLMI served as a "depositor" for purposes of the Merrill Trusts, and was an "issuer" within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(4) and the Exchange Act, 15 U.S.C. §78c(a)(8).

20.     Defendant MLPFS is a Delaware corporation with its principal place of business located at 250 Vesey Street, 4 World Financial Center, New York, New York.  MLPFS is an affiliate of MLML, First Franklin and MLMI.  MLPFS acted as an "underwriter", within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11) and the Exchange Act, 15 U.S.C. §78c(a)(20), in connection with the Certificates issued by the Merrill Trusts.  As an underwriter, MLPFS participated in the drafting and dissemination of the Prospectus Supplements pursuant to which the Certificates were sold to ABP.

21.     Defendant First Franklin, which was acquired by Merrill Lynch on December 30, 2006, has its principal place of business located at 2150 North First Street, San Jose, California.

First Franklin is an affiliate of MLML, MLMI and MLPFS. First Franklin originated mortgage loans and served as a "sponsor" for purposes of the offerings of Certificates by the Merrill Trusts. Moreover, in conjunction with MLPFS, First Franklin worked with loan sellers and servicers in structuring the securitization transactions related to the Certificates.

22. Greenwich Capital is an indirect wholly owned subsidiary of the Royal Bank of Scotland Group plc. Greenwich Capital and its affiliated entities structured and sold to ABP the Certificates issued by the "Greenwich Capital Trust" (as defined in paragraph 51).

23. Defendant FAS is a Delaware corporation organized on August 2, 1995, for the limited purpose of acquiring, owning and transferring mortgage assets and selling interests in those assets or bonds secured by those assets. Its principal place of business is 600 Steamboat Road, Greenwich, Connecticut. FAS is a limited purpose finance subsidiary of Greenwich Capital and an affiliate of GCM. FAS served as the "depositor" for purposes of the Greenwich Capital Trust, and was an "issuer" within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(4) and the Exchange Act, 15 U.S.C. §78c(a)(8).

24. Defendant GCA is a wholly owned subsidiary of Greenwich Capital. Its principal place of business is 600 Steamboat Road, Greenwich, Connecticut. GCA was a co-signatory with FAS on the registration statement governing the Greenwich Capital Trust. At all material times, GCA transacted significant business throughout the State of New York.

25. Defendant GCM is an SEC registered broker-dealer, with its principal place of business located at 600 Steamboat Road, Greenwich, Connecticut. GCM acted as an "underwriter", within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11) and the Exchange Act, 15 U.S.C. §78c(a)(20), of the Certificates issued by the Greenwich Capital Trust. As an underwriter, GCM participated in the drafting and dissemination of the Prospectus

Supplement pursuant to which the Certificates were sold to ABP.  At all material times, GCM transacted significant business throughout the State of New York.

26.     Defendant GCFP, a Delaware corporation, is a wholly owned direct subsidiary of Greenwich Capital with its principal place of business located at 600 Steamboat Road, Greenwich, Connecticut.   GCFP served as the "sponsor" for purposes of the offering of Certificates by the Greenwich Capital Trust.   Moreover, in conjunction with GCM, GCFP worked with loan sellers and servicers in structuring the securitization transactions related to the Certificates.  At all material times, GCFP transacted significant business throughout the State of New York.

27.     Defendants MLMI and FAS are hereinafter collectively to as the "Issuing Defendants."

28.     Defendants Merrill Lynch, MLPFS, and GCM are hereinafter collectively referred to as the "Underwriter Defendants."

29.     All Defendants identified in ¶¶ 16-26 are hereinafter collectively referred to as the "Corporate Defendants."

C.     **INDIVIDUAL DEFENDANTS**

30.     Defendant McGovern was, at relevant times, a Director of MLMI.  While serving as a Director of MLMI, Defendant McGovern was concurrently a Director and Senior Counsel of Merrill Lynch.  Defendant McGovern signed the Registration Statements dated March 28, 2006 and March 7, 2007, governing the Merrill Trusts.

31.     Defendant Park was, at relevant times, the President and Chairman of the Board of Directors of MLMI.  While serving as President and Chairman of MLMI, Defendant Park was concurrently a managing partner of defendant Merrill Lynch.  Defendant Park signed the March 7, 2007 Registration Statement governing certain of the Merrill Trusts.

32.     Defendant Puglisi was, at relevant times, a Director of MLMI. Defendant Puglisi signed the Registration Statements dated March 28, 2006 and March 7, 2007, governing the Merrill Trusts.

33.     Defendant B. Sullivan was, at relevant times, the Vice President, Treasurer (Principal Financial Officer) and Controller of MLMI.   Defendant B. Sullivan signed the Registration Statements dated March 28, 2006 and March 7, 2007, governing the Merrill Trusts.

34.     Defendant Whalen was, at relevant times, President and Chairman of the Board of Directors of MLMI.   Defendant Whalen signed the March 28, 2006 Registration Statement governing certain of the Merrill Trusts.

35.     Defendant Franks was, at relevant times, Principal Executive Officer, President, a director and Chairman of the Board of Directors of Structured Asset Securities Corporation ("SAS").   Defendant Franks signed the Registration Statement dated February 23, 2007, governing certain of the Lehman Trusts.

36.     Defendant Grieb was, at relevant times, Chief Financial Officer of SAS. Defendant Grieb signed the March 29, 2006 and August 8, 2006 Registration Statements governing the Lehman Trusts.

37.     Defendant McKinney was, at relevant times, a director of SAS.   Defendant McKinney signed the Registration Statement dated February 23, 2007 governing certain of the Lehman Trusts.

38.     Defendant Smith was, at relevant times, Controller and Principal Accounting Officer of SAS.  Defendant Smith signed the March 29, 2006 and February 23, 2007 Registration Statements governing certain of the Lehman Trusts.

39.     Defendant J. Sullivan was, at relevant times, a director of SAS.  Defendant J. Sullivan signed the September 16, 2005, March 29, 2006, and February 23, 2007 Registration Statements governing the Lehman Trusts.

40.     Defendant Tabet was, at relevant times, Chairman, President, Managing Director, and a Director of SAS.  Defendant Tabet signed the September 16, 2005 and March 29, 2006 Registration Statements governing certain of the Lehman Trusts.

41.     Defendant Zusy was, at relevant times, Chairman, President, Managing Director, and a Director of SAS.  Defendant Zusy signed the September 16, 2005 Registration Statement governing certain of the Lehman Trusts.

42.     Defendant Anderson was, at relevant times, a Director and Managing Director of both FAS and GCA.  In addition, at all relevant times, Anderson also was the Managing Director, Head of Asset-Backed Principal Finance at GCM.  Defendant Anderson signed the March 31, 2006 Registration Statement governing the Greenwich Capital Trust.

43.     Defendant Esposito was, at relevant times, a Director, Managing Director and General Counsel of FAS and Managing Director, Director, General Counsel and Secretary of GCA.  Defendant Esposito signed the March 31, 2006 Registration Statement governing the Greenwich Capital Trust.

44.     Defendant Mathis was, at relevant times, Chief Financial Officer and Managing Director of both FAS and GCA.  In addition, at all relevant times, Mathis also was the Managing Director and Chief Financial Officer at GCM.  Defendant Mathis signed the March 31, 2006 Registration Statement governing the Greenwich Capital Trust.

45.     Defendant McGinnis was, at relevant times, President and Director of both FAS and GCA.  In addition, at all relevant times, McGinnis was also GCM's Managing Director,

Head of Securitized Products.  Defendant McGinnis signed the March 31, 2006 Registration Statement governing the Greenwich Capital Trust.

46.     Defendant Walsh was, at relevant times, a Director and Managing Director of both FAS and GCA.  In addition, at all relevant times, Walsh was also the Managing Director, Head of Mortgage Trading, Originations and Finance at GCM.  Defendant Walsh signed the March 31, 2006 Registration Statement governing the Greenwich Capital Trust.

47.     Defendants McGovern, Park, Puglisi, B. Sullivan, Whalen, Franks, Grieb, McKinney, Smith, J. Sullivan, Tabet, Zusy, Anderson, Esposito, Mathis, McGinnis, and Walsh are referred to collectively hereinafter as the "Individual Defendants."  The table below summarizes the Registration Statements signed by the Individual Defendants.

| File No. | Document Date | Signatories |
|---|---|---|
| 333-127589 | September 16, 2005 | Mark L. Zusy<br>Samir Tabet<br>James J. Sullivan |
| 333-130545 | March 28, 2006 | Matthew Whalen<br>Brian T. Sullivan<br>Michael M. McGovern<br>Donald J. Puglisi |
| 333-129480 | March 29, 2006 | Samir Tabet<br>James J. Sullivan<br>Edward Grieb<br>Kristine Smith |
| 333-130961 | March 31, 2006 | Robert J. McGinnis<br>Carol P. Mathis<br>Joseph N. Walsh III<br>John C. Anderson<br>James M. Esposito |
| 333-133985 | February 23, 2007 | Lana Franks<br>Richard McKinney<br>James J. Sullivan<br>Edward Grieb<br>Kristine Smith |
| 333-140436 | March 7, 2007 | Paul Park<br>Brian T. Sullivan<br>Michael M. McGovern<br>Donald J. Puglisi |

### D.   BANKRUPT LEHMAN ENTITIES

48.     Until its collapse, Lehman Brothers was a global financial services firm which conducted business in investment banking, equity and fixed-income sales, research and trading, investment management, private equity and private banking.  Lehman Brothers and its affiliated entities structured and sold to ABP the Certificates issued by the "Lehman Trusts" (as defined in paragraph 51).   Lehman Brothers acted as a sponsor and/or seller for the Lehman Trusts. Lehman Brothers is not named as a defendant because, on September 15, 2008, it filed for bankruptcy protection under Chapter 11 of the U.S. Bankruptcy Code.

49.     Lehman Brothers, Inc. ("LBI") was an "underwriter", within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11) and the Exchange Act, 15 U.S.C. §78c(a)(20), for the Certificates issued by the Lehman Trusts.   LBI is liable under Sections 11 and 12 of the Securities Act, but is not named as a defendant because, on September 15, 2008, its parent company, Lehman Brothers, filed for bankruptcy protection under Chapter 11 of the U.S. Bankruptcy Code, and in conjunction therewith, the Securities Investor Protection Corporation commenced proceedings to liquidate LBI.

50.     Structured Asset Securities Corporation ("SAS") was a "depositor" and thereby an "issuer", within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(4) and the Exchange Act, 15 U.S.C. §78c(a)(8), for purposes of the Certificates issued by the Lehman Trusts.  SAS is not named as a defendant herein because, on February 9, 2009, SAS filed for bankruptcy protection under Chapter 11 of the U.S. Bankruptcy Code.

51.     Non-parties, the "Issuing Trusts", are New York common law trusts.  The Issuing Trusts were created and structured by Merrill Lynch, Lehman Brothers and Greenwich Capital and their affiliated entities to issue billions of dollars worth of RMBS.  The Issuing Trusts issued the Certificates purchased by ABP.  The non-party Issuing Trusts are:

- Merrill Lynch Mortgage Investors Trust, Series 2006-AF2

- Merrill Lynch Mortgage Investors Trust, Series 2006-HE4

- Merrill Lynch Mortgage Investors Trust, Series 2006-HE5

- Merrill Lynch Mortgage Investors Trust, Series 2006-HE6

- Merrill Lynch Mortgage Investors Trust, Series 2006-OPT1

- Merrill Lynch Mortgage Investors Trust, Series 2006-RM5

- Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-1

- Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-2

- Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-3

- Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-4

- Merrill Lynch Mortgage Investors Trust, Series 2007-HE3

- Merrill Lynch Alternative Note Asset Trust, Series 2007-A1

- First Franklin Mortgage Loan Trust, Series 2007-FF1

(hereinafter, collectively, the "**Merrill Trusts**")

- First Franklin Mortgage Loan Trust, Series 2006-FF15

- First Franklin Mortgage Loan Trust, Series 2006-FF17

- First Franklin Mortgage Loan Trust, Series 2006-FFA

- First Franklin Mortgage Loan Trust, Series 2006-FFB

- Lehman XS Trust, Series 2006-4N

- Lehman XS Trust, Series 2006-10N

- Lehman XS Trust, Series 2006-14N

- Lehman XS Trust, Series 2006-20

- Lehman XS Trust, Series 2007-4N

- Lehman XS Trust, Series 2007-8H

16

- Structured Asset Securities Corporation Mortgage Loan Trust, Series 2006-BC4

- Structured Asset Securities Corporation Mortgage Loan Trust, Series 2006-BC5

- Structured Asset Securities Corporation Mortgage Loan Trust, Series 2006-S1

- Structured Asset Securities Corporation Mortgage Loan Trust, Series 2007-BC3

- Structured Asset Securities Corporation Mortgage Loan Trust, Series 2007-MN1A

- Structured Asset Securities Corporation Mortgage Loan Trust, Series 2007-OSI

(hereinafter, collectively the "**Lehman Trusts**")

- First Franklin Mortgage Loan Trust, Series 2006-FF16

(hereinafter, the "**Greenwich Capital Trust**," and together with the Merrill Trusts and the Lehman Trusts the "**Issuing Trusts**").

## SUBSTANTIVE ALLEGATIONS

## I.    THE SECURITIZATION PROCESS GENERALLY

52.    Traditionally, the process for extending mortgage loans to borrowers involved a lending institution (the loan originator) making a loan to a home buyer in exchange for a promise, documented in the form of a promissory note, by the home buyer to repay the principal and interest on the loan.  The loan originator obtained a lien against the home as collateral in the event the home buyer defaulted on its obligation.  Under this simple model, the loan originator held the promissory note until it matured, and was exposed to the risk that the borrower might fail to repay the loan.  As such, the loan originator had a financial incentive to ensure that the borrower had the financial wherewithal to repay the loan, and that the underlying property had sufficient value to enable the originator to recover its principal and interest in the event that the borrower defaulted.

53.     Beginning in the 1990s, however, banks and other mortgage lending institutions increasingly used securitization to finance the extension of mortgage loans to borrowers.  Under the securitization process, after a loan originator issues a mortgage to a borrower, the loan originator sells the mortgage to a third-party financial institution.  By selling the mortgage, the loan originator not only obtains fees, but receives the proceeds from the sale of the mortgage up front, and thereby has new capital to issue more mortgages.  The financial institutions which purchase the mortgages then pool the mortgages together, and securitize those mortgages into what are commonly referred to as residential mortgage-backed securities or RMBS.  In this manner, unlike the traditional process for extending mortgage loans, the loan originator is no longer subject to the risk that the borrower may default; that risk is transferred with the mortgages to investors who purchase the RMBS.

54.     The securitization of residential mortgage loans, and the creation of RMBS collateralized against these loans, typically follows the same structure and pattern in each transaction.  First, a loan originator, such as a mortgage lender or bank, originates the underlying residential mortgage loans.  After a loan has been made, a "sponsor" or "seller" (who either originated the loans itself or acquired the loans from other loan originators) sells the mortgage loans to a "depositor."  The depositor pools these loans and deposits them into a special purpose entity or trust created by the depositor.  One trust is established to hold the pool of mortgages for each proposed offering.  In order to facilitate multiple offerings of RMBS, a depositor sets up multiple trusts to hold the different pools of mortgages that are to be securitized.  With respect to each offering, in return for the pool of mortgages acquired from the depositor, the trust issues and distributes RMBS certificates to the depositor.  The depositor then works with an underwriter to price and sell the certificates to investors.  Thereafter, a servicer is appointed to

service the mortgage loans held by the trust, *i.e.*, to collect the mortgage payments from the borrower in the form of principal and interest, and to remit them to the trust for administration and distribution to the RMBS investors.  The diagram below illustrates the typical structure of a securitization:



In selling the certificates to investors, the depositor and underwriters disseminate to investors various disclosure or offering documents describing the certificates being sold.  The offering documents comprise: (1) a "shelf" registration statement (under SEC Rule 415, an issuer may file one registration statement covering several offerings of securities made during a period of up to three years after the filing of the registration statement); (2) a "base" prospectus; and (3) a "prospectus supplement."  Because a depositor will create a different trust for each offering of RMBS (as described above), the depositor files one shelf registration statement and one base prospectus that apply to multiple trusts that the depositor proposes to establish.  With respect to each specific trust, however, the depositor also files a prospectus supplement that applies only to

that particular trust.  Thus, for any given offering of securities, the relevant offering documents will typically be a shared registration statement and shared base prospectus, as well as an individual, trust-specific prospectus supplement.

55.     Each investor who purchases an RMBS certificate is entitled to receive monthly payments of principal and interest from the trust.  The order of priority of payment to each investor, the interest rate to be paid to each investor, and other payment rights accorded to each investor depend on which class or tranche of certificates the investor purchases.

56.     The highest or senior tranche is the first to receive its share of the mortgage payments and is also the last to absorb any losses should mortgage borrowers become delinquent or default on their mortgages.  Accordingly, these senior tranches receive the highest investment rating by the rating agencies, usually AAA.  After the senior tranche, the middle tranches (referred to as mezzanine tranches) next receive their share of the proceeds.  These mezzanine tranches are generally rated from AA to BB by the rating agencies.  The process of distributing the mortgage proceeds continues down the tranches through to the bottom tranches, referred to as equity tranches.  This process is repeated each month and all investors receive the payments owed to them so long as the mortgage borrowers are current on their mortgages.

## II.   THE SECURITIZATIONS ASSOCIATED WITH ABP'S CERTIFICATES AND ABP'S INVESTMENTS IN THE CERTIFICATES

57.     In this case, the Issuing Trusts and the Certificates purchased by ABP were structured and sold by three different groups of entities – Merrill Lynch, Lehman Brothers, and Greenwich Capital and their respective affiliated entities.

58.     With respect to the Merrill Trusts, the depositor that created the Issuing Trusts was a Merrill Lynch-affiliated entity, Defendant MLMI.  The sponsor and/or seller for the Merrill Trusts were also Merrill Lynch-affiliated entities, specifically, either MLML or First

Franklin.  Another Merrill Lynch-affiliated entity, Ownit, originated loans that were included in the Issuing Trusts.  In addition, the underwriter was another Merrill Lynch-affiliated entity, Defendant MLPFS.  As such, the vast majority of the transactions among the sponsor/seller, depositor and the Merrill Trusts were not arm's-length transactions, as Merrill Lynch controlled all the entities.

59.     With respect to the Lehman Trusts, the depositor was a Lehman Brothers-affiliated entity, non-defendant SAS.  The sponsor and/or seller for the Lehman Trusts was Lehman Brothers.  In addition, the underwriter was another Lehman Brothers affiliate, non-defendant LBI.  Therefore, as for the Merrill Trusts, the transactions among the sponsor/seller, depositor and the Lehman Trusts were not arm's-length transactions, as Lehman Brothers controlled all the entities.

60.     With respect to the Greenwich Capital Trust, the relevant entities were similarly all Greenwich Capital-affiliated entities.  The sponsor was Defendant GCFP; the depositor was Defendant FAS; and Defendant GCM acted as the underwriter.

61.     In connection with their role as the depositors for the Issuing Trusts that are the subject of this action, Defendants MLMI and FAS and non-defendant SAS prepared and filed with the SEC the following shelf registration statements, to which registration statements the Certificates purchased by ABP are traceable:

*MLMI*

| Registration Statement | Date Filed | Amount Registered |
| --- | --- | --- |
| 333-130545 | March 28, 2006 | $35,000,000,000 |
| 333-140436 | March 7, 2007 | $85,000,000,000 |

*SAS*

| Registration Statement | Date Filed | Amount Registered |
|:---:|:---:|:---:|
| 333-127589 | September 16, 2005 | $75,000,000,000 |
| 333-129480 | March 29, 2006 | $143,000,000,000 |
| 333-133985 | February 23, 2007 | $105,992,402,127 |

*GCA/FAS*

| Registration Statement | Date Filed | Amount Registered |
|:---:|:---:|:---:|
| 333-130961 | March 31, 2006 | $85,433,340,861 |

62.     By preparing the above Registration Statements, each of Defendants MLMI and FAS was an "issuer" within the meaning of the Securities Act, 15 U.S.C. §77b(a)(4) and the Exchange Act, 15 U.S.C. §78c(a)(8), of the Certificates traceable to the above Registration Statements.  The above Registration Statements were signed by the Individual Defendants and, in the case of the Greenwich Capital Trust, co-signed by Defendant GCA.

63.     At the time of filing, each Registration Statement contained an illustrative form of a prospectus supplement that would be used in the various offerings of Certificates.  At the effective date of a particular offering of Certificates, the Underwriter Defendants prepared and filed a final Prospectus Supplement with the SEC containing a description of the mortgage pool for that particular offering of Certificates, and the underwriting standards by which the mortgages were supposedly originated.  The Underwriter Defendants then marketed and sold the Certificates pursuant to these Prospectus Supplements.

64.     The following chart summarizes and identifies (1) each Issuing Trust that issued and sold the Certificates purchased by ABP; (2) the dates of the Registration Statements and

Prospectus Supplements pursuant to which the Certificates were issued and sold; and (3) the identities of the depositor, the issuer, underwriters, and the sponsor/seller for each offering.

| Amended Registration Statement File No. and Date | Issuing Trust | Prospectus Supplement Date | Depositor | Underwriter(s) | Sponsor/ Seller |
|---|---|---|---|---|---|
| | | | | | |
| 333-127589 9/16/05 | Structured Asset Securities Corporation Mortgage Loan Trust, Series 2006-S1 | 3/1/06 | SAS | Lehman Brothers Inc. | Lehman Holdings |
| | Lehman XS Trust, Series 2006-14N | 8/31/06 | SAS | Lehman Brothers Inc. | Lehman Holdings |
| | Lehman XS Trust, Series 2006-4N | 4/3/06 | SAS | Lehman Brothers Inc. | Lehman Holdings |
| | | | | | |
| 333-130545 3/28/06 | Merrill Lynch Mortgage Investors Trust, Series 2006-HE4 | 7/26/06 | MLMI | MLPFS | MLML |
| | Merrill Lynch Mortgage Investors Trust, Series 2006-OPT1 | 9/26/06 | MLMI | MLPFS | MLML |
| | Merrill Lynch Mortgage Investors Trust, Series 2006-HE5 | 9/28/06 | MLMI | MLPFS | MLML |

| Amended Registration Statement File No. and Date | Issuing Trust | Prospectus Supplement Date | Depositor | Underwriter(s) | Sponsor/ Seller |
|---|---|---|---|---|---|
| | Merrill Lynch Mortgage Investors Trust, Series 2006-RM5 | 10/27/06 | MLMI | MLPFS | MLML |
| | Merrill Lynch Mortgage Investors Trust, Series 2006-AF2 | 10/31/06 | MLMI | MLPFS | MLML |
| | Merrill Lynch Mortgage Investors Trust, Series 2006-HE6 | 12/27/06 | MLMI | MLPFS | MLML |
| | First Franklin Mortgage Loan Trust, Series 2007-FF1 | 1/25/07 | MLMI | MLPFS | MLML |
| | Merrill Lynch Alternative Note Asset Trust, Series 2007-A1 | 2/12/07 | MLMI | MLPFS | MLML |
| | | | | | |
| 333-129480 3/29/06 | Lehman XS Trust, Series 2006-10N | 7/5/06 | SAS | Lehman Brothers Inc. | Lehman Brothers Holdings Inc. |
| | | | | | |
| 333-130961 3/31/06 | First Franklin Mortgage Loan Trust, Series 2006-FF16 | 11/17/06 | FAS | Greenwich Capital Markets | Greenwich Capital Financial Products |
| | | | | | |

| Amended Registration Statement File No. and Date | Issuing Trust | Prospectus Supplement Date | Depositor | Underwriter(s) | Sponsor/ Seller |
|---|---|---|---|---|---|
| 333-133985 2/23/07 | First Franklin Mortgage Loan Trust, Series 2006-FF15 | 10/27/06 | SAS | Lehman Brothers Inc.; NatCity Investments, Inc. | Lehman Brothers Holdings Inc. |
| | First Franklin Mortgage Loan Trust, Series 2006-FFA | 10/31/06 | SAS | Lehman Brothers Inc. | Lehman Brothers Holdings Inc. |
| | Structured Asset Securities Corporation Mortgage Loan Trust, Series 2006-BC4 | 11/30/06 | SAS | Lehman Brothers Inc. | Lehman Brothers Holdings Inc. |
| | First Franklin Mortgage Loan Trust, Series 2006-FF17 | 11/27/06 | SAS | Lehman Brothers Inc. | Lehman Brothers Holdings Inc. |
| | First Franklin Mortgage Loan Trust, Series 2006-FFB | 12/1/06 | SAS | Lehman Brothers Inc. | Lehman Brothers Holdings Inc. |
| | Structured Asset Securities Corporation Mortgage Loan Trust, Series 2006-BC5 | 12/1/06 | SAS | Lehman Brothers Inc. | Lehman Brothers Holdings Inc. |
| | Lehman XS Trust, Series 2006-20 | 1/3/07 | SAS | Lehman Brothers Inc. | Lehman Brothers Holdings Inc. |

| Amended Registration Statement File No. and Date | Issuing Trust | Prospectus Supplement Date | Depositor | Underwriter(s) | Sponsor/ Seller |
|---|---|---|---|---|---|
| | Lehman XS Trust, Series 2007-4N | 4/2/07 | SAS | Lehman Brothers Inc. | Lehman Brothers Holdings Inc. |
| | Structured Asset Securities Corporation Mortgage Loan Trust, Series 2007-BC3 | 5/31/07 | SAS | Lehman Brothers Inc. | Lehman Brothers Holdings Inc. |
| | Structured Asset Securities Corporation Mortgage Loan Trust, Series 2007-OSI | 5/31/07 | SAS | Lehman Brothers Inc. | Lehman Brothers Holdings Inc. |
| | Lehman XS Trust, Series 2007-8H | 6/4/07 | SAS | Lehman Brothers Inc. | Lehman Brothers Holdings Inc. |
| | | | | | |
| 333-140436 3/7/07 | Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-1 | 3/27/07 | MLMI | MLPFS | MLML |
| | Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-2 | 4/27/07 | MLMI | MLPFS | FFFC |
| | Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-3 | 5/30/07 | MLMI | MLPFS | FFFC |

| Amended Registration Statement File No. and Date | Issuing Trust | Prospectus Supplement Date | Depositor | Underwriter(s) | Sponsor/ Seller |
|---|---|---|---|---|---|
| | Merrill Lynch Mortgage Investors Trust, Series 2007-HE3 | 6/8/07 | MLMI | MLPFS | MLML |
| | Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-4 | 6/26/07 | MLMI | MLPFS | FFFC |
| | | | | | |

## III.   IMPORTANT FACTORS IN THE DECISION OF INVESTORS SUCH AS ABP TO INVEST IN THE CERTIFICATES

65.    In purchasing the Certificates, Plaintiff, like other investors, attached critical importance to: (a) the underwriting standards used to originate the loans underlying the Certificates; (b) the appraisal methods used to value the properties securing the underlying mortgage loans; (c) the ratings assigned to the Certificates; (d) the ability of the Issuing Trusts to establish legal title to the underlying loans; and (e) the level of credit enhancement applicable to the Certificates.

66.    Sound underwriting was critically important to ABP because the ability of borrowers to repay principal and interest was the fundamental basis upon which the investments in the Certificates were valued.   Reflecting the importance of the underwriting standards, the Offering Documents contained representations concerning the standards purportedly used to originate the mortgages held by the Issuing Trusts.

67.    For example, the MLMI March 7, 2007 Registration Statement stated that:  "The mortgage loans to be included in the assets of the issuing entity will have been originated or

27

purchased by the Sellers and will have been originated substantially in accordance with the underwriting criteria for [ ] mortgage loans described herein under 'Underwriting Guidelines'."

68.     Similarly, the Offering Documents indicated that the underwriting guidelines were primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan.  The Offering Documents represented that exceptions to the underwriting guidelines were made on a case-by-case basis, and only when compensating factors such as substantial liquid assets, good credit history, or stable employment were present.  The Offering Documents also represented that quality control reviews were conducted to ensure that all mortgage loans to be held by the Issuing Trusts met quality standards.

69.     With respect to loans acquired from third-party originators, the Prospectus Supplements represented that stated underwriting guidelines required them to consider, among other things, the mortgagor's credit history, repayment ability, and debt-to-income ratio, as well as the type and use of the mortgaged property.  In addition, the Prospectus Supplements represented that in order to submit loan packages, the loans must have been made in compliance with the terms of a signed mortgage loan purchase agreement.

70.     Independent and accurate real estate appraisals were also critically important to investors such as ABP because they ensured that the mortgage loans underlying the Certificates were not under-collateralized, thereby protecting RMBS investors in the event a borrower defaulted on a loan.  As such, by allowing RMBS investors to assess the degree to which a mortgage loan was adequately collateralized, accurate appraisals provided investors such as ABP with a basis for assessing the price and risk of the Certificates.

71.     One measure that uses the appraisal value to assess whether mortgage loans are under-collateralized is the loan-to-value ("LTV") ratio.   The LTV ratio is a mathematical calculation that expresses the amount of a mortgage as a percentage of the total value of the property, as obtained from the appraisal.   For example, if a borrower seeks to borrow $900,000 to purchase a house worth $1,000,000, the LTV ratio is $900,000/$1,000,000, or 90%.   If, however, the appraised value of the house is artificially increased to $1,200,000, the LTV ratio drops to just 75% ($900,000/$1,200,000).

72.     From a lender's perspective, the higher the LTV ratio, the riskier the loan, because it indicates the borrower has a lower equity stake, and a borrower with a lower equity position has less to lose if s/he defaults on the loan.   Worse, particularly in an era of falling housing prices, a high LTV ratio creates the heightened risk that, should the borrower default, the amount of the outstanding loan may ***exceed*** the value of the property.   The Offering Documents represented that none of the underlying loans had LTV values in excess of 100%.   However, LTV ratios are only as accurate as the appraisal data used to calculate them.

73.     Real estate appraisals are governed by USPAP, which are the generally accepted standards for professional appraisal practice in North America promulgated by the Appraisal Standards Board of the Appraisal Foundation, as authorized by Congress.   With respect to real estate appraisals, USPAP requires the following:

> ***An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests.   In appraisal practice, an appraiser must not perform as an advocate for any party or issue.   An appraiser must not accept an assignment that includes the reporting of predetermined opinions and conclusions.***

> \* \* \* \* \*

> *It is unethical for an appraiser to accept an assignment, or to have a compensation arrangement for an assignment, that is contingent on any of the following:*
>
> 1.   *the reporting of a predetermined result (e.g., opinion of value);*
>
> 2.   *a direction in assignment results that favors the cause of the client;*
>
> 3.   *the amount of a value opinion;*
>
> 4.   *the attainment of a stipulated result; or*
>
> 5.   *the occurrence of a subsequent event directly related to the appraiser's opinions and specific to the assignment's purpose.*

74.   Reflecting the importance of independent and accurate real estate appraisals to investors such as ABP, the Offering Documents contained extensive disclosures concerning the value of the collateral underlying the mortgages pooled in the Issuing Trusts, and the appraisal methods by which such values were obtained.

75.   For example, the Offering Documents represented that the properties securing the mortgages were to be appraised by qualified, independent appraisers in conformity with USPAP. The Offering Documents represented that each appraisal was required to satisfy applicable government regulations and be on forms acceptable to Fannie Mae and Freddie Mac.

76.   In addition, the Offering Documents represented that the appraisal procedure guidelines used by the loan originators required an appraisal report that included market data analysis based on recent sales of comparable homes in the area.  If appropriate, the guidelines required a review appraisal, consisting of an enhanced desk, field review, or automated valuation report confirming or supporting the original appraisal value of the mortgaged property.

77.   Owner-occupancy rates are also important to investors such as ABP.  Mortgages on properties that are owner-occupied are considerably less likely to default than mortgages on

investment properties.  The Offering Documents contained statistics purporting to provide data on the owner-occupancy rates of the mortgage loans underlying the Certificates.

78.    The rating assigned to each of the Certificates was another important factor in ABP's decision to purchase the Certificates.  ABP and other investors relied on the ratings as an indicator of the safety and likelihood of default of the mortgage loans underlying a particular Certificate.  Consistent with its conservative corporate investment guidelines, ABP purchased the Certificates because they all were rated AAA or were otherwise investment grade.

79.    In purchasing the Certificates, ABP relied on the ability of each of the Issuing Trusts to show that it in fact had legal title to the underlying mortgage loans.  ABP would never have purchased any of the Certificates if there was any doubt as to whether the Issuing Trusts had legal title to any of the mortgage loans pooled for each offering.

80.    Finally, the Prospectus Supplements represented the level of credit enhancement, or loss protection, associated with the Certificates.  Credit enhancements impact the overall credit rating that a Certificate receives. The amount of credit enhancements built into the Certificates was overstated, which exposed Plaintiff ABP to additional losses.  These levels of credit enhancement were material to ABP.

**IV.    DEFENDANTS KNEW THAT A LARGE PERCENTAGE OF THE MORTGAGE LOANS UNDERLYING PLAINTIFF'S CERTIFICATES WERE MADE AS A RESULT OF THE SYSTEMATIC ABANDONMENT OF PRUDENT UNDERWRITING GUIDELINES AND APPRAISAL STANDARDS**

81.    Prior to underwriting and selling the Certificates to investors like ABP, Defendants had identified but failed to disclose the widespread underwriting and appraisal deficiencies by the mortgage originators described below.  This was in direct contrast to the representations in the Offering Documents  accompanying the Certificates sold to ABP.

82.     As has now come to light, contrary to the representations in the Offering Documents, Defendants First Franklin, MLN, Ownit, Lehman Bank and the third-party originators that originated the mortgages underlying the Certificates knowingly departed from the underwriting standards that were represented in the Offering Documents.

83.     In the early 2000s, an unprecedented boom in the housing market began to unfold. Between 1994 and 2004, the housing market experienced a dramatic rise in home ownership, as 12 million more Americans became homeowners.   Likewise, the subprime market grew dramatically, enabling more and more borrowers to obtain credit who traditionally would have been unable to access it.   According to INSIDE MORTGAGE FINANCE, from 1994 to 2006, subprime lending increased from an estimated $35 billion, or 4.5% of all one-to-four family mortgage originations, to $600 billion, or 20% of originations.

84.     To ride this housing boom, Wall Street financial firms aggressively pushed into the complex, high margin business of securitization, *i.e.*, packaging mortgages and selling them to investors as RMBS.  This aggressive push created a boom for the mortgage lending industry. Mortgage originators generated profits primarily through the sale of their loans to investment banks like Merrill Lynch, Lehman and Greenwich, and the originators were therefore driven to originate and sell as many loans as possible.   Increased demand for mortgages by banks like Merrill Lynch, Lehman and Greenwich led to increased volume in mortgage originations.   That increased volume, in turn, led to a decrease in the gain-on-sale margins that mortgage originators received from selling pools of loans.   As a result, originators began to borrow money from the same large banks that were buying their mortgages in order to fund the origination of even more mortgages.   By buying and packaging mortgages, Wall Street enabled the lenders to extend credit even as the dangers grew in the housing market.   Indeed, according to the FBI, a fraud

analytics company analyzed more than 3 million loans and found that between 30 and 70 percent of early payment defaults were linked to significant misrepresentations in the original loan applications.

85.     With respect to this action, the three players that structured the Certificates purchased by ABP were Merrill Lynch, Greenwich Capital, Lehman Brothers, and their affiliated entities.   Each of these players embarked on a scheme to profit from the housing boom by acquiring or partnering with subprime lenders, such as the originators described in paragraphs 104-125, 135-153 below, and then directing or encouraging these lenders to originate and purchase large numbers of mortgage loans, regardless of the borrower's ability to pay, so that the loans could then be quickly pooled, packaged as RMBS and flipped at a profit on to an unsuspecting secondary market (that is, RMBS investors such as Plaintiff).

86.     Defendants reaped massive profits from its activities in the RMBS space during the U.S. housing boom.   At nearly every stage in the mortgage securitization process, Defendants garnered enormous profits—pocketing the difference between what it paid for a pool of mortgage loans and what it received from selling those loans into a securitization; from collecting underwriting fees and commissions from selling the RMBS it had securitized to investors; to earning interest and fees from the warehouse lending arrangements it established with subprime originators to facilitate the issuance of the loans underlying those securities.

87.     Defendants had direct insight into the true quality of the loans underlying the Certificates they issued to Plaintiff ABP.   This is evidenced by Defendants' extensive financial relationships with the third party originators through warehouse lending arrangements, as well as by the origination of equally defective loans through their own mortgage origination units, Defendant First Franklin, and non-defendants MLN, Ownit, and Lehman Bank.

88.     Instead of disclosing the true nature of these loans to investors like Plaintiff ABP, however, Defendants routinely placed defective loans into securitizations to be sold to investors in a frantic attempt to eliminate loans from its own balance sheet that Defendants knew would decline in value.

89.     Merrill Lynch obtained a significant portion of the residential mortgages that it securitized by purchasing billons of dollars worth of these loans from originators such as MLN. Merrill Lynch advanced warehouse lines of credit to MLN to assist in funding mortgage loans. MLN originated of some of the mortgage loans underlying the RMBS purchased by Plaintiff ABP.

90.     However, merely financing these third-party mortgage originators was not sufficient for Merrill Lynch to keep pace with its competition, such as Lehman Brothers and Countrywide Financial Corp., in the expanding industry of rapid origination, securitization and sale of securities backed by residential mortgage loans to investors.  As a result, Merrill Lynch entered the origination business itself by investing $100 million in California based subprime originator Ownit Mortgage Solutions ("Ownit") in exchange for a 20% ownership stake in the company.

91.     To further ensure the process of rapid origination of subprime mortgages for securitization, on December 30, 2006, Merrill Lynch acquired Defendant First Franklin, a mortgage origination unit owned by National City Corporation.  By acquiring its own mortgage loan origination unit, Merrill Lynch now had completely vertically integrated its RMBS operations by having affiliated entities at every stage of the process.

92.     Lehman Brothers engaged in a similar course of vertical integration, using its subsidiary Lehman Bank to originate mortgage loans *en masse* expressly for its securitizations.

As these loans were ultimately intended to be passed off onto investors such as ABP, Lehman Brothers did not originate these loans to the same standards that it would have had it intended to hold them to maturity.  It was aware that other originators in the mortgage market, including the third party Originators that it purchased loans from, did likewise.  Lehman Brothers controlled every step of the securitization process, from the origination of loans through their pooling, securitization and eventual resale to investors such as ABP, and thus knew of the low quality of the underlying mortgages.

93.    With respect to the Underwriter Defendants, as part of their due diligence they obtained reports regarding the quality and legality of the loans that the Originators supplied. These reports disclosed that many of the loans were seriously flawed for reasons such as lack of documentation, unrealistic borrower incomes and failure to meet underwriting standards.  The Underwriter Defendants ignored these red flags and their own stated underwriting guidelines, waiving problems that should have led them to reject many of the loans.

94.    Investors such as ABP would not have purchased RMBS such as the Certificates had they known that the Originators were operating completely untethered by any reasonable guidelines or standards and that the quality of the loans in the pool was so poor.  *See* Section IV, *supra*.  Defendants knowingly misled investors to keep their lucrative securitization business going by, among other things, representing in the Offering Documents that the loans underlying the Certificates had been made generally in accordance with stated underwriting guidelines, that exceptions to the underwriting guidelines had been made only to those borrowers who could demonstrate a compelling reason for doing so, that the mortgaged properties had been fairly appraised in accordance with USPAP, and that the Originators had verified the incomes and

assets of the borrowers.  Defendants further misrepresented the quality of the Certificates by passing along the false LTV data they had received from Originators.

95.     On May 26, 2011, the Financial Industry Regulatory Authority ("FINRA") announced that it had fined Defendant Merrill Lynch $3 million for misrepresenting delinquency data and inadequate supervision in connection with the issuance of RMBS.  FINRA found that Merrill Lynch negligently misrepresented the historical delinquency rates for 61 subprime RMBS it underwrote and sold.  Delinquency rates constitute material information for RMBS investments because that data affects the investors' ability to evaluate the fair market value, the yields on the certificates and the anticipated holding periods of each of these securitizations. Investors may consider this information in assessing the profitability of these securitizations and in determining whether future returns would be disrupted by mortgage holders who fail to make loan payments.

96.     According to FINRA, Merrill Lynch also failed to establish a reasonable system to supervise and review its reporting of historical delinquency information.  FINRA concluded that the delinquencies were significant enough to affect an investor's assessment of subsequent securitizations.

97.     In originating or acquiring the loans, the Originators, including Merrill Lynch affiliates, intentionally ignored other crucial requirements, including the borrowers' actual repayment ability. They also ignored the fact that the mortgages underlying the Certificates had been extended based on collateral appraisals that were not performed in accordance with USPAP as a result of Merrill Lynch's demands that as many loans as possible be originated so they could be packaged and sold to investors like ABP.

### A.    DEFENDANT MERRILL LYNCH ABANDONED ITS UNDERWRITING GUIDELINES AND APPRAISAL STANDARDS

98.    In 2002, Stanley O'Neal ("O'Neal") was named CEO of Merrill Lynch. Immediately, O'Neal sought to increase Merrill Lynch's participation in asset-backed securities products such as RMBS and collateralized debt obligation ("CDO") instruments.  (CDOs are simply securities that are collateralized against other asset-backed securities, such as RMBS.  In this manner, CDOs represent a form of securitization upon securitization.)  Such CDO deals were immensely attractive because, by assembling and selling these CDO securities, Merrill Lynch reaped hundreds of millions of dollars in fees.

99.    According to a November 9, 2008 NEW YORK TIMES article, entitled *The Reckoning – How the Thundering Herd Faltered and Fell*, by 2005, Merrill was in a "full-on race to become the biggest mortgage player on Wall Street."  In the period leading up to 2006, Merrill Lynch transformed itself from a lower-ranked CDO arranger into the so-called "Wal-Mart" of CDOs.  From 2002 to 2006, Merrill Lynch increased its CDO originations from $2.2 billion to $53.7 billion.  In fact, from 2005 through 2007, Merrill Lynch was Wall Street's biggest underwriter of CDO deals, underwriting 128 CDOs totaling $119.3 billion, more than any other firm, according to newsletter ASSET-BACKED ALERT.

100.    Many of these CDO deals were backed by RMBS.  For example, Merrill Lynch originated over $44 billion of RMBS CDOs in 2006 alone, a prodigious output resulting in at least $700 million in fee income.  In order to keep the CDO deal machine alive, Merrill Lynch therefore depended on a steady stream of RMBS and, in turn, mortgage loans.  To ensure a consistent supply, Merrill Lynch strove to create a vertically integrated securitization business by acquiring, investing in or financing companies that originated mortgage loans, including First Franklin, MLN, and Ownit.  Merrill Lynch instructed and/or exerted pressure on the Originators

that it controlled or did business with to increase mortgage origination quantity by whatever means necessary.  The result was that loan origination exploded, but in high-risk, low-quality loans.  As the NEW YORK TIMES reported, higher-yield, subprime mortgage loans came to account for nearly two-thirds of all mortgages underlying Merrill Lynch's CDO products.

101.    To operate its CDO business, Merrill Lynch had to warehouse billions of dollars of RMBS until they could be repackaged and sold.  By September 2006, Merrill Lynch had an inventory of approximately $18 billion in RMBS, along with another $14 billion in unsecuritized subprime loans.  However, Merrill Lynch was aware that these were unstable, overvalued assets, and took precautions to protect itself against their inevitable decline in value.  Through two related strategies known as "de-risking" and "mitigation," Merrill Lynch sought to shift these losses to other parties.

102.    First, Merrill Lynch churned out new CDOs at a rapid pace so as to avoid having to record losses on its RMBS portfolio.  Many of the CDOs arranged by Merrill Lynch were in fact collateralized by other Merrill Lynch CDOs, resulting in so-called "CDO squared" and "CDO cubed" structures.  These complex deal structures helped disguise the risky nature of the underlying mortgage-backed collateral that Merrill Lynch was seeking to dispose of.

103.    With respect to the Merrill Trusts, the mortgage loans were originated by Defendant First Franklin, an affiliate of Merrill Lynch, and various other Originators.  Due to ownership interests or lending arrangements, Merrill Lynch had direct awareness of and influence over the lending practices of the Originators First Franklin, MLN and Ownit.  Furthermore, Merrill Lynch was either aware that each of the third-party Originators described in Section IV.D., *infra*, had abandoned their underwriting guidelines, or pressured them to abandon their underwriting guidelines so as to obtain more loans for securitization.

### 1.    First Franklin Financial Corporation

104.    First Franklin was a leading player in the subprime and non-traditional loan markets.  Originally a subsidiary of National City Corporation ("National City"), it was acquired by Merrill Lynch for $1.3 billion.  First Franklin went on to become one of Merrill Lynch's primary sources of loan origination and a major component of its securitization business.  In Merrill Lynch's 10-K Annual Statement for the period ending December 29, 2006, filed on February 26, 2007, Merrill Lynch stated that, "[O]n September 5, 2006, we announced an agreement to acquire the First Franklin mortgage origination franchise and related servicing platform from National City Corporation.  We expect First Franklin to accelerate our vertical integration in mortgages, adding scale to our mortgage securitization platform."  First Franklin's financial results were reported as a part of Merrill Lynch's Global Markets and Investment Banking ("GMI") segment.  In Merrill Lynch's 10-K Annual Statement for the period ending December 28, 2007, filed on February 25, 2008, Merrill Lynch described First Franklin's operations as having been "integrated into GMI's mortgage securitization business."

105.    From the very beginning of their relationship, Merrill Lynch was aware that First Franklin's lending standards or lack thereof would have an impact on its own overall mortgage portfolio.  In Merrill Lynch's 10-K Annual Statement for the period ending December 29, 2006, filed on February 26, 2007, Merrill Lynch noted that, "As a result of [the First Franklin] acquisition which was completed in the fiscal first quarter of 2007, the credit profile of our mortgage lending portfolio may be impacted in future periods."

106.    As Merrill Lynch had planned, First Franklin originated an extraordinarily heavy volume of mortgage loans for its mortgage securitization platform.  In Merrill Lynch's 10-K Annual Statement for the period ending December 28, 2007, filed on February 25, 2008, Merrill

Lynch disclosed that First Franklin had sold approximately $40 billion of outstanding loans through various asset sales and securitization transactions over the past 36 months.

107.    A witness interviewed by American International Group ("AIG") in connection with a separate lawsuit, who worked at First Franklin as an underwriter between 2005 and 2007, said that First Franklin required its underwriters to depart from the stated guidelines and that some of First Franklin's lending practices were "basically criminal."  *American International Group v. Banc of America Corporation, et al.,* No. 652199/2011 (N.Y. Sup. Ct. filed Aug. 8, 2011).  She said that her managers would call appraisers directly if they did not provide the desired home values and request re-appraisals until a satisfactory value was returned.  When the witness spoke out about this conduct, she was fired in retaliation.

108.    Another First Franklin underwriter quoted in the AIG complaint said that her branch manager frequently overrode her decisions not to fund loans because First Franklin only audited about 5% of its closed loans.   Accordingly, borrowers were permitted to claim implausible income levels without verification.  This employee also said that First Franklin management instructed appraisers to change their appraisals and omit problematic details, and would hire only certain appraisers whom they knew would cooperate.

109.    Another First Franklin underwriter quoted in the AIG complaint noted First Franklin's compensation structure "created an incentive" to close risky loans and ignore underwriting guidelines, because bonuses were based only on the number of loans that were actually funded and closed.  As a result of this policy, some First Franklin underwriters "would approve anything."

110.    According to a March 23, 2007 NEW YORK TIMES article entitled *The Subprime Loan Machine; Automated Underwriting Software Helped Fuel A Mortgage Boom*, First

Franklin lowered its lending standards and applied lax controls in its underwriting practice by customizing underwriting software in order to approve the wrong borrowers.  The article stated in part that "the push for speed influenced some lenders to take shortcuts, ignore warning signs or focus entirely on credit scores," and that the software quickly weeded out only the riskiest applicants while automatically approving the rest.  According to Professor Nicolas Retsinas, the director of the Harvard Joint Center for Housing Studies, "Automated underwriting put the credit score on such a pedestal that it obscured the other important things, like is the income actually there."

111.    As a result of this wholesale departure from its own underwriting guidelines and appraisal standards, First Franklin eventually collapsed, leading to regulatory investigations as well as the filing of civil lawsuits. In Merrill Lynch's 10-K Annual Statement for the period ending December 28, 2007, filed on February 25, 2008, Merrill Lynch disclosed that it had recognized a liability of approximately $520 million relating to its obligations to repurchase defective First Franklin loans.  Merrill Lynch implicitly acknowledged in this filing that First Franklin had engaged in unsound lending, stating that,

> In connection with the acquisition of First Franklin on December 30, 2006, Merrill Lynch acquired sub-prime mortgage loans and originated a significant volume of sub-prime mortgage loans during the first half of 2007.  As the year developed, delinquencies and defaults in the sub-prime mortgage loan market increased significantly leading to tighter underwriting criteria for new mortgages.  As a result, First Franklin substantially reduced its sub-prime lending activities and currently is only making loans that are underwritten to prime underwriting criteria.

112.    On May 5, 2008, Merrill Lynch announced that it would stop funding loans at First Franklin and explore selling the company.  A few months later, in an August 11, 2008 article entitled *National City Says Faces SEC Probe*, REUTERS reported that the SEC had

launched an investigation of National City regarding its loan underwriting when First Franklin was wholly owned by National City, as well as the sale of First Franklin to Merrill Lynch.

113.    On December 23, 2008, a class action lawsuit was filed in the United States District Court for the Northern District of Ohio alleging violations of federal securities laws by National City in connection with the underwriting practices employed by National City and First Franklin.  The complaint filed in the action identified specific deviations from First Franklin's stated underwriting guidelines.  For example, with respect to National City's residential real estate loans, the company represented that those loans were "'prime' quality 'conforming' loans 'made to borrowers in good credit standing'."  But instead, as the complaint alleges, "the Company did not consider borrower creditworthiness in originating loans and, in fact, a substantial portion of National City's residential loans were provided to subprime borrowers … [T]he Company did not adhere to its strict underwriting and loan-origination policies … [A] material portion of the Company's loans were issued with little, if any, supporting documentation… ."  On November 30, 2010, the court approved a settlement of $22.5 million.

### 2.    Mortgage Lenders Network USA, Inc.

114.    Founded in 1996, MLN was a closely-held company that specialized in providing mortgages and home equity financing to borrowers with low income and impaired credit. According to NATIONAL MORTGAGE NEWS, MLN was the 15th largest issuer of subprime mortgages, originating $3.3 billion in subprime loans in the third quarter of 2006 alone.

115.    MLN relied heavily on warehouse lines of credit provided by other financial institutions in order to conduct its business. In fact, Merrill Lynch Bank USA and Merrill Lynch Mortgage Capital, Inc. (both wholly-owned subsidiaries of Merrill Lynch) were among MLN's four largest warehouse lenders, providing MLN with substantial lines of credit to originate subprime loans that would eventually be sold back to Merrill Lynch for collateralization into

RMBS.  As a result, Merrill Lynch was particularly aware of MLN's poor financial condition and substandard lending practices.

116.    MLN was another subprime player that benefited immensely from employing lax underwriting practices in order to ramp up loan originations. The company offered low- and no-documentation loans to borrowers, originated loans without regard to the borrowers' ability to repay the loans, and shopped for appraisals that supported the numbers that MLN needed in order to get loans approved. However, when the subprime market began to collapse, MLN experienced significant financial hardships which eventually led to the company's demise. On January 2, 2007, MLN announced that it had stopped funding loans and would not be accepting any new loan applications. In February 2007, MLN filed for Chapter 11 bankruptcy.

117.    Because many of MLN's loans defaulted, Merrill Lynch was contractually able to "put" a significant number of the bad loans back to MLN for repurchase. These "put backs" played a huge role in MLN's eventual collapse, making Merrill Lynch one of MLN's largest creditors after the bankruptcy with roughly $81.3 million in outstanding debt.

118.    MLN was also targeted by state regulatory agencies as a result of its subpar lending practices. On January 19, 2007, the Connecticut Department of Banking ("DOB") issued a Temporary Order to Cease and Desist and Notice of Intent to Impose Civil Penalty to MLN as a result of various violations of Connecticut statutes, such as failing to timely disperse loan proceeds, failing to provide complete and accurate loan portfolio information, and failing to show compliance with mortgage lending license requirements. The DOB ordered MLN to suspend all lending activities and threatened to fine the company with up to $7.6 million in civil penalties for its violations. State regulators from Massachusetts, Rhode Island, Michigan, Maine,

Vermont, New Hampshire, New York and Pennsylvania have all charged MLN with similar violations.

119.    Consumer lawsuits also followed, many alleging violations of the Truth in Lending Act ("TILA") as a result of MLN's dismal underwriting practices. On May 12, 2009, a lawsuit was filed against MLN in the Superior Court of Georgia, Gwinnett County, claiming that MLN intentionally relaxed its underwriting standards and sold risky loan products to borrowers in order to increase its loan origination volume. Specifically, the complaint alleged that employees were encouraged to steer borrowers into larger mortgages than they could afford in order to maximize MLN's profits. Plaintiffs also stated that MLN took no meaningful steps to determine whether borrowers could actually afford to repay the loans and used fraudulently inflated appraisals in order to get larger loans approved.

120.    A similar action was filed in July 2010 against MLN in the U.S. District Court for the Northern District of Georgia, alleging that MLN departed from sound underwriting practices by ignoring borrowers' ability to repay the loans and by failing to verify borrowers' income, employment and assets. The plaintiffs were saddled with a loan that they could not afford and ultimately defaulted. As a result, the plaintiffs filed for bankruptcy and the action was later terminated.

### 3.    Ownit Mortgage Solutions, Inc.

121.    In 2005, Merrill Lynch purchased a 20% share in Ownit, one of its primary loan originators.  According to Ownit founder and CEO William Dallas ("Dallas"), Merrill Lynch proceeded to use its ownership stake and its $3.5 billion credit line to Ownit as leverage, instructing Ownit to lower its underwriting standards and to originate more higher-yield, riskier loans.  Dallas said, "[Merrill Lynch] never told us to make bad loans.  They would say, 'You

need to increase your coupon.' [make loans with higher yields] The only way to do that was to make crappier loans."

122.   In an interview with THE NEW YORK TIMES, Dallas recalled being asked to make more no-income-verification loans. "The message, he said was simple: You are leaving money on the table – do more of them." Dallas said that while he personally disagreed with Merrill Lynch's strategy, "If I can sell it at a profit, why would I not do it?"

123.   According to Dallas, Ownit complied with Merrill Lynch's directive, originating $6 billion in loans from September 2005 to December 2006, including "crazy" 45-year adjustable rate mortgages and no-income-verifications loans. Dallas stated, "The market [was] paying me to do a no-income-verification loan more than it [was] paying me to do the full documentation loans."

124.   This intentional weakening of underwriting standards had an immediate and direct impact upon the performance of Ownit's loans. From December 2005 through May 2006, Ownit began to experience first payment defaults and "early payment defaults" (*i.e.*, defaults on any one of the first three mortgage repayments). According to Dallas, prior to Merrill Lynch's involvement with Ownit, it had never experienced such defaults.

125.   Ownit's relationship with Merrill Lynch began to deteriorate in 2006 as defaults on loans made by Ownit that year spiked and Merrill Lynch demanded that Ownit buy back loans that had experienced early payment default. In December 2006, Merrill Lynch and Ownit's other backers decided against continuing to finance the troubled company. Ownit filed for Chapter 11 bankruptcy protection under the U.S. Bankruptcy Code in December 2006.

B.   DEFENDANT GREENWICH CAPITAL ABANDONED ITS UNDERWRITING
GUIDELINES AND APPRAISAL STANDARDS

126.   Greenwich Capital structured other Certificates purchased by ABP.   The
Greenwich Capital story echoes that of Merrill Lynch.   By the end of 2005, Greenwich Capital
had become one of the largest RMBS underwriters. According to INSIDE MORTGAGE FINANCE, in
2005 alone, Greenwich Capital underwrote $120.32 billion of RMBS.

127.   On September 2, 2011, the Federal Housing Finance Agency ("FHFA"), acting as
conservator for Fannie Mae and Freddie Mac, sued Greenwich Capital in the United States
District Court for the District of Connecticut, alleging, as Plaintiff does, that the offering
documents "falsely represented that the underlying mortgage loans complied with certain
underwriting guidelines and standards, including representations that significantly overstated the
ability of the borrowers to repay their mortgage loans."  One of the RMBS that was a subject of
the FHFA lawsuit was also purchased by Plaintiff, namely, First Franklin Mortgage Loan Trust,
Series 2006-FF16.

128.   For each of the 68 Greenwich Capital RMBS named in its lawsuit, the FHFA
reviewed either a random sample of 1,000 of the underlying loans, or all of the underlying loans
if there were fewer than 1,000 in the pool.  This review confirmed, on a statistically significant
basis, that Greenwich Capital's representations regarding owner-occupancy rates, LTV ratios,
and underwriting standards had all been materially false in each of the Prospectus examined.

129.   In the case of the Greenwich Capital Trust, the underlying mortgage loans were
also originated by First Franklin and then acquired by Defendant GCFP, acting as sponsor, for
deposit into the Greenwich Capital Trust.  As further alleged above, First Franklin systematically
disregarded its loan underwriting guidelines.  As a consequence, the description of the mortgage

46

loan underwriting guidelines in the Offering Documents for the Greenwich Capital Trust contained misstatements and omissions of material fact.

### C. LEHMAN BROTHERS ABANDONED ITS UNDERWRITING GUIDELINES AND APPRAISAL STANDARDS

130.   Another big player in the rush to originate and securitize mortgages was Lehman Brothers, which engaged in an "assembly line" conversion of hundreds of thousands of primarily subprime and Alt-A residential mortgages into $93.24 billion of purportedly "investment grade" RMBS, which were then sold to investors such as ABP.   According to INSIDE MORTGAGE FINANCE, by the end of 2005 Lehman was the second-largest issuer of non-agency mortgage-backed securities and the second-largest non-agency underwriter of mortgage-backed securities. At its peak, Lehman Brothers completed a total of 94 offerings in a period of 21 months – averaging five $1 billion offerings per month and typically completing each securitization and underwriting within 21 days from the date of purchase by Lehman of the mortgage loans from the originators.

131.   In its drive to increase the volume of securitization deals, Lehman Brothers, like Merrill Lynch, set aside prudent underwriting standards.  Indeed, according to another complaint regarding Lehman Brothers RMBS, the motto among Lehman Brothers' residential mortgage-backed securities origination sales group became "there are no bad loans only badly priced loans" – meaning loans found not to comply with underwriting guidelines were generally not rejected, but simply negotiated to be purchased more cheaply.  Lehman Brothers' due diligence was also limited, inadequate and defective.

132.   In the case of the Lehman Trusts, the underlying mortgage loans were originated by both Lehman affiliated entities, as well as by third party originators and then acquired by Lehman Brothers, acting as sponsor, for deposit into the Lehman Trusts.  As further alleged

below, the originators of the loans securitized by Lehman systematically disregarded their underwriting guidelines. Consequently, the description of the mortgage loan underwriting guidelines in the Offering Documents for the Lehman Trusts contained misstatements and omissions of material fact.

133.    Like Merrill Lynch, Lehman Brothers was a vertically integrated business with involvement in each stage of the securitization process. Lehman Brothers considered its subsidiary lender, Lehman Brothers Bank, FSB ("Lehman Bank") to be an integrated component of a single enterprise. As Lehman Brothers stated in its 10-K Annual Report for the period ending November 30, 2006, filed on February 13, 2007:

> We originate commercial and residential mortgage loans through
> [Lehman Bank], Bankhaus and other subsidiaries in the U.S.,
> Europe and Asia. We are a leading underwriter of and market-
> maker in residential and commercial mortgage and asset-backed
> securities and are active in all areas of secured lending, structured
> finance and securitized products. We underwrite and make
> markets in the full range of U.S. agency-backed mortgage
> products, mortgage-backed securities, asset-backed securities and
> whole loan products. We are also a leader in the global market for
> residential and commercial mortgages[.]

134.    As described below, Lehman Brothers had control over its subsidiary Lehman Bank, and instructed it to abandon its underwriting standards so as to generate more loans for securitization. Furthermore, because of its intimate understanding of the real estate and securitization markets and its constant need for loans, Lehman Brothers was either aware that each of the third-party Originators described in Section IV.D., *infra*, had abandoned their underwriting guidelines, or pressured them to abandon their underwriting guidelines.

### 1.    Lehman Brothers Bank

135.    In 1999 Lehman Brothers acquired Delaware Savings Bank FSB and renamed it Lehman Brothers Bank. While Lehman Brothers Bank maintained an unprofitable retail branch

in Wilmington, Delaware, it was Lehman Brothers Bank's mortgage business that was a profitable business.

136.    Lehman Brothers also purchased Aurora Loan Services LLC ("Aurora"), a residential loan originator and servicer of predominately "Alt-A mortgage products."  Alt-A mortgages were more profitable than standard mortgages, but were riskier than standard mortgages.  Because Aurora was owned by Lehman, Lehman and its officers were aware of the standards for origination of loans by Aurora.  Lehman purchased originators as part of an overall strategy to guarantee a stream of mortgage originations that could be bundled and resold to investors.  As Lehman stated in a Form 10-Q Quarterly Report filed on July 15, 2003, its acquisition of Aurora "add[ed] long-term value to [Lehman's] mortgage franchise by allowing further integration of the business platform.  The mortgage loans originated by [Aurora] are expected to provide a source of loan product for our securitization pipeline."

137.    In all, between 1998 and 2004, Lehman Brothers purchased six domestic lenders – Aurora, BNC Mortgage LLC, Delaware Savings Bank FSB, Financial Freedom Senior Funding Corp., SIB Mortgage Corporation, and Woodlands Commercial Bank.  These subsidiaries provided Lehman with almost all of the loans they originated.

138.    Lehman's vertically integrated business model was based on moving loans from affiliated lenders or third-party originators, through its sponsor, depositor, and underwriter entities, and reselling them to investors such as ABP as rapidly as possible.  Lehman had a "flow" agreement with its affiliates whereby it purchased loans as the affiliates originated them, with a purchase price set primarily by Lehman.  Such "flow" purchases were, unsurprisingly, a much better deal for Lehman than open market auctions.  Once the loans were acquired, Lehman recorded them in "trading ledgers," and assigned senior traders to oversee their securitization.

These traders were required to securitize all of the loans in their ledgers on a monthly basis, such that the entire process was completed in less than a month.

139.     This model left almost no time for Lehman to ensure that the loans were underwritten in accordance with the stated guidelines.   However, Lehman Brothers was indifferent to the risks that its lax standards for loan origination and underwriting entailed because it generated its fees at each stage of the process – origination, underwriting, bundling, and selling the RMBS, and any risk would be borne by investors.

140.     According to its 2007 Form 10-K, Lehman Brothers originated approximately $60 billion in residential mortgages during 2006 and $47 billion during 2007.   Given the massive scale of Lehman Brothers' origination operations, its executives would have been fully aware of the subsidiaries' lending standards.   Indeed, Richard Fuld, former Chairman of Lehman Brothers, stated that Lehman Brothers had an active role in setting the underwriting standards of its subsidiary originators.   In testimony to the House Oversight Committee on October 7, 2008, Fuld stated: "We realized the way to handle [Aurora and BNC] was to buy them.   If our name was going to be associated with them, buy them, change the management and change the underwriting standards."

141.     Nevertheless, origination of mortgages substantially riskier than RMBS investors were led to believe was commonplace throughout the industry, including at Lehman Brothers' own subsidiaries.   According to the FCIC Report, in October 2004, a lawyer working on foreclosure cases warned the Federal Reserve that Lehman Bank was repeatedly making loans with false appraisals and false income statements, to the point where she believed that the very survival of the firm was put in question.

142.    According to an internal presentation by Lehman Brothers' then-chief risk officer Madelyn Antoncic, dated August 17, 2007, Lehman Brothers maintained "tight oversight" over its subprime portfolio, including a dedicated risk manager for its residential origination activities, a monthly risk review process, extensive risk reporting tools, stress testing on a weekly and monthly basis, and monitoring of early payment defaults and exposure to representations and warranties fraud.  Thus, Lehman Brothers had multiple tools and processes that alerted it to the low quality of its mortgage portfolio.

143.    According to a December 22, 2008 article in THE GLOBE AND MAIL, in spring 2006, a group of Lehman auditors performed an internal analysis of a pool of Aurora loans, and discovered that up to half of them contained material misrepresentations.  An Aurora manager involved in the review yelled at the lead auditor, "You people find too much fraud," and stormed out.  In a March 17, 2007, internal email, a Lehman Brothers employee wrote: "Aurora's product is far from Alt–A anymore. The traditional Alt–A program is only 40% of Aurora's production ... the rest 60% of production has 100% [ ] financing in lower FICOs with non-full documentation, and/or investment properties."   In other words, these mortgages were closer to subprime standards than to Alt-A standards.

144.    Although Lehman Brothers was aware of the lax lending standards of its own originating subsidiaries and of mortgage originators in general, Lehman was indifferent to the undisclosed risk that the loans underlying its RMBS carried because it knew these risks (and the associated losses that these risks entailed) were to be pawned off on unsuspecting RMBS lenders, including Plaintiff.  Indeed, Lehman's then-chief financial officer Erin Callan explained Lehman Brothers's philosophy:

> It doesn't come from Goldman's model of taking a proprietary bet,
> or  Morgan  Stanley's  model,  or  even  Merrill's  model  of

> warehousing a significant amount of product. It just comes from a
> basic focus and philosophy that we really didn't want to go long
> the product or short the product. We wanted to originate to
> distribute and we hedged that origination capability.

145.    Lehman Brothers eventually found itself increasingly unable to sell a substantial amount of RMBS, and its large inventory of these and similarly overvalued assets helped to force Lehman Brothers into bankruptcy in September 2008.

### 2.    BNC Mortgage LLC

146.    In 2004, Lehman Brothers purchased Irvine, California-based BNC Mortgage LLC ("BNC"), a subprime home mortgage lender as part of the implementation of its vertically integrated structure whereby BNC originated subprime mortgage loans, and Lehman's Fixed Income Division securitized and sold the mortgages to investors. Lehman purchased BNC in order to dramatically increase its subprime loan origination capabilities and feed the demand for subprime mortgage securitizations, and described the lender as its "subprime origination platform." According to a one witness, former BNC employees have said that BNC sold approximately 75% of the loans it originated to Lehman.

147.    By 2006, BNC was among the top-20 subprime mortgage lenders, with 23 offices across the country. It originated over $14 billion worth of home loans in 2006 alone, according to an August 22, 2007, MARKETWATCH article, entitled *Lehman Shuts BNC Mortgage Unit, Cuts 1,200 Jobs.*

148.    In the first quarter of 2007, BNC originated $2 billion of mortgage loans, down 40% from first quarter 2006. In June of 2007, Lehman stated in a regulatory filing that it had an unrealized loss of $459 million in the first quarter of 2007 relating to mortgages and mortgage-backed securities. That same month, Lehman announced plans to merge BNC into Lehman's Aurora.

149.    According to an August 22, 2007, BLOOMBERG article entitled *Lehman Brothers Shuts Down Subprime Unit, Fires 1,200,* amid mounting losses and a rapid slowdown in the subprime mortgage market, Lehman decided to close BNC, becoming the first Wall Street firm to shutter its subprime mortgage lending unit.

150.    Similarly, a June 27, 2007, WALL STREET JOURNAL article entitled *How Wall Street Stoked the Mortgage Meltdown* reported that interviews of 25 former BNC employees revealed that the company regularly falsified tax forms, pay stubs, and other information in order to help a borrower secure a mortgage.

151.    In November 2008, the Office of the Comptroller of the Currency, part of the United States Department of the Treasury, issued a report identifying the ten mortgage originators with the highest rate of foreclosures in the ten U.S. metropolitan areas with the highest foreclosure rates, known as the "Worst Ten in the Worst Ten" report.  The report concluded that 21 companies, in various combinations, occupied the "worst ten slots in the worst ten metro areas."  BNC was named in this report as one of the "Worst Ten in the Worst Ten." By the first half of 2008, according to this report, 1,769 mortgages issued by BNC between 2005 to 2007 in the ten metropolitan areas with the highest foreclosure rates were already in foreclosure.

152.    According to a December 22, 2008, article in THE GLOBE AND MAIL entitled *Lehman's Rise and Fall*, BNC and other subprime mortgage lenders used low "teaser" rates, with no down payment required, to attract borrowers.  Although payments would rise, often by 40%, within two years, borrowers were counseled that they would easily be able to refinance or sell the property if they could not afford the higher payment.

153.    The March 11, 2010, report issued by Anton R. Valukas, Lehman's court-appointed bankruptcy examiner, highlighted risky mortgage lending practices employed by BNC.  In testimony before the House Committee on Financial Services, the bankruptcy examiner stated that the public was unaware that "Lehman's risk controls were being ignored."  One of BNC's most aggressive and most popular lending programs was known as "80/20."  Under this program, BNC extended two separate mortgage loans to a borrower in order to bring the borrower's LTV ratio to 100%, and based the loans only on the borrower's self-reported (*i.e.* unverified) income data.  The high LTV ratio of the loans meant that the borrower had no equity in the home, and when combined with lax documentation requirements, made these loans particularly risky.

> **D.    THE THIRD PARTY ORIGINATORS OF THE MORTGAGE LOANS UNDERLYING ABP'S CERTIFICATES ABANDONED THEIR UNDERWRITING GUIDELINES AND APPRAISAL STANDARDS**

154.    As discussed above, many of the underlying mortgage loans that the Defendants packaged into securities and sold to Plaintiff were originated by third-party institutions and then sold en masse to Merrill Lynch, Lehman or Greenwich.  The Offering Documents associated with each of Plaintiff's Certificates described each of the specific originators' underwriting guidelines.

155.    Defendants were aware of a collapse in underwriting standards on the part of the Originators with whom they did business, including widespread failure to abide by stated underwriting guidelines, permitting sales personnel and management to routinely override underwriting decisions, pressuring appraisers to artificially inflate the values of mortgaged properties, and making no efforts to verify the income of borrowers.  Defendants were also aware that, as a result of the Originators' fraudulent appraisal practices, which made the borrowers appear to have more collateral than they actually did, the LTV values of the loans

were inflated. However, rather than putting an end to these corrupt practices or refusing to purchase these defective loans, Defendants urged the Originators to make more and riskier loans.

156. The Offering Documents represented that the underlying mortgage loans were originated in compliance with the underwriting and appraisal standards of the originators. Several of the relevant originators involved in these transactions are now known to have, among other things, ignored their own underwriting guidelines and used inflated appraisals during loan generation. The questionable practices that were employed by many of these originators have led to numerous allegations and investigations into their operations. In fact, as noted below, faulty underwriting has led to the downfall of several of the originators whose loans Merrill, Lehman and Greenwich bundled in these offerings.

157. The third party originators of the mortgage loans underlying the Certificates that departed from stated underwriting guidelines with respect to the mortgages underlying Plaintiff's Certificates included, but are not limited to the following:

### 1.   Accredited Home Lenders Inc.

158. Accredited was a mortgage banking company that operated throughout the United States and Canada, originating loans through a network of mortgage brokers and a retail unit. Accredited expanded at a rapid pace as the subprime mortgage industry boomed, and the total volume of loans the company originated increased from $1.5 billion in 2000 to $12.4 billion in 2004, increasing even further through 2006.

159. Accredited achieved this breakneck pace of growth in large part by discarding its underwriting standards. One witness, a corporate underwriter who worked at Accredited between June 2004 and March 2005, described how underwriting decisions were frequently overridden by managers on the sales side of the business. The witness noted that such loans were tracked internally, and it was well-known they performed poorly. Moreover, according to

the witness, by no later than the early part of 2005, Accredited was approving risky loans that did not comply with its own underwriting guidelines in an effort to reach monthly production targets. Another witness, a corporate underwriter who worked at Accredited in Tampa, Florida between August 2003 and February 2006, described how Operations Managers and Senior Operations Managers constantly overrode decisions to reject loan applications.

160.    Another former Accredited corporate underwriter claimed that the rejection of a risky loan was often subject to an override.  The former employee stated, "[t]he overrides were rampant, especially during the last few days of each month when they wanted to ramp up production."  He continued, "If the borrower breathed, he got the loan."  The former Accredited Chief Appraiser stated that by June 2006, "between 12% and 15% of [Accredited's] business was being done through management overrides."

161.    Not surprisingly, on May 1, 2009, Accredited filed for bankruptcy.  Accredited faced huge demands from banks who purchased loans from Accredited to repurchase the loans based on the discovery of various defects in the loans.  In bankruptcy filings, Accredited stated that it faced more than $200 million in repurchase claims.

### 2.    Aegis Mortgage Corporation

162.    Aegis started as a privately held mortgage banking company owned by three individuals.  By 1998, the company was generating $1 billion in annual loan volume.  In 1998 and 1999, Cerberus Capital Management, LP ("Cerberus") made a $45 million investment in Aegis.  With this cash, Aegis acquired two extremely distressed mortgage production operations, UC Lending and New America Financial.  These and subsequent acquisitions enabled Aegis to grow from 150 employees in nine locations in 1999 to 3,800 employees in over 100 locations in 2005.  By 2006, Aegis was ranked as the 13th largest subprime lender in the country, generating

close to $20 billion in annual originations.  In eight years, the company's subprime originations grew by an incredible 1,750%.

163.    Aegis' astronomic growth was fueled by an insatiable appetite for high fee, high-risk mortgages.  To satisfy its enormous appetite, Aegis loosened its loan underwriting standards to the point of near abandonment by 2006.  A large portion of the loans Aegis originated during this time were in fact purchased from unlicensed mortgage brokers.  Because Aegis was selling all the loans it originated to investment banks like Merrill Lynch for securitization, underwriting standards were thrown by the wayside.  Quantity became more important than quality, as guidelines were consistently ignored and more and more loans approved.

164.    Eventually, the bad loans caught up with Aegis.  A news report issued on August 6, 2007, announced that Aegis could not meet all of its existing funding obligations.  On August 13, 2007, the company was forced to file for bankruptcy protection.

165.    Despite filing for bankruptcy, Aegis was still subject to scrutiny for its aggressive loan origination practices.  In August 2010, the U.S. Attorney for the United States District Court for the Northern District of Ohio brought a 49-count indictment against several attorneys, appraisers, and loan officers alleging that, from July 2003 through January 2006, a mortgage fraud scheme was devised involving the preparation and submission of fraudulent mortgage loan applications to various lenders, including Aegis, knowing that they contained false information, including the applicants' "assets, whether the property would be used as their primary residence and the source of the down payment funds…." The applications also contained phony appraisal values that far exceeded the true value of the underlying properties.

### 3.    Ameriquest Mortgage Company

166.    Ameriquest Mortgage Company ("Ameriquest") also originated mortgage loans that were pooled in securitizations and purchased by ABP.  Ameriquest was a wholly-owned

retail lending subsidiary of ACC Capital Holdings Corporation ("ACC Capital"), the nation's largest subprime lender, as well as an affiliate of Argent Mortgage Company, LLC, another third-party originator discussed below.

167.   At one time the nation's largest subprime mortgage lender, Ameriquest's apparent success in the subprime lending market was characterized by the company's complete abandonment of prudent underwriting guidelines.  As revealed by a multi-state investigation, Ameriquest made stated income or low documentation loans where Ameriquest employees fabricated or inflated the borrowers' income and/or assets in order to qualify the borrowers for the loans.

168.   Former Ameriquest employees have spoken out regarding Ameriquest's business practices.  A NATIONAL PUBLIC RADIO newscast from May 14, 2007, described how employees were encouraged to conceal rate terms and to make fake fixed-loan documents pushing customers into loans that they could not afford.  One former Ameriquest employee, Tyson Russum, stated that the "impression [he] got was that … it's basically make the sale at any cost." Russum, a loan officer who worked in Tampa, Florida, recalled observing some co-workers applying white-out to income numbers on W-2s and bank statements and filling in "bigger amounts basically to qualify people for loans that they couldn't afford," a practice that was referred to as "taking the loan to the art department."  Such practices were not isolated incidents but rather occurred at Ameriquest branches across the country.

169.   An August 20, 2007, BUSINESSWEEK article entitled "Did Big Lenders Cross the Line?" reported the emergence of a growing number of lawsuits pertaining to subprime mortgage lending, suggesting that some big lenders, like Ameriquest, had been colluding to "falsify loan

documents by beefing up income and lowballing outstanding debts" in an effort to "keep up loan volume and generate sales."

170.    The article described one such lawsuit filed by Mary Overton. Overton's complaint alleged that loan officers at a Brooklyn, New York, branch of Ameriquest "coerced [her] into signing a loan", but "[u]nbeknownst to Ms. Overton, Ameriquest created fake tax returns, employment records, and a 401(k)—to make it appear that the loan was affordable." The article reported that at least 40 other borrowers alleged that Ameriquest doctored loan documents or increased borrowers' income in an effort to boost loan generation and sales.

171.    According to written testimony provided in March 2009 by Illinois Attorney General Lisa Madigan to the House Committee on Financial Services:

> Ameriquest [] received its funding line from Wall Street firms. These same firms bought and securitized the subprime loans Ameriquest sold. *For those of us on the state level, the Ameriquest investigation marks the moment when we began to see the underwriting practices of mortgage lenders erode at a disturbingly accelerated pace.* In 2002, Ameriquest was originating loans with an average loan-to-value ratio of 74 percent. Two years later, the ratio had risen to 81 percent. Ameriquest had also ramped up its originations of stated income loans, that is, loans that permit the borrower merely to state his or her income without further review. By 2003, Ameriquest was originating almost 30 percent of its loans – which were all subprime – as stated-income or limited-documentation loans.
>
> *Our multistate investigation of the nation's largest subprime mortgage lender revealed that Ameriquest engaged in the kinds of fraudulent practices that other predatory lenders subsequently emulated on a wide scale. These practices included: inflating home appraisals*…Ameriquest also locked borrowers into costly loans by including three-year prepayment penalties on loans with a two-year introductory rate that reset to a higher rate at the end of two years. [T]hese penalties were added because Wall Street investors preferred and paid more for loans [with prepayment penalties].

172.    Ameriquest entered into a nationwide settlement in 2006 under which it agreed to injunctive relief and monetary payments totaling $325 million.  Among other things, Ameriquest agreed to use independent loan closers for all subprime loans, to ensure that each loan provided an actual benefit to the borrower, and not to fabricate or inflate income or assets or sign any documents on behalf of a borrower.

173.    In October 2007, Wachovia Bank N.A. ("Wachovia") filed a lawsuit against Ameriquest for failure to comply with repurchase requests on loans with fraudulent files. Wachovia paid Ameriquest almost $129 million for loans purchased on December 29, 2005, but later identified at least 135 loans that Ameriquest misrepresented, including loans with documentation containing "incorrect credit scores, false employment records and misstatements of the kind of homes that were being financed."

174.    A class action complaint was also filed in the United States District Court for the Northern District of Illinois in December 2005 against Ameriquest, its sister company Argent, and parent ACC Holdings, which was later consolidated along with 14 other class action cases before the Judicial Panel on Multidistrict Litigation (the "MDL Panel").  The complaint alleged that Ameriquest violated numerous federal and state laws, including the Truth in Lending Act, breach of contract, unjust enrichment, and state Consumer Protection and Deceptive Trade Practices Acts, by engaging in

> a uniform common plan and scheme to prey upon unsuspecting consumers by routinely causing borrowers to enter into residential loans with unfavorable terms, misleading and inappropriate "discount" fees, high and adjustable interest rates, prepayment penalties, and excessive loan principal compared to equity and ability to pay.

In January 2010, Ameriquest and its affiliate defendants participated in a $22 million settlement of these claims.

### 4. Argent Mortgage Company, L.L.C.

175. Argent Mortgage Company, LLC ("Argent") also originated loans packaged into RMBS and purchased by ABP. Argent was incorporated in 2001 and was a wholly-owned subsidiary of ACC Capital, operating as one of the nation's largest subprime lenders. As discussed above, Argent was also an affiliate of Ameriquest. Citigroup purchased Argent on August 31, 2007.

176. Argent's success in the mortgage-lending market was attributable to its loan originations using fraudulent loan applications and its departure from sound underwriting practices. In 2005, the Florida Attorney General initiated an investigation against Argent after numerous complaints alerted the office that Argent was providing mortgages to homeowners for home repair projects using fraudulent documents and loan applications. Investigators discovered nearly 130 loans funding nearly $13 million that were approved based on fraudulent applications. As a result of these investigations, Argent's former vice president Orson Benn was sentenced to 18 years in prison in September 2008 for racketeering, mortgage fraud and grand theft.

177. According to a December 7, 2008, article describing its investigation into Argent's dismal lending practices, the MIAMI HERALD discovered that several former Argent employees engaged in mortgage fraud, including Benn, who actively assisted mortgage brokers in falsifying borrowers' financial information by "tutoring … mortgage brokers in the art of fraud." Benn himself stated that the "accuracy of loan applications was not a priority," but rather, *the company made money by bundling mortgages and selling them to investors on Wall Street. To increase the flow of loans generated, Benn taught brokers to prepare phony income statements and doctor credit reports*.

178. During the course of its investigation, the MIAMI HERALD obtained every loan application generated by one Argent broker between May 2004 and September 2005. In a

January 29, 2009 article, the paper revealed that out of 129 applications, 103 contained "red flags," such as "non-existent employers, grossly inflated salaries and sudden, drastic increases in the borrower's net worth."  The article stated that the "simplest way for a bank to confirm someone's income is to call the employer.  But in at least two dozen cases, the applications show[ed] bogus telephone numbers for work references."  Argent's verification process was so deficient that a "borrower [who] claimed to work a job that didn't exist … got enough money to buy four houses."  Another borrower "claimed to work for a company that didn't exist – and got a $170,000 loan."

179.   The CLEVELAND PLAIN DEALER also reported in a May 11, 2008, article that industry leaders believed that "lower-echelon employees of companies like Argent actively participated in fraud."  For example, Jacqulyn Fishwick, who worked for over two years as an underwriter and account manager at an Argent loan-processing center near Chicago, had personally seen "some stuff [she] didn't agree with" and witnessed some Argent employees who "played fast and loose with the rules."  Fishwick also saw "[Argent] account managers remove documents from files and create documents by cutting and pasting them."

180.   In April 2010, the FCIC heard testimony from several former Citigroup executives as part of the FCIC's investigation regarding the causes of the subprime lending meltdown. Richard Bowen, Citigroup's former chief underwriter for CitiMortgage, told the FCIC panel in his April 7, 2010, testimony that "he had warned management … of the company's mortgage risk beginning in 2006," when he discovered that more than 60% of the mortgages being bought and sold by Argent were defective; advice apparently not heeded, since Citigroup acquired Argent in 2007.

### 5.   Bank of America

181.   Bank of America is one of the world's largest financial institutions and was a major player in both originating mortgages and securitizing RMBS.  In 2006 it originated $167.5 billion of mortgage debt, ranking it as the nation's sixth largest mortgage lender.  To achieve this volume and to sustain a mortgage loan pipeline for its mortgage securitization business, Bank of America abandoned its underwriting standards.

182.   In 2005, according to the Financial Crisis Inquiry Report, the Division of Banking Supervision and Regulation at the Federal Reserve Board began looking into the changing loan patterns in the mortgage market by examining mortgage originations at several large banks, including Bank of America.  The review noted the "slowly deteriorating quality of loans due to loosening underwriting standards."  It found that a "large percentage of [the banks' mortgage loans] issued were subprime and Alt-A, and that the underwriting standards for these products had deteriorated."  The review also found that "nontraditional loans" made up 18.3% of the mortgage originations at Bank of America.  As of 2003, according to the review, two-thirds of all nontraditional loans were of the "stated-income, minimal documentation variety known as liar loans, which had a particularly great likelihood of going sour."

183.   The deterioration of Bank of America's mortgage underwriting standards occurred in large part through its practice of using "exception processing" to approve loans that violated its underwriting guidelines.  If the bank's automated underwriting system rejected a loan application, that loan was referred to an underwriter for manual underwriting.  If the underwriter was unable to approve the loan, the application was then transferred to a more senior underwriter with authority to approve it.

184.   Bank of America likewise purchased and "waived in" poorly underwritten loans from third-party originators in order to maintain loan volume for its mortgage securitization

business, despite these loans' divergence from its underwriting guidelines.   According to a "Trending Report" prepared by Clayton Holdings, Inc., ("Clayton") and published by the Financial Crisis Inquiry Commission in 2010, Clayton, a third-party due diligence firm engaged by Bank of America to analyze loan pools before the bank purchased them, reviewed approximately 10,200 loans for Bank of America between the second quarter of 2006 and the first quarter of 2007.   Of these, Clayton informed Bank of America that approximately 30% did not meet the established underwriting guidelines, yet Bank of America waived 27% of the offending loans into a subsequent securitization.

185.   Bank of America also participated in a practice known as "warehouse lending," whereby it extended lines of credit to third-party loan originators used to fund mortgage loans, which could then be securitized and sold, with the loan being repaid out of the proceeds.   In connection with such loans, the originators customarily provided Bank of America with information, including performance characteristics, about the underlying loans.   As a result of these transactions with mortgage originators, Bank of America had detailed information about the originators' persistent disregard for established underwriting guidelines.

186.   According to a May 17, 2011 NEW YORK TIMES article authored by Gretchen Morgenson, entitled "New York Investigates Banks' Role in Financial Crisis," New York Attorney General Eric T. Schneiderman has launched an inquiry into Bank of America's mortgage securitization practices during the financial crisis.   On August 4, 2011, Attorney General Schneiderman moved to intervene in a proposed $8.5 billion settlement between Bank of America and Bank of New York Mellon relating to RMBS underwritten by Countrywide, now owned by Bank of America.   The New York Attorney General found that Bank of America and Countrywide "face Martin Act liability because there are repeated false representations in the

Governing Agreements [for RMBS] that the quality of the mortgages sold into the Trusts would be ensured," and also face liability for "persistent illegality" in violation of Executive Law § 63(12) for "repeatedly breached representations and warranties regarding loan quality."

### 6.   Countrywide Home Loans, Inc.

187.   Countrywide was one of the primary mortgage loan suppliers for Merrill Lynch. As is now widely known, Countrywide was one of the principal loan originators that helped precipitate the housing boom and bust.   Until its collapse, Countrywide was one of the largest mortgage lenders in the United States, responsible for originating and/or servicing more than 18% of residential mortgages nationally.   In 2005 and 2006 alone, Countrywide originated in excess of $850 billion in home loans throughout the country.

188.   Countrywide's drive for market share and loan origination volume was built around the complete abandonment of all prudent underwriting standards. To increase loan origination, Countrywide departed from its underwriting guidelines by: (i) disregarding and/or affirmatively manipulating the income, assets and employment status of borrowers seeking mortgage loans, or encouraging ineligible borrowers to resort to no documentation loans and stated income loans in order to mask the borrowers' deficiencies and therefore secure approval; (ii) intimidating and manipulating appraisers so as to systematically overvalue mortgaged properties; (iii) approving loans based on false affordability metrics, for example, the borrower's ability to make loan repayments based on low, introductory "teaser" interest rates; and (iv) permitting employees to liberally make "exceptions" and issue loans even though the loans did not pass muster under Countrywide's underwriting guidelines.

189.   Countrywide's practices have been and continue to be the target of multiple state and federal investigations and proceedings.   In June 2009, the SEC filed a civil suit (the "SEC Action") against three former top Countrywide executives: Angelo Mozilo, former chairman of

the board and chief executive officer; David Sambol, chief operating officer and president; and Eric Sieracki, chief financial officer. *Securities and Exchange Commission v. Mozilo*, No. 2:09-cv-03994-JFW-MAN (C.D. Cal.). According to the SEC, these three individuals defrauded investors by falsely claiming that Countrywide underwrote low-risk mortgages at a time when the company was getting into increasingly risky parts of the lending business, including "subprime" mortgages – those made to less creditworthy borrowers. The SEC further asserted that Mozilo engaged in insider trading of Countrywide stock. On October 15, 2010, the SEC announced that Mozilo agreed to pay a record $22.5 million penalty, the largest ever paid by a public company's senior executive in an SEC settlement. Mozilo also agreed to $45 million in disgorgement of ill-gotten gains to settle the SEC's disclosure violation and insider trading charges against him, for a total financial settlement of $67.5 million that will be returned to harmed investors, and was barred from ever again serving as an officer or director of a publicly traded company. Sambol and Sieracki agreed to pay $520,000 and $130,000 in civil penalties, respectively. The SEC has also made available Countrywide internal documents and testimony given by Countrywide's former executives in connection with the SEC Action, revealing the role that these individuals played in Countrywide's continued wholesale and systematic abandonment of its underwriting guidelines.

### 7.   EquiFirst Corporation

190.   EquiFirst was engaged in the business of originating and selling "non-conforming" loan products, including subprime, Alt-A, and jumbo mortgage loans collateralized by one-to-four family residential properties. For 2006, EquiFirst's subprime and Alt-A residential mortgage originations totaled approximately ***$10.7 billion***. In 2007, EquiFirst was the twelfth-largest subprime wholesale mortgage originator in the United States, originating $3.8bn of subprime home loans.

191.    EquiFirst focused on "innovative" subprime products that relied on, among other things, inappropriately lax underwriting standards and temporary payment reductions, offering loans to borrowers with credit scores as low as 520.  As a consequence, EquiFirst's residential loan portfolio (including subprime mortgages), significantly deteriorated.  Regions Financial Corporation ("Regions"), the then-parent company of EquiFirst, recorded $142 million in after-tax losses which it later attributed to significant and rapid deterioration of the subprime market during the first three months of 2007.  Additionally, Regions' 2007 10-K revealed loan losses from continuing operations (including subprime mortgages made by EquiFirst) that more than tripled from 2006 levels, increasing from $142.4 million by the end of 2006 to $555 million by the end of 2007.

192.    On January 19, 2007, Barclays Bank, PLC announced that it had entered into an agreement with Regions to acquire EquiFirst for $76 million.  Regions CEO Dowd Ritter later said, "I would have given [EquiFirst] away.  If we didn't get rid of it, the whole company would be gone by now."  On February 17, 2009, less than two years after the acquisition, Barclays shut down EquiFirst due to the decline in the market for subprime mortgages.

193.    In September 2011, U.S. Bank NA, initiated a lawsuit in federal court in Minneapolis against EquiFirst and others, alleging that EquiFirst falsely assured buyers of the creditworthiness of the loans being offered, and that as of June 2011, over 45% of the original loan balance had been liquidated, while over 30% of the remaining loans were delinquent.  According to a September 6, 2011, article in BLOOMBERG about the case, one investor reviewed 200 loan filed related to the securities at issue, and identified material breaches of representations or warranties in 150, or *75%* of them.  In 55 of the loans, according to the article, the investor found misrepresentations of borrower income and/or employment.  In one example, a borrower's

loan application stated that he earned over $14,000 per month for performing "account analysis." According to the borrower's income-tax returns, however, he earned $1,548 per month as a taxi driver.

194.     These allegations are echoed in a September 2, 2011, complaint filed by the Federal Housing Finance Agency, which states that EFC Holdings, through its EquiFirst unit, routinely and egregiously departed from its stated underwriting guidelines when originating subprime mortgages.  This led, the suit alleges, to material false and misleading statements or omissions regarding compliance with underwriting guidelines in the Prospectus Supplements for several securities purchased by Freddie Mac, in violation of federal securities laws.

### 8.     First National Bank of Nevada

195.     FNBN was established in 1987 under the name Laughlin National Bank, but later changed its name to First National Bank of Nevada in 1998. The company garnered success in the industry by offering low-quality, "Alt-A" mortgages to borrowers, accumulating assets of over $4.3 billion in 2006. FNBN merged with First National Bank of Arizona on June 30, 2008.

196.     FNBN was no stranger to the subprime lending business and soon fell under the watchful eye of regulators. According to a June 16, 2009 USA TODAY article entitled *Where were regulators when banks were failing?*, the Office of the Comptroller of the Currency ("OCC") had identified problems with FNBN as early as 2002, finding that it was "adversely impacted by the significant concentration in high-risk mortgage products and weak risk management controls." On July 25, 2008, the OCC closed FNBN, naming the Federal Deposit Insurance Corporation ("FDIC") as receiver. Mutual of Omaha Bank entered into a purchase and assumption agreement with the FDIC, agreeing to take over all deposits and certain assets of FNBN.

197.    FNBN was also the target of numerous consumer lawsuits. The complaints primarily alleged that it engaged in predatory lending practices by originating risky loans to borrowers that were sold into securitized mortgage pools, all while knowing that the terms of the loans were such that the borrowers would likely default.  Other lending institutions also filed lawsuits against FNBN.  In early 2007, FNBN was sued by a Lehman Brothers investment trust in New York and Aurora Loan Services in Denver, seeking repurchase of over 38 home mortgage loans.  Lehman and Aurora claimed that FNBN misrepresented the income, debt and employment information of borrowers, as well as the appraisal values of the properties underlying the loans.

### 9.    First NLC Financial Services, LLC

198.    First NLC, a wholly-owned subsidiary of Friedman, Billings, Ramsey Group, Inc. ("FBR"), was one of the top subprime residential mortgage lenders in the United States, originating over $7.4 billion in mortgage loans in 2006. First NLC also did business under the name The Lending Center.

199.    Like the other Originators, First NLC achieved financial success in the subprime market by engaging in questionable lending practices. In an effort to boost loan originations, the company ignored sound underwriting guidelines, misstated borrowers' financial information in loan documentation, provided loans to borrowers with shaky or even poor credit, and then sold the loans to third parties for profit.

200.    As a result, the company became the target of several lawsuits. For example, in March 2007, a borrower filed suit against First NLC in the Middle District of Florida alleging violation of the Truth in Lending Act ("TILA").  The complaint claimed that First NLC failed to disclose, *inter alia*, the maximum interest rates applicable to the loan and the true cost of the credit transaction. The broker involved in the transaction was also alleged to have received

kickbacks from First NLC for providing the borrower with a higher interest rate than he could have otherwise obtained in the marketplace.

201.    In July 2008, two lawsuits were filed against First NLC in the Southern District of Florida for violation of TILA and the Real Estate Settlement Procedures Act ("RESPA"), claiming that the company "fraudulently increased and grossly overstated the [borrowers'] income," qualifying the borrowers for a "higher loan than their verifiable income could support."

202.    The downfall of the subprime market seriously impacted First NLC's ability to continue its risky lending practices, and, in January 2008, the company announced that it would be shutting down its loan origination business. Later that month, the company filed for protection under Chapter 11 of the U.S. Bankruptcy Code.

### 10.    GreenPoint Mortgage Funding

203.    GreenPoint Mortgage Funding ("GreenPoint"), formerly part of North Fork Bancorp, was another originator of mortgage loans packaged into securitizations that were purchased by ABP.  GreenPoint specialized in non-conforming and Alt-A mortgages which generated higher origination fees than standard loans.  At one time, GreenPoint originated $25 billion of mortgage loans a year nationwide, and was one of the nation's largest originators of "Alt-A" loans, *i.e.*, loans were supposedly intended for applicants who had strong credit but lacked proof of income from traditional employment, such as investors or self-employed borrowers, but GreenPoint repeatedly extended these loans to borrowers who both lacked proof of income and had weak credit.

204.    Like the other third-party originators, GreenPoint's apparent business success was built upon the abandonment of its stated underwriting guidelines.  For example, according to GreenPoint's origination guidelines, the loans it originated were supposed to be based on borrower creditworthiness and the value of the collateral underlying the mortgage loan.

Although stated income or no documentation loans were based on a borrower's representations about his or her ability to repay, with little or no documentation to substantiate those representations, GreenPoint's underwriting guidelines generally required the highest level credit scores and low LTV ratios for these loans.   GreenPoint's employees, however, routinely extended these loans to borrowers with weak credit.

205.    According to a November 13, 2008, BUSINESSWEEK article entitled, *Sex, Lies and Subprime Mortgages*, GreenPoint's employees and independent mortgage brokers targeted more and more borrowers who had no realistic ability to repay the loans being offered to them.   In addition, GreenPoint created a system for overriding loan rejections.   If underwriters denied an application based upon creditworthiness, managers could override their decisions and approve the loans anyway.   GreenPoint employees used this system to increase their own commissions at the expense of their underwriting guidelines.

206.    In 2006, Capital One acquired GreenPoint as part of the acquisition of North Fork Bancorp.   In October 2007, GreenPoint ceased accepting new loan applications.   GreenPoint was eventually liquidated by Capital One in December 2008.   As stated by the WASHINGTON BUSINESS JOURNAL in an August 21, 2007, article entitled *Capital One to shutter mortgage-banking unit, cut 1,900 jobs*, Capital One took an $860 million write-down due to mortgage-related losses associated with GreenPoint's origination business.

207.    GreenPoint's   business   model   depended   on   others'   acceptance   of   its representations regarding the quality of its products and its commitment to cover any losses resulting from breaches of those representations.   GreenPoint, however, assured its investors that its "no-doc" or "low-doc" loan originations were amply supported by borrowers' ability to repay

loans in a timely fashion.  GreenPoint also maintained that it conducted a quality control review of the loans that it acquired from approved correspondent lenders.

208.    As a result of these misrepresentations, GreenPoint has been the subject of lawsuits relating to its loan origination practices and lax underwriting standards.  In February 2009, U.S. Bank National Association ("US Bank") filed a breach of contract action against GreenPoint in the Supreme Court of New York for failure to repurchase $1.83 billion in loans that GreenPoint originated between September 2005 and July 2006.  The complaint alleged that the company violated numerous representations and warranties, including:

- pervasive misrepresentations and/or negligence with respect to the statement of the income, assets or employment of the borrower;

- misrepresentations of the borrower's intent to occupy the property as the borrower's residence and subsequent failure to so occupy the property;

- inflated and fraudulent appraisal values; and

- pervasive violations of GreenPoint's own underwriting guidelines and prudent mortgage-lending practices, including loans made to borrowers (i) who made unreasonable claims as to their income, (ii) with multiple, unverified social-security numbers, (iii) with credit scores below the required minimums, (iv) with debt-to-income and/or loan-to-value ratios above the allowed maximum or (v) with relationships to GreenPoint or other non-arm's-length relationships….

209.    US Bank hired a consultant to review the loan documentation for compliance with GreenPoint's representations and warranties regarding the sales.  The consultant found that an overwhelming 93%, or 963 out of a sample of 1,030 loans sold, with a total principal balance of $91.8 million, did not comply with GreenPoint's representations and warranties contained in the sale agreements.  Defendants filed a motion to dismiss the complaint, and on March 3, 2010, the court denied the motion in part, allowing all of the claims against GreenPoint to proceed.

### 11.   IndyMac Bank F.S.B.

210.    IndyMac was spun off as an independent company by Countrywide in 1997, and along with its former parent company became one of the most notorious subprime mortgage lenders involved in the inflation of the housing bubble.  In order to compete against other loose mortgage underwriters, IndyMac itself drastically loosened its underwriting standards.  As an IndyMac spokesperson admitted in an interview with The Orange County Register, "given strong competition in a declining overall mortgage market ... [and] in order to compete and grow," IndyMac "loosened its lending standards along with everyone else … ."  IndyMac originated over $90 billion of mortgages in 2006 alone.

211.    At the center of this loosening of underwriting standards was IndyMac's use of Alt-A loans.  Alt-A loans were tremendously profitable for IndyMac, because the underwriting costs were much lower and the interest rates charged to the borrowers were higher than for a standard 30-year fixed mortgage.  In the first quarter of 2007, just 21% of IndyMac total loan production included "full doc" mortgages.

212.    The underwriting departures at IndyMac were systemic.  According to a June 6, 2008 amended complaint filed in a federal securities lawsuit in the Central District of California, IndyMac's management, including Michael W. Perry ("Perry"), IndyMac's former Chairman and CEO, exploited internal control weaknesses or simply overrode controls to drive loan originations and sales growth.  For example, a former IndyMac vice-president states that Perry sought to make his short term goals for the company "at all costs."  To this end, Perry put immense pressure on subordinates to "push loans through", even if it meant consistently making "exceptions" to the company's guidelines and policies.  A former IndyMac underwriting team leader stated, "I would reject a loan and the insanity would begin.  It would go to upper

management and the next thing you know it's going to closing. . . . There's nothing there to support this loan."

213.    A June 2008 report by the Center for Responsible Lending found that IndyMac had engaged in fraudulent underwriting activities including making loans based on false appraisals and income data that exaggerated borrowers' finances, altering loan applications to falsify income and asset data, remaining deliberately ignorant of borrowers' finances by specifically instructing "stated income" borrowers not to provide documentation of income or assets, and permitting management and sales personnel to routinely override underwriting decisions.  Inside IndyMac, shoddily documented loans were referred to as "Disneyland loans," in reference to a mortgage given to a Disneyland cashier whose loan application claimed an annual income of $90,000.

214.    On July 11, 2008, IndyMac finally collapsed and was placed in receivership by the Federal Deposit Insurance Corporation, becoming one of the largest bank failures in U.S. history.  IndyMac and its management has essentially conceded that they departed from prudent underwriting guidelines.

215.    An audit report on the failure of IndyMac by the Office of the Inspector General ("OIG") found that "IndyMac encouraged the use of nontraditional loans."  The OIG examined 22 delinquent loans representing a cross-section of IndyMac's loan products, and found "little, if any, review of borrower qualifications, including income, assets, and employment."  The OIG also found that IndyMac had accepted appraisals that were not in compliance with the USPAP, including instances where IndyMac accepted multiple and wildly varying appraisals on a single property.  For example, the file for one $1.5 million loan contained several appraisals ranging

between $639,000 and $1.5 million, with no support to show why the highest appraisal was the appropriate one to use for approving the loan.

### 12.    NovaStar Mortgage Inc.

216.    NovaStar was one of the top twenty mortgage originators in 2007.  Like the other Originators described herein, NovaStar's rise was accompanied by material departures from its stated underwriting guidelines.

217.    According to a federal securities class action lawsuit filed on October 19, 2007 in the United States District Court for the Western District of Missouri, from at least January 2006 onwards, NovaStar routinely deviated from its underwriting guidelines so that more and more loans could be approved and  then securitized, earning NovaStar large profits.  For example, NovaStar began granting numerous exceptions, such as LTV exceptions, credit score exceptions, and also inflated property value appraisals. According to a former underwriter at NovaStar's Independence, Ohio office, the Company maintained a phone-in "help desk," referred to as "NovaStar Solutions," that aided the account executives in pre-clearing exceptions for loans that were unusual and that would not be approved in the normal underwriting process. In fact, the "NovaStar Solutions" help desk had more authority to grant exceptions for loans prior to closing than the underwriters who examined the loans.   In March 2006, NovaStar weakened its underwriting standards further when it lowered the minimum required credit score for individuals seeking a 100% LTV loan to 580.

218.    According to another former underwriter, NovaStar advocated "transactional thinking," whereby, underwriters were told to approve or deny a loan application by assessing whether a particular loan "made sense," regardless of NovaStar's guidelines.   Essentially, underwriters could be creative with the underwriting guidelines and use their personal judgment in applying them, except for the credit score.   For example, the guidelines provided that a

borrower needed "time on job" of at least two years.  However, if a borrower had an employment gap of six months but had not missed a credit payment during that time, then the underwriter could make an exception.  In this sense, the guidelines were just parameters and the "unspoken law" was to make loans.

219.    A further way by which NovaStar departed from its underwriting guidelines was to allow for loans to be *re-written*, even during the underwriting process, to ensure approval. For example, according to one witness, loans that were presented to the underwriters as complete, full documentation loans often were in fact incomplete, lacking proof of salary information or clearly showing that a proposed borrower's bank statements contradicted the information they had affirmed on the application. In many such cases, rather than rejecting the loan because of the defects, the underwriters and account executives would merely discard the contradicting information and approve it as a low documentation or no documentation loan.

220.    At the same time that it was facilitating the abandonment of its underwriting guidelines, NovaStar began to dismantle the internal checks that had previously been installed to monitor deviations from underwriting guidelines. PFQC was created to periodically report to the NovaStar's Credit Committee about trends in the underwriting process. Beginning in late 2005, PFQC saw a massive increase in deviations from the policies and practices that underwriters and account executives were supposed to follow in the loan funding process. Where loans in the past were granted one exception in the underwriting process, the PFQC auditors were routinely seeing three and four exceptions in loans.

221.    As the number of loans deviating from NovaStar's underwriting guidelines increased, NovaStar took steps to reduce the number of PFQC auditors, as well as other auditors, thus preventing the performance of many audits on the loans NovaStar was funding. According

to a former quality control auditor who worked in the Post-Closing department in Kansas City, the result of this was that fewer funded loans were audited for quality; of those loans that were audited and reviewed, many variances from and exceptions to the underwriting guidelines that previously were flagged and recorded as "high risk" were overlooked in the audit process and removed from the company's system; and it became much more difficult to address and resolve questions raised by outside investors concerning the specific loans in the pools they were considering purchasing. By March 2006, two of the managers of the PFQC group, including the Company's Chief Credit Officer, departed from the company.

222.    In February 2007, NovaStar disclosed that loans made in 2006 were defaulting at a "torrid" rate. According to an April 1, 2007 NEW YORK TIMES article authored by Gretchen Morgenson and Julie Creswell, entitled *Borrowing Trouble*, 53% of the loans underwritten by NovaStar in 2006 did not have full borrower documentation attached to them, and NovaStar's early payment default rate for loans underwritten in 2006 was 8.19 percent.

223.    NovaStar's complete abandonment of its underwriting guidelines brought about its eventual collapse. In early 2008, NovaStar completely discontinued its mortgage lending operations and sold its mortgage servicing rights to Saxon Mortgage Services, Inc. On September 12, 2008, an involuntary petition for liquidation under Chapter 7 was filed against it in the U.S. Bankruptcy Court for the District of Delaware.

### 13.    Option One Mortgage Corporation

224.    Option One Mortgage Corporation ("Option One") was a national mortgage lender formerly owned by H&R Block, Inc., whose assets have now been sold to American Home Mortgage Servicing, Inc.  According to the Comptroller of the Currency's "Worst Ten in the Worst Ten" list, Option One was the country's sixth worst mortgage originator, by number of foreclosures, as of March 22, 2010.  Like the other Originators, Option One was motivated to

violate its underwriting and appraisal standards in order to increase the volume of loans it could sell to Wall Street investment banks to be securitized. Numerous former employees with first-hand knowledge have confirmed that Option One violated its stated standards for underwriting and appraisals.

225.    According to a former underwriter at Option One in Atlanta, Georgia from 2005 to 2006, if an underwriter denied a loan and an account executive complained, the loan was escalated to the branch manager, who then got in touch with the underwriter. For a top-producing account executive, whatever red flags existed would be overlooked, and invariably the loan would be pushed through. The former underwriter estimated that at least 50% of the total loan volume in Option One's Atlanta branch was approved in this manner. This witness also stated that a loan applicant could lie about her/his income, but the untrue information would be overlooked and the loan would be approved, even if the former underwriter initially rejected the loan application.

226.    Another witness, an underwriter at Option One's Marietta, Georgia, office in 2005, reported that Option One approved stated income loans even though Option One knew the stated income was manifestly implausible. Another Option One underwriter employed in Hawaii from November 2004 to January 2006 stated that the overwhelming majority of stated income loans were "crafted," meaning that the borrowers were not earning anywhere near what they claimed. However, this witness stated that he felt pressured to push loans through because every loan generated income and "[i]f you applied any level of rational thought, you were frowned upon."

227.    With respect to property appraisals, a witness stated that Option One routinely inflated appraisal values and that if an underwriter questioned the appraised value, the account

executive and branch manager would override the underwriter's objection, as with any other red flag in a loan file. Similarly, a staff review appraiser for Option One working throughout the western United States from January 2004 to May 2007 described the appraisals as bordering on fraudulent but was unable to prevent loans based on the flawed appraisals. Whenever this witness objected to loans because of flawed appraisals, the loan officer would complain to the branch manager, who would complain to the Appraisal Department at Option One's headquarters in Irvine, California. In this manner, loan rejections would be continually escalated until someone high enough in the Underwriting and Sales Department said to go forward with the loan.

228.   On June 3, 2008, the Massachusetts AG filed an action against Option One and its past and present parent companies for their unfair and deceptive origination and servicing of mortgage loans. According to the Massachusetts AG, beginning in 2004, Option One "increasingly disregarded underwriting standards, created incentives for loan officers and brokers to disregard the interests of the borrowers and steer them into high-cost loans, and originated thousands of loans that [Option One] knew or should have known the borrowers would be unable to pay, all in an effort to increase loan origination volume so as to profit from the practice of packaging and selling the vast majority of [Option One's] residential subprime loans to the secondary market." The Massachusetts AG alleged that Option One's agents and brokers "frequently overstated an applicant's income and/or ability to pay, and inflated the appraised value of the applicant's home", and that Option One "avoided implementing reasonable measures that would have prevented or limited these fraudulent practices." As a result, Option One's "origination policies … employed from 2004 through 2007 have resulted in an explosion of foreclosures."

229.    In November 2008, the Suffolk County Superior Court granted a preliminary injunction in favor of the Massachusetts AG, holding that "certain mortgage loans [issued by Option One] were 'presumptively unfair,' because they posed an unreasonable risk of default and foreclosure."

230.    Many consumer lawsuits have also been filed against Option One as a result of its questionable lending practices.  In April 2009, a consumer lawsuit was filed in the United States District Court for the District of Massachusetts claiming that Option One violated TILA and the Real Estate Settlement Procedures Act by failing to disclose the true cost and interest rates associated with the borrower's mortgage.  Another complaint filed in November 2009 alleged that Option One had intentionally inflated the borrower's income on loan documentation in order to get the loan approved.

231.    The FHFA also conducted a more in-depth forensic review of 2,382 loan files underlying one particular Greenwich Capital RMBS, Soundview Home Loan Trust Asset Backed Certificates, Series SVHE 2007-OPT1.  The loans underlying this RMBS had been originated by Option One.  While Option One's stated guidelines were generally consistent with industry standards, the FHFA discovered that approximately *80%* of the reviewed loans had not been underwritten in accordance with those guidelines.  The FHFA found breaches including failure to test the reasonableness of the borrower's stated income, failure to investigate the borrower's intention to occupy the property, failure to properly calculate the borrower's debt-to-income ratio, and failure to investigate credit report information.  For example, Option One offered a low-documentation loan with a principal amount of $285,000 to a borrower who claimed to earn $15,000 per month as a refrigeration technician.  That same borrower later admitted in a bankruptcy filing that his income was $5,229 per month.  The loan defaulted, resulting in a

$217,393 loss.  Option One also offered a full-documentation loan with a principal amount of $205,485 to borrowers whose credit report showed 15 inquiries in the past 90 days alone, including inquiries from mortgage lenders and servicers.  The credit report also showed that the borrowers had obtained three undisclosed mortgages totaling $614,725 in just the past two months.  There was no evidence that the underwriter investigated these debts.  The loan defaulted, resulting in a $222,500 loss – more than the value of the original loan.  Greenwich Capital's systematic misrepresentations of loan quality and failures to apply stated lending standards can only be explained by a total breakdown of underwriting.

### 14.    People's Choice Home Loan, Inc.

232.    People's Choice Home Loan, Inc. ("People's Choice") was another entity that originated mortgage loans packaged into RMBS that were purchased by ABP.  People's Choice, founded in 1999, operated as a subsidiary of People's Choice Financial Corporation and marketed itself as a subprime lender of wholesale and retail mortgages through the Internet, issuing over $4.5 billion in mortgage-backed securities in 2005.

233.    People's Choice garnered most of its financial success by targeting and extending subprime loans to borrowers with poor credit histories and by using unscrupulously loose underwriting and lending guidelines in its business practice.  People's Choice also came to possess a reputation in the industry for being a "fraud factory," requiring little or no supporting financial documentation for loans, using inaccurate appraisal values and doctoring loan documents to get borrowers approved.

234.    James LaLiberte, former Chief Operating Officer ("COO") at People's Choice, stated in a March 22, 2009, interview with DATELINE NBC that the company "got where [they] are" in the business because "[f]raud is what we do."  LaLiberte described how it was his job to set underwriting guidelines but that he was met with "resistance" in his attempts to improve the

company's internal procedures.  LaLiberte emphasized how borrowers were not required to document their financial capacity to repay in order to receive a loan and recounted how People's Choice once issued two loans, totaling $640,000, to a massage therapist whose loan documentation claimed that she made $15,000 *per month*.  A similar loan was made to a house cleaner whose documentation claimed she made $11,500 per month.

235.   In 2004, a mortgage broker named Heidi Weppelman assisted the FBI in a mortgage fraud investigation in northeast Florida.   Weppelman recorded a telephone conversation with People's Choice employee Jennifer Grosslight that was later used as evidence at the trial of a man named J.R. Parker, who sold rental homes and referred customers to Weppelman for mortgages.  During that conversation, Weppelman and Grosslight discussed how People's Choice employees would falsify loan documentation, including appraisal values, signatures on contracts and leases and bank account information, in order to process more loans.  Grosslight described these practices as being "totally fine" and that they were "the furthest from any issue."

236.   People's Choice has been bombarded with lawsuits as a result of its questionable lending practices.  In September 2005, a class action lawsuit was filed against the company in the United States District Court for the Northern District of Illinois, alleging that People's Choice used "prescreening" mailers in order to identify "persons who [had] poor credit or [had] recently obtained bankruptcy discharges, for the purpose of targeting them for subprime credit."   On February 5, 2008, the court granted plaintiffs' motion for a default judgment against defendants for $2 million.

### 15.   Residential Funding Company, LLC

237.   Residential Funding is a wholly-owned subsidiary of Residential Capital Corporation, itself a wholly-owned subsidiary of General Motors Acceptance Corporation LLC.

In 2010, GMAC LLC was rebranded as Ally Financial Inc.  Residential Funding originated mortgage loans through its affiliates or purchased them from a network of individual mortgage originators, and also acted as a servicer for mortgage loans.  From 2002 through the first quarter of 2007, Residential Funding sponsored securitizations of more than 1.3 million first lien mortgage loans with an aggregate principal balance of more than $243 billion.

238.    MBIA Insurance Corporation ("MBIA"), a company that had sold financial guaranty insurance policies for five securitization transactions sponsored by Residential Funding, conducted a review of 1,847 delinquent loans that Residential Funding had originated.  MBIA found that a mere 7% of the mortgage loans it reviewed had been originated or acquired in material compliance with Residential Funding's representations and warranties.

239.    MBIA's review uncovered widespread failures in underwriting standards on the part of Residential Funding.  Residential Funding had failed to verify its borrowers' incomes or assets, failed to review its borrowers' credit histories, failed to obtain property appraisals, and granted underwriting exceptions without any justifications for doing so.  For example, in November 2006 Residential Funding made a $140,000 loan to a borrower on a non-owner occupied property with an original appraisal value of $740,000 and a senior loan balance of $513,567.  The borrower, who was employed as the owner of a liquor store, claimed an income of $500,000 per year but demonstrated no liquid assets.  In 2007, the borrower filed for bankruptcy, claiming that he or she had earned $0 for 2006.  Furthermore, the appraisal indicated that the mortgaged property did not meet legal standards.

240.    In a lawsuit filed by MBIA, MBIA alleged that Residential Funding had entered into "negotiated commitments" with a number of loan originators, whereby Residential Funding agreed that it would purchase mortgage loans from originators in the future even if those loans

did not comply with Residential Funding's underwriting guidelines.  Residential then proceeded to securitize these loans while falsely representing that they had been underwritten in substantial compliance with its underwriting guidelines.

241.    MBIA alleged that Residential Funding had engaged in a "bulk purchase program," whereby Residential Funding agreed to purchase a bulk amount of mortgage loans that had already been originated without re-underwriting the loans being acquired or otherwise confirming that they complied with Residential Funding's underwriting guidelines.   Again, Residential Funding securitized these loans while falsely representing that they had been underwritten in substantial compliance with its underwriting guidelines.

242.    MBIA further alleged that Assetwise, the computer program that Residential Funding underwriting personnel used in deciding whether or not to approve individual loans for purchase, did not in fact apply the stated Residential Funding underwriting guidelines, and that numerous mortgage loans approved through Assetwise did not comply with underwriting guidelines.

243.    A securities lawsuit filed by the West Virginia Investment Management Board quotes a former Residential Funding employee as saying that Residential Funding, "needed to continue to purchase more loans for the securitizations, or they would have been out of business."   The employee said that Residential Funding's President and CEO Bruce Paradis would directly encourage Residential Funding traders with reservations about loan quality to buy the loans anyway so as to maintain good relations with the vendors that Residential Funding bought billions of dollars of loans from.

### 16.     ResMAE Mortgage Corporation

244.     ResMAE Mortgage Corporation was a nationwide mortgage banking company which, originated, sold, and serviced subprime mortgages.  By 2006, ResMAE was one of the fastest growing subprime lenders in the United States.

245.     Because ResMAE lacked the finances to fund loans, it would enter into agreements with financial institutions like Merrill to provide a line of  credit.  Shortly after originating the loan, ResMAE would sell it to repay its line of credit to the financial institution.

246.     In 2006 alone, Merrill Lynch purchased approximately $3.5 billion in mortgages from ResMAE, which Merrill Lynch proceeded to stuff into mortgage pools for purposes of securitization.  ResMAE's loans, however, proved to be poorly underwritten.  According to BLOOMBERG, ResMAE made $7.7 billion in loans during 2006, up 11 % from 2005, placing it twenty-first among U.S. subprime lenders.  According to DataQuick, a national database of real estate information, approximately two-thirds of the loans that ResMAE made in 2006 are now in default.  On February 12, 2007, ResMAE filed for Chapter 11 bankruptcy.

### E.     DEFENDANTS KNEW THE LOANS THEY ACQUIRED FROM THE THIRD PARTY ORIGINATORS AND PACKAGED AND SOLD TO INVESTORS SUCH AS ABP WERE DESTINED TO FAIL

247.     Defendants were aware that a significant number of the loans they were securitizing, such as those that were packaged into RMBS purchased by Plaintiff ABP, did not meet the underwriting guidelines of their own affiliated originators, as well as those of the various third party originators whose loans they pooled into securities they issued.

248.     During the housing boom, Merrill Lynch, Lehman Brothers and Greenwich, along with other issuers of RMBS, hired Clayton Holdings LLC ("Clayton") to conduct due diligence to review whether the loans to be included in a particular RMBS offering complied with the law and met the lending standards that mortgage companies said that they were using.  Clayton's

Form 10-K filed on March 14, 2008, represented that Clayton provides "services to the leading buyers and sellers of, and investors in, residential and commercial loan portfolios and securities…includ[ing] major capital markets firms, banks and lending institutions, including the largest MBS issuers/dealers."

249.    On September 23, 2010, hearings were held by the FCIC in Sacramento, California.    Part of the hearings involved the role that Clayton played in the mortgage securitization process.  Clayton's then-current Senior Vice President of Transaction Management Vicki Beal ("Beal") suggested that, rather than directing due diligence firms to conduct thorough portfolio reviews that would most likely identify defective loans, the investment banks, such as Merrill Lynch, Lehman Brothers and Greenwich pressured loan reviewers to disregard the problematic loans through the use of exceptions and offsets, even in cases where such practices did not satisfy the applicable underwriting guidelines.

250.    Clayton reviewed 911,000 loans for 23 investment or commercial banks, including Merrill Lynch, Lehman Brothers and Greenwich (the "Trending Report").   The Trending Report covered roughly 10% of the total number of mortgages Clayton was contracted to review.  Clayton graded each loan for credit and compliance by using the following grading scale: Event 1, loans that meet guidelines; Event 2, loans that do not meet guidelines but have sufficient compensating factors; and Event 3, loans that do not meet guidelines and have insufficient compensating factors.

251.    Of the mortgage loans reviewed, only 54% met the lenders' underwriting standards.  About 28% of the loans sampled were initially rejected, as they were unable to meet numerous underwriting standards.  However, according to the testimony of Beal and Johnson,

39% of these troubled loans were waived back into the mortgage pools and sold to investors like Plaintiff ABP during the period.

252.     Clayton provided a report which contained the rejection and waiver rates for the loans that were pooled into RMBS by Merrill Lynch, Lehman Brothers and Greenwich and sold to investors like Plaintiff.   It revealed that of the Merrill Lynch securitized loans that Clayton reviewed for underwriting compliance, 23% neither met underwriting guidelines nor possessed compensating factors to justify an exception to be included into securitizations (Event 3). However, Merrill Lynch ignored many of these underwriting failures and waived *32%* of those rejected loans back into its mortgage pools, and sold mortgage backed securities containing these non-compliant loans to investors like Plaintiff ABP.   Of the Lehman Brothers securitized loans that Clayton reviewed for underwriting compliance, 26% neither met underwriting guidelines nor possessed compensating factors to justify an exception, but Lehman nonetheless waived *37%* of those rejected loans back into its mortgage pools.   Of the Greenwich securitized loans that Clayton reviewed for underwriting compliance, 18% neither met underwriting guidelines nor possessed compensating factors to justify an exception, but Greenwich nonetheless waived *53%* of those rejected loans back into its mortgage pools.

253.     Additionally, in their capacity as underwriters for the Certificates purchased by ABP, Defendants Merrill Lynch, MLPFS and GCM had an obligation to conduct due diligence regarding the accuracy and completeness of the Offering Documents prior to their dissemination to investors such as ABP.   In connection with that due diligence process, the Underwriter Defendants had access to various sources of information, including the Clayton Report, that should have alerted them to the various originators' systematic and widespread abandonment of stated underwriting guidelines and appraisal methods.   The Underwriter Defendants were

supposed to play a "gatekeeper" role for public investors like Plaintiff, who did not have access to non-public information through which to test the assertions in the Offering Documents.

254.    However, it is evident that the Underwriter Defendants did not fulfill their obligations to ensure that investors, like ABP, were provided with Offering Documents containing accurate and complete information. For example, Ms. Beal told the FCIC in her prepared remarks, "to our knowledge, prospectuses do not refer to Clayton and its due diligence work."  She further stated that "Clayton does not participate in the securities sales process, nor does it have knowledge of our loan exception reports being provided to investors or the rating agencies as part of the securitization process."

255.    Because Clayton only reviewed a small portion of the loans that Merrill Lynch, Lehman Brothers and Greenwich securitized, it is apparent that Merrill Lynch, Lehman Brothers and Greenwich either knew or acted with reckless disregard with respect to the risk that a substantial number of the loans that were included in the securitizations purchased by Plaintiff ABP were not underwritten in compliance with the originator's underwriting guidelines.

256.    Since Merrill Lynch, Lehman Brothers and Greenwich paid lower prices to acquire troubled loans from the various originators, it could have passed these discounts on to investors like Plaintiff ABP.  Instead, Defendants charged investors such as Plaintiff ABP the same high prices that were associated with better-quality loans, thereby increasing their own profits on securitizations that *they knew* were problematic.

257.    Thus, contrary to the representations in the Offering Documents, the mortgage loans underlying Plaintiff's Certificates not only did not comply with the underwriting standards as represented, but these standards were knowingly and systemically ignored by Merrill Lynch,

Lehman and Greenwich in order to achieve their respective goal of originating and securitizing as many loans as possible in order to maximize their fees.

258.    As represented in the Offering Documents, Defendants' underwriting guidelines were primarily intended to assess the ability and willingness of the borrower to repay the mortgage loan, apart from the adequacy of the mortgaged property as collateral for the loan. Accordingly, the underwriting guidelines required the consideration of, among other things, the borrower's assets, liabilities, income, employment history and credit history.

259.    Notwithstanding these explicit requirements in their underwriting guidelines, the originators extended numerous loans even though the borrower's financial and employment information was not provided, or even if it was, where that information was patently false and the originators knew that the borrower was misrepresenting her or his income, occupation and other information, and was engaged in outright mortgage fraud.

## V.    DEFENDANTS SYSTEMATICALLY MISREPRESENTED THAT APPRAISALS FOR THE SECURITIZED MORTGAGES WERE CONDUCTED IN ACCORDANCE WITH INDUSTRY APPROVED APPRAISAL STANDARDS

260.    With the emergence of the RMBS market, mortgage lenders including the Originators found that they could reap the benefits of unrestrained lending while offloading the risks onto investors such as ABP.  As a result the Originators had little to no financial interest in whether the mortgaged properties would provide sufficient collateral in case of default, as long as underwriters such as the Underwriter Defendants were willing to buy their mortgage loans for securitization.

261.    The Originators responded to these perverse incentives in part by disregarding USPAP uniform appraisal standards and systematically inflating appraisal values, in many instances lending more than the mortgaged properties were really worth.

262.     Some appraisers were openly instructed to alter their valuations for the benefit of the mortgage lenders.  According to the June 26, 2007 testimony of Alan Hummel, the chair of the Appraisal Institute's Government Relations Committee, before the House Committee on Financial Services on 'Legislative Proposals on Reforming Mortgage Practices,' "Unfortunately, these parties with a vested interest in the transaction are often the same people managing the appraisal process within many financial institutions, and therein is a terrible conflict of interest. . . . [I]t is common for a client to ask an appraiser to remove details about the material condition of the property to avoid problems in the underwriting process."  A 2007 study conducted by the October Research Corporation reported that 90% of appraisers had been pressured to raise property valuations so that deals could go through, and that 75% of appraisers reported "negative ramifications" if they did not alter their appraisals accordingly.

263.     For example, Option One routinely inflated appraisal values and, in those instances when underwriters questioned the appraised values, permitted sales personnel to routinely override the underwriters' objections.  A staff review appraiser working for Option One described the company's appraisals as bordering on fraudulent.  *See* Paragraph 227, *supra.*

264.     Likewise, a corporate underwriter who worked at First Franklin between 2005 and 2007 said that managers would contact appraisers who did not provide sufficiently high appraisal values and request re-appraisals until they were satisfied.  Another underwriter said that First Franklin managers instructed appraisers to leave flaws in properties out of their appraisals, and only worked with appraisers whom they knew would cooperate.  *See* Paragraphs 107-08, *supra.*

265.     Countrywide committed some of the most flagrant violations of USPAP in its appraisal practices.  Since at least 2005, loan officers from all of Countrywide's origination divisions were permitted to (i) hire appraisers of their own choosing, (ii) discard appraisals that

did not support loan qualification, and (iii) replace appraisers when necessary to obtain a more favorable LTV so as to qualify a loan for approval. Countrywide loan officers were allowed to lobby appraisers to assign particular values to a property in order to support the closing of a loan. In fact, Countrywide intimidated appraisers in order to hit the appraisals that Countrywide needed to support the making of a mortgage loan. By employing these practices, Countrywide methodically and deliberately enlisted appraisers in its scheme to inflate appraisals, which resulted in the issuance of low-quality, high-risk loans.

266.     An independent appraiser stated that Countrywide in-house or outside loan officers demanded inflated numbers from him in Compton and Watts, California. The officers told him to either give them the appraisal numbers they wanted or that he would be "done" and that he would be blackballed by every lender doing business in California. According to this appraiser, he completed over 100 inflated appraisals just for Countrywide and one other mortgage lender. In some cases he was appraising houses for $100,000 more than they were worth in such dangerous neighborhoods that he never even got out of his car, but simply drove by and took pictures of the house and gave the broker or the lender the number that was demanded.

267.     A former Regional Vice President of Countrywide KB Home Loans, Inc. ("CWKB") has alleged that Landsafe – the only appraiser employed by CWKB to appraise the homes on behalf of the joint venture – was encouraged to inflate the value of appraised homes by as much as 6% in order to allow the borrower to "roll up" the closing costs of the mortgage. This practice resulted in the actual home value being less than the mortgaged amount, putting the home buyer "upside down" on the home immediately after purchasing it. It also put RMBS investors such as ABP at risk because they were unaware of the true value of the underlying real

estate assets.  The same practice is also described in *Zaldana, et al. v. KB Home, et al.*, No. CV 08-3399 (EDL) (N.D. Ca.), a class action brought on behalf of purchasers of houses built by KB Home.  The plaintiffs in this action describe a process whereby KB Home paid Countrywide to make loans with subsidized initial payments to KB Home borrowers.  This allowed  KB Home to prop up the ostensible sales price of the houses and sell to buyers who would not otherwise be able to afford or qualify for the monthly mortgage payments.   In turn, Countrywide had its Landsafe appraisers ignore the subsidies and appraise the houses at the full stated sales price, thereby inflating the actual value of the house.

268.    Even absent explicit coercion or collusion, mortgage originators could inflate apparent home values simply by offering work to only complaint appraisers.  According to the April 7, 2010 testimony of Richard Bitner ("Bitner"), a former executive of a subprime mortgage originator, before the FCIC, "[B]rokers didn't need to exert direct influence.  Instead they picked another appraiser until someone consistently delivered the results they needed."

269.    Widespread and systematic overvaluations by mortgage originators set into motion a snowball effect that inflated housing prices all across the country and further distorted the RMBS market.  As Bitner testified, "If multiple properties in an area are overvalued by 10%, they become comparable sales for future appraisals.  The process then repeats itself.  We saw it on several occasions.  We'd close a loan in January and see the subject property show up as a comparable sale in the same neighborhood six months later.  Except this time, the new subject property, which was nearly identical in size and style to the home we financed in January, was being appraised for 10% more. . . . In the end, the subprime industry's willingness to consistently accept overvalued appraisals significantly contributed to the run-up in property values experienced throughout the country."

270.    Reflecting the importance of independent and accurate real estate appraisals to investors such as ABP, the Offering Documents contained extensive disclosures concerning the value of the collateral underlying the mortgages pooled in the Issuing Trusts, and the appraisal methods by which such values were obtained.  Each Prospectus Supplement also reported the average LTV ratios of the mortgage loans pooled in the Issuing Trusts.

271.    Because investors such as ABP would not have invested in the Certificates had it known of Originators' abandonment of prudent appraisal methods, Defendants falsely claimed in the Offering Documents that the mortgaged properties securing the Certificates had been appraised by qualified independent appraisers in conformance with USPAP.  Defendants further claimed in the Offering Documents that their appraisal values were based on market data analyses of recent sales of comparable properties.

272.    Defendants' claims regarding LTV ratios were also false and misleading.  Due to the Originators' systematic abuse of the appraisal process and disregard for USPAP appraisal standards, the reported value of the properties securing the mortgage loans was substantially overstated.  This distorted the loan-to-value ratio, making the Certificates appear to be safer investments than they actually were.

273.    For example, the FHFA's reviews of the loans underlying 68 Greenwich Capital RMBS revealed that Greenwich Capital also consistently misrepresented the LTV ratios of the underlying mortgages and the number of properties with high LTV ratios.  For each loan it examined, the FHFA used an industry standard automated valuation model ("AVM") to calculate the value of the mortgaged property at the time of origination.  AVMs are commonly used in the real estate industry and rely upon similar data as appraisers, including county records, tax records, and data on comparable properties.

274.    The FHFA's review of 68 Greenwich Capital RMBS revealed that in each case, the offering documents understated the percentage of underwater loans (loans with LTV ratios greater than 100%) by up to 34.34%.  ABP purchased Certificates issued by one of the RMBS that the FHFA reviewed, the First Franklin Mortgage Loan Trust Asset Backed Certificates, Series 2006-FF16.  The Prospectus Supplement for the RMBS reported that 60.15% of the underlying mortgages had LTV ratios at or less than 80%, and that none of the underlying mortgages had LTV ratios greater than 100%.  In truth, only 38.48% of the underlying mortgages had LTV ratios at or less than 80%, and 16.14% of the underlying mortgages were already underwater.

## VI.    THE CREDIT RATINGS ASSIGNED TO THE CERTIFICATES MATERIALLY MISREPRESENTED THE CREDIT RISK OF THE CERTIFICATES

275.    The AAA and otherwise investment grade credit ratings of the Certificates were an important factor in Plaintiff ABP's decision to purchase the Certificates.  Because Plaintiff ABP is a conservative institutional investor, it purchased only investment grade Certificates, the vast majority of which were rated AAA.

276.    Investment grade securities are understood by investors to be stable, secure and safe.  A rating of AAA denotes high credit quality, and is the same rating as those typically assigned to bonds backed by the full faith and credit of the United States Government, such as treasury bills. Historically, before 2007, investments with AAA ratings had an expected cumulative loss rate of less than 0.5 percent, with an annual loss rate of close to zero.  According to Standard and Poor's, the default rate on all investment grade corporate bonds (including AA, A and BBB) from 1981 to 2007, for example, averaged about .094% per year and was not higher than 0.41% in any year.

277.    The Defendants well understood (and banked on) the importance that purchasers of mortgage-backed securities attached to credit ratings.  In most cases, the purchasers were institutional investors such as ABP who did not have the knowledge, means or wherewithal to independently analyze the mortgage pools underlying any particular offering to verify for themselves that the ratings were accurately determined.

278.    Accordingly, Defendants featured the ratings prominently in the Offering Documents and discussed at length the ratings assigned to the Certificates, and the bases for the ratings.  Each Prospectus Supplement stated that the issuance of each tranche of the Certificates was conditioned on the assignment of particular, investment-grade ratings, and listed the ratings in a chart.  Almost all the Certificates purchased by ABP were AAA-rated securities, and the remainder were also investment grade.

279.    Unbeknownst to ABP and other investors, at all relevant times, Defendants knew that the ratings were not reliable because those ratings were bought and paid for, and were supported by, flawed information provided by Defendants to the rating agencies.  In fact, Defendants manipulated the rating agencies to obtain the desired ratings for the Certificates.

280.    Specifically, the ratings of the Certificates were significantly compromised by the misinformation provided by Defendants to the rating agencies.  Among other matters, Defendants did not disclose to the rating agencies that the Originators had abandoned their underwriting standards by, among other things, manipulating the assets, liabilities, income and other important information concerning borrowers; using false metrics to qualify borrowers; and aggressively using exceptions to qualify borrowers.  Defendants did not disclose that, in obtaining appraisals to value the underlying collateral, the Originators used inflated appraisals

that departed from industry approved standards.   Defendants did not otherwise disclose their

knowledge of the pervasive fraud that affected the mortgages underlying the Certificates.

281.   Apart from supplying incomplete and false information to the rating agencies,

Defendants also manipulated its relationship with the rating agencies in order to achieve the

desired ratings.   The rating agencies received enormous revenues from the issuers who paid them

for rating their securities.   Because the desired rating of a securitized product was the starting

point for any securities offering, the rating agencies were actively involved in helping

Defendants structure the products to achieve the requested rating.   As a result, the rating agencies

worked backwards, starting with Defendants' target rating and then working toward a structure

that would yield the desired rating.    Among other things, the rating agencies instructed

Defendants on how much "credit enhancement" to provide to each tranche of the Certificates, in

order to secure the desired ratings.

282.   In this manner, Defendants were able to manipulate the rating agencies to achieve

the inflated ratings they desired.   Through repeated communications with the rating agencies,

Defendants were effectively able to reverse engineer aspects of the ratings models and then

modify the structure of an offering to improve the ratings without actually improving the

underlying credit quality.

283.   There is evidence that Defendant Merrill Lynch manipulated the rating agencies

by using fees as bargaining chips.   According to documents released by the U.S. Subcommittee

for Permanent Investigations, in June 2007, Merrill Lynch was seeking a rating from Moody's

for a CDO.   Moody's agreed to rate the CDO, but only for a higher than usual fee using a

"complex CDO fee schedule."   In an email exchange, Merrill Lynch wrote, "We are okay with

the revised fee schedule for this transaction.   We are agreeing to this under the assumption that

this will not be a precedent for any future deals and that you will work us further on this transaction to try and get to some middle ground with respect to the ratings."

284.    Merrill Lynch also sought to influence the rating agencies by refusing to permit certain analysts to rate Merrill Lynch transactions.  For example, Richard Michalek, a former Moody's employee responsible for legal analysis of complex structured finance transactions, testified before the United States Senate Subcommittee for Permanent Investigations that, "During my tenure at Moody's, I was explicitly told that I was 'not welcome' on deals structured by certain banks, however, I never saw a 'list.'  I was told by my then-current managing director in 2001 that I was 'asked to be replaced' on future deals by Chris Ricciardi, who headed the structured group at CSFB, and then at Merrill Lynch. . . . When Mr. Ricciardi left CSFB to head the structured group at Merrill Lynch, I was co-incidentally 're-assigned' off of a Merrill Lynch deal on which work had not yet begin, even though I had never worked on a Merrill CDO before."

285.    The rating process was further compromised by the practice of "rating shopping." Defendants did not pay for the credit rating agencies' services until after the agencies submitted a preliminary rating.  Essentially, this practice created bidding wars in which the issuers would hire the agency that was providing the highest rating for the lowest price.  The credit rating agencies were only paid if they delivered the desired investment grade ratings, and only in the event that the transaction closed with those ratings.  "Ratings shopping" jeopardized both the integrity and independence of the rating process.

286.    On May 13, 2010, Bloomberg reported that the New York Attorney General had subpoenaed Merrill Lynch to as part of a probe into see whether investment banks misled rating

agencies about the quality of its RMBS.  The probe is focusing on whether Merrill Lynch, among others, manipulated the companies' ratings models.

287.    According to the Levin Report, former ratings agency analysts and managers told the Senate's Permanent Subcommittee on Investigations that investment banks pressured them to get their deals done quickly, increase the size of the tranches that received AAA ratings and reduce the credit enhancements protecting the AAA tranches from loss.

288.    As a result, the Certificates were not worthy of the investment grade ratings given to them, as evidenced most clearly by the fact that many of the Certificates – all initially awarded investment grade ratings (mostly AAA) – have now been downgraded to junk, a vast number of the underlying loans have been foreclosed upon, and the remaining underlying loans are suffering from crippling deficiencies and face serious risks of default.  The collective downgrade of AAA and otherwise investment-grade rated Certificates indicates that the ratings set forth in the Offering Documents were false, unreliable and inflated.

289.    By including and endorsing the AAA and other investment grade ratings contained in the Offering Documents, Defendants falsely represented that they actually believed that the ratings were an accurate reflection of the credit quality of the Certificates.

## VII.    DEFENDANTS' "CREDIT ENHANCEMENTS" DID NOT PROVIDE SECURITY

290.    Defendants used a variety of credit enhancements.  The most common was "subordination" in which the Defendants created a hierarchy of loss absorption among the tranche securities.  To create that hierarchy, Defendants placed the pool's tranches in an order, with the lowest tranche required to absorb any losses first, before the next highest tranche. Losses might occur, for example, if borrowers defaulted on their mortgages and stopped making mortgage payments into the pool.  Lower level tranches most at risk of having to absorb losses typically received noninvestment grade ratings from the credit rating agencies, while the higher

level tranches that were protected from loss typically received investment grade ratings. One key task for both Defendants and the credit rating agencies was to calculate the amount of "subordination" required to ensure that the higher tranches in a pool were protected from loss and could be given AAA or other investment grade ratings.

291. A second common form of credit enhancement was "over-collateralization." In this credit enhancement, the Defendants ensured that the revenues expected to be produced by the assets in a pool exceeded the revenues designated to be paid out to each of the tranches. That excess amount provided a financial cushion for the pool and was used to create an "equity" tranche, which was the first tranche in the pool to absorb losses if the expected payments into the pool were reduced. This equity tranche was subordinate to all the other tranches in the pool and did not receive any credit rating. The larger the excess, the larger the equity tranche, and the larger the cushion created to absorb losses and protect the more senior tranches in the pool. In some pools, the equity tranche was also designed to pay a relatively higher rate of return to the party or parties who held that tranche due to its higher risk.

292. Still another common form of credit enhancement was the creation of "excess spread," which involved designating an amount of revenue to pay the pool's monthly expenses and other liabilities, but ensuring that the amount was slightly more than what was likely needed for that purpose. Any funds not actually spent on expenses would provide an additional financial cushion to absorb losses, if necessary.

293. S&P and Moody's both made use of automated systems to determine the level of credit enhancement that an RMBS would require to qualify its top tranches for a AAA trading. These models analyzed loan data (including LTV and owner-occupancy ratios) and other factors to estimate the number of loans that were likely to default, the amount of expected losses, and

the level of credit enhancement that would be necessary to protect senior bondholders such as ABP.  Because, however, the information that Defendants fed into these programs regarding borrower data and loan characteristics was untrue, the programs severely underestimated default rates and losses, and recommended insufficient levels of credit enhancement.  Defendants were aware that there was no possibility that the rating agencies' computer models could accurately assess the risk of their RMBS offerings and recommend appropriate deal structures given the faulty loan data that was input, but they ignored this so as to obtain the maximum ratings with the minimum amount of credit enhancement.

294.    As set forth below, representations regarding the inclusion and scope of these credit enhancements were made in all of the Offering Documents.  These representations were false and misleading because all of the purported "enhancements" depended on or derived from inflated appraisals of the mortgaged properties, which caused the listed LTV ratios and levels of credit enhancement to be untrue.

## VIII.   A SIGNIFICANT NUMBER OF THE MORTGAGE LOANS WERE MADE TO BORROWERS WHO DID NOT OCCUPY THE PROPERTIES IN QUESTION

295.    The Offering Documents contained information regarding the purported occupancy status of the mortgaged properties including whether they were primary homes, investment property, or second homes.  These representations were material to investors such as ABP because high owner-occupancy rates would have made the Certificates safer investments than Certificates backed by second homes or investment properties.

296.    Another company, Allstate Insurance Company ("Allstate") conducted loan-level analyses of nine Merrill Lynch RMBS it had purchased.  This forensic analysis covered thousands of mortgage loans.  To determine whether a given borrower actually occupied the property as Merrill Lynch represented in the Offering Documents, Allstate investigated tax

information for the sampled loans.  Additionally, a review of credit records, property records and lien records was conducted in effort to determine whether the borrowers were in fact residing at the mortgaged property.

297.    Allstate found that for each of the nine Merrill Lynch RMBS that it reviewed, the Offering Documents had overstated the percentage of borrowers who occupied the mortgaged properties by as much as 14.07%.

298.    ABP purchased Certificates issued by one of the RMBS that Allstate reviewed, the Merrill Lynch Mortgage Investors Trust, Series 2006-OPT1.  The Prospectus Supplement for this RMBS represented that 93.41% of the mortgage pool consisted of owner-occupied properties.  However, Allstate's review determined that in reality, Merrill Lynch had overstated the owner occupancy rate by 8.69% and that only 84.71% of the properties were actually owned-occupied.

299.    The FHFA performed similar analyses of owner-occupancy rates for 68 Greenwich Capital RMBS that it had purchased.  It found that for each of the Greenwich Capital RMBS that it reviewed, the Offering Documents had overstated the percentage of borrowers who occupied the mortgaged property by at least six percent, and by as much as 23.25%.

300.    ABP purchased Certificates issued by one of the RMBS that the FHFA reviewed, the First Franklin Mortgage Loan Trust Asset Backed Certificates, Series 2006-FF16.  The Prospectus Supplement for the RMBS represented that 94.05% of the mortgage pool consisted of owner-occupied properties.  However, the FHFA's review determined that, in reality, Greenwich Capital had overstated the owner occupancy rate by 11.14%, and that only 88.16% of the properties were actually owner-occupied.

## IX.    DEFENDANTS FAILED TO ENSURE THAT TITLE TO THE UNDERLYING MORTGAGE LOANS WAS EFFECTIVELY TRANSFERRED

301.    A fundamental aspect of the mortgage securitization process is that the issuing trust for each offering must obtain good title to the mortgage loans comprising the pool for that offering.  This is necessary in order for the holders of the RMBS to be legally entitled to enforce the mortgage loans in the event of default.  Two documents relating to each mortgage loan must be validly transferred to the trust as part of the securitization process – a promissory note and a security instrument (either a mortgage or a deed of trust).

302.    The rules for these transfers are governed by the law of the state where the property is located, by the terms of the pooling and servicing agreement ("PSA") for each securitization, and by the law governing the issuing trust (with respect to matters of trust law).  In general, state laws and the PSAs require the promissory note and security instrument to be transferred by indorsement, in the same way that a check can be transferred by indorsement, or by sale.  In addition, state laws generally require that the trustee of the issuing trust have physical possession of the original, manually signed promissory note in order for the loan to be enforceable by the trustee against the borrower in the event of a default by the borrower.

303.    In order to preserve the bankruptcy-remote status of the issuing trusts in RMBS transactions, the notes and security instruments are generally not directly transferred from the mortgage loan originator to the trust.  Rather, the notes and security instruments are initially transferred from the originator to the depositor, either directly or via one or more special-purpose entities.  After this initial transfer to the depositor, the depositor transfers the notes and security interests to the issuing trust for the particular securitization.  Each of these transfers must be valid under applicable state law in order for the trust to have good title to the mortgage loans.

304.     To ensure that the trust qualifies as a tax-free real estate mortgage investment conduit ("REMIC"), the PSA generally requires the transfers to the trust to be completed within a strict time limit after formation of the trust.  Furthermore, the applicable trust law in each state generally requires strict compliance with the trust documents, including the PSA, so that failure to comply strictly with the timeliness, indorsement, physical delivery and other requirements of the PSA with respect to the transfers of the notes and security instruments means that the transfers would be void and the trust would not have good title to the mortgage loans.  Adam Levitin, a professor of law at Georgetown University, testified before the United States House Subcommittee on Housing and Community Opportunity, that, "If the notes and mortgages were not properly transferred to the trusts, then the mortgage-backed securities that the investors purchased were in fact *non-mortgage backed securities*."

305.     The Offering Documents for the Certificates represented in substance that the Issuing Trust for each respective offering had obtained good title to the mortgage loans comprising the pool underlying the offering.   However, in actual fact, Originators and Defendants routinely and systematically failed to comply with the requirements of applicable state laws and the PSAs for valid transfers of the notes and security instruments.

306.     For example, according to an employee of one of the Originators, at Countrywide it was standard operating procedure for the physical title transfer documents to be retained within the corporate entity as opposed to providing it to the relevant issuing trust.  According to the employee's testimony, that was "***the normal course of business [because] we are the servicer, [and] we're the ones that are doing all the servicing, and that would include retaining the documents.***"

307.    According to a June 12, 2011 NEW YORK TIMES article, The New York and Delaware state attorneys general have launched an investigation targeting Bank of America, Merrill Lynch's parent company, in a probe questioning the validity of potentially thousands of mortgage transfers.

## X.    DEFENDANTS' SPECIFIC MATERIAL MISSTATEMENTS AND OMISSIONS IN THE OFFERING DOCUMENTS

308.    In light of the numerous departures from underwriting guidelines and appraisal standards by the Originators described above, the Offering Documents (Registration Statements and Prospectus Supplements) disseminated by Defendants in the course of selling the Certificates contained numerous misstatements and omissions.

### A.    DEFENDANTS MADE FALSE AND MISLEADING STATEMENTS REGARDING UNDERWRITING STANDARDS AND PRACTICES

309.    The Prospectus Supplements disseminated by Defendants in the course of selling the Certificates, and therefore the Registration Statements of which those Prospectus Supplements formed a part, contained the following misleading statements, amongst others, in identical or substantially similar language, regarding the underwriting standards and practices that the Originators applied in originating the mortgage loans underlying the Certificates.

> Underwriting standards are applied by or on behalf of a lender to evaluate a prospective borrower's credit standing and repayment ability, and the value and adequacy of the mortgaged property as collateral.

The above misstatements were contained in the following Offering Documents: Registration Statement (333-130961) filed by RBS Acceptance (Form S-3/A, Am. 3), at 52 (Mar. 31, 2006); Registration Statement (333-133985) filed by Structured Asset Securities Corp. (Form S-3/A, Am. 3), at 73 (Aug. 8, 2006); Prospectus Supplement for First Franklin Mort. Loan Trust 2006-FF16 (Form 424B5) at S-77 (Nov. 17, 2006); Prospectus Supplement for First Franklin Mort.

Loan Trust, Series 2007-FF1 (Form 424B5) at S-33 (Jan. 25, 2007); Prospectus Supplement for

First Franklin Mort. Loan Trust 2006-FF15 (Form 424B5) at S-54 (Oct. 27, 2006); Prospectus

Supplement for First Franklin Mort. Loan Trust 2006-FF17 (Form 424B5) at S-54 (Nov. 27,

2006); Prospectus Supplement for First Franklin Mort. Loan Trust 2006-FFA (Form 424B5) at

S-51 (Oct. 31, 2006); Prospectus Supplement for First Franklin Mort. Loan Trust 2006-FFB

(Form 424B5) at S-53 (Dec. 1, 2006); Prospectus Supplement for Lehman XS Trust, Series

2006-4N (Form 424B5) at S-55 (Apr. 3, 2006); Prospectus Supplement for Lehman XS Trust,

Series 2006-14N (Form 424B5) at S-76 (Aug. 31, 2006); Prospectus Supplement for Lehman XS

Trust, Series 2006-20 (Form 424B5) at S-57 (Jan. 3, 2007); Prospectus Supplement for Lehman

XS Trust 2007-8H (Form 424B5) at S-57 (Jun. 4, 2007); Prospectus Supplement for Lehman XS

Trust, Series 2007-4N (Form 424B5) at S-79 (Apr. 2, 2007); Prospectus Supplement for Merrill

Lynch Alt. Note Asset Trust, Series 2007-A1 (Form 424B5) at S-40-41 (Feb. 12, 2007);

Prospectus Supplement for Merrill Lynch First Franklin Mort. Loan Trust, Series 2007-1 (Form

424B5) at S-35 (Mar. 27, 2007); Prospectus Supplement for Merrill Lynch First Franklin Mort.

Loan Trust, Series 2007-2 (Form 424B5) at S-34 (Apr. 27, 2007); Prospectus Supplement for

Merrill Lynch First Franklin Mort. Loan Trust, Series 2007-3 (Form 424B5) at S-35 (May 30,

2007); Prospectus Supplement for Merrill Lynch First Franklin Mort. Loan Trust, Series 2007-4

(Form 424B5) at S-35 (Jun. 26, 2007); Prospectus Supplement for Merrill Lynch Mort. Investors

Trust, Series 2006-AF2 (Form 424B5) at S-38 (Oct. 31, 2006); Prospectus Supplement for

Merrill Lynch Mort. Investors Trust, Series 2006-HE4 (Form 424B5) at S-34 (Jul. 26, 2006);

Prospectus Supplement for Merrill Lynch Mort. Investors Trust, Series 2006-HE5 (Form 424B5)

at S-36 (Sep. 28, 2006); Prospectus Supplement for Merrill Lynch Mort. Investors Trust, Series

2006-HE6 (Form 424B5) at S-38 (Dec. 27, 2006); Prospectus Supplement for Merrill Lynch

Mort. Investors Trust, Series 2006-OPT1 (Form 424B5) at S-37 (Sep. 26, 2006); Prospectus Supplement for Merrill Lynch Mort. Investors Trust, Series 2006-RM5 (Form 424B5) at S-35 (Oct. 27, 2006); Prospectus Supplement for Merrill Lynch Mort. Investors Trust, Series 2007-HE3 (Form 424B5) at S-37 (Jun. 8, 2007); Prospectus Supplement for Structured Asset Securities Corp. Mort. Loan Trust 2006-BC5 (Form 424B5) at S-62 (Dec. 1, 2006); Prospectus Supplement for Structured Asset Securities Corp. Mort. Loan Trust 2007-BC3 (Form 424B5) at S-66 (May 31, 2007); Prospectus Supplement for Structured Asset Securities Corp. Mort. Loan Trust 2006-S1 (Form 424B5) at S-49-50 (Mar. 1, 2006); Prospectus Supplement for Structured Asset Securities Corp. Mort. Loan Trust 2007-OSI (Form 424B5) at S-64 (May 31, 2007); Prospectus Supplement for Structured Asset Securities Corp. Mort. Loan Trust 2006-BC4 (Form 424B5) at S-64 (Nov. 30, 2006); Prospectus Supplement for Lehman XS Trust, Series 2006-10N (Form 424B5) at S-76 (Jul. 5, 2006); Registration Statement (333-129480) filed by SAS (Form S-3/A, Am. 3), at 73 (Mar. 29, 2006).

310.    The statements quoted above were false because they represented that the Originators applied underwriting guidelines to assess the value of the mortgaged properties, evaluate the adequacy of such properties as collateral for the mortgage loans and assess the applicants' abilities to repay their mortgage loans, when in fact the Originators had actually abandoned these standards so that they could increase the volume of loan origination and the resulting fees that they earned.  For further discussion of Originators' disregard of their stated underwriting guidelines, *see* Section IV.A, *supra*.

## B.  DEFENDANTS MADE FALSE AND MISLEADING STATEMENTS REGARDING QUALITY CONTROL PROCEDURES

311.    The Offering Documents represented that numerous quality control procedures were conducted with respect to the loans underlying the Certificates.  For example, the Offering Documents contained, in sum or substance, the following representation:

> Quality control reviews are conducted to ensure that all mortgage loans meet quality standards.

The above misstatements were contained in the following Offering Documents: Prospectus Supplement for Merrill Lynch Mort. Investors Trust, Series 2006-HE4 (Form 424B5) at S-45 (Jul. 26, 2006); Prospectus Supplement for First Franklin Mort. Loan Trust 2006-FF16 (Form 424B5) at 79 (Nov. 17, 2006); Prospectus Supplement for First Franklin Mort. Loan Trust, Series 2007-FF1 (Form 424B5) at S-37 (Jan. 25, 2007); Prospectus Supplement for First Franklin Mort. Loan Trust 2006-FF15 (Form 424B5) at S-57 (Oct. 27, 2006); Prospectus Supplement for First Franklin Mort. Loan Trust 2006-FF17 (Form 424B5) at S-57 (Nov. 27, 2006); Prospectus Supplement for First Franklin Mort. Loan Trust 2006-FFA (Form 424B5) at S-53 (Oct. 31, 2006); Prospectus Supplement for First Franklin Mort. Loan Trust 2006-FFB (Form 424B5) at S-55 (Dec. 1, 2006); Prospectus Supplement for Lehman XS Trust, Series 2006-4N (Form 424B5) at S-55 (Apr. 3, 2006); Prospectus Supplement for Lehman XS Trust 2007-8H (Form 424B5) at S-59 (Jun. 4, 2007); Prospectus Supplement for Lehman XS Trust, Series 2007-4N (Form 424B5) at S-79 (Apr. 2, 2007); Prospectus Supplement for Merrill Lynch Alt. Note Asset Trust, Series 2007-A1 (Form 424B5) at S-35 (Feb. 12, 2007); Prospectus Supplement for Merrill Lynch First Franklin Mort. Loan Trust, Series 2007-1 (Form 424B5) at S-38 (Mar. 27, 2007); Prospectus Supplement for Merrill Lynch First Franklin Mort. Loan Trust, Series 2007-2 (Form 424B5) at S-37 (Apr. 27, 2007); Prospectus Supplement for Merrill Lynch First Franklin Mort. Loan Trust, Series 2007-3 (Form 424B5) at S-38 (May 30, 2007); Prospectus Supplement for

Merrill Lynch First Franklin Mort. Loan Trust, Series 2007-4 (Form 424B5) at S-38 (Jun. 26, 2007); Prospectus Supplement for Merrill Lynch Mort. Investors Trust, Series 2006-HE6 (Form 424B5) at S-42 (Dec. 27, 2006); Prospectus Supplement for Merrill Lynch Mort. Investors Trust, Series 2006-OPT1 (Form 424B5) at S-40 (Sep. 26, 2006); Prospectus Supplement for Merrill Lynch Mort. Investors Trust, Series 2006-RM5 (Form 424B5) at S-37 (Oct. 27, 2006); Prospectus Supplement for Merrill Lynch Mort. Investors Trust, Series 2007-HE3 (Form 424B5) at S-39 (Jun. 8, 2007); Prospectus Supplement for Structured Asset Securities Corp. Mort. Loan Trust 2007-OSI (Form 424B5) at S-61 (May 31, 2007); Prospectus Supplement for Structured Asset Securities Corp. Mort. Loan Trust 2006-BC4 (Form 424B5) at S-75 (Nov. 30, 2006); Prospectus Supplement for Lehman XS Trust, Series 2006-10N (Form 424B5) at S-76 (Jul. 5, 2006).

312.    The above statements of material facts were untrue when made because they failed to disclose that the Sponsors and Originators did not, in fact, apply quality control measures to assess the value of the mortgaged properties, evaluate the adequacy of such properties as collateral for the mortgage loans and assess the applicants' ability to repay their mortgage loans.

C.    **DEFENDANTS MADE FALSE AND MISLEADING STATEMENTS REGARDING UNDERWRITING EXCEPTIONS**

313.    The Prospectus Supplements disseminated by Defendants in the course of selling the Certificates, and therefore the Registration Statements of which those Prospective Supplements formed a part, contained the following misleading statements, among others, using identical or substantially similar language, regarding the circumstances under which Defendants granted underwriting exceptions for loans underlying the Certificates:

> On a case by case basis, an underwriter may determine that, based upon compensating factors, a prospective mortgagor not strictly

qualifying under the underwriting risk category guidelines described below warrants an underwriting exception. Compensating factors may include, but are not limited to, low loan-to-value ratio, low debt-to-income-ratio, substantial liquid assets, good credit history, stable employment and time in residence at the applicant's current address.

The above misstatements were contained in the following Offering Documents: Prospectus Supplement for First Franklin Mort. Loan Trust 2006-FF15 (Form 424B5) at S-55 (Oct. 27, 2006); Prospectus Supplement for First Franklin Mort. Loan Trust 2006-FF16 (Form 424B5) at 78 (Nov. 17, 2006); Prospectus Supplement for First Franklin Mort. Loan Trust, Series 2007-FF1 (Form 424B5) at S-35 (Jan. 25, 2007); Prospectus Supplement for First Franklin Mort. Loan Trust 2006-FF17 (Form 424B5) at S-56 (Nov. 27, 2006); Prospectus Supplement for First Franklin Mort. Loan Trust 2006-FFA (Form 424B5) at S-52 (Oct. 31, 2006); Prospectus Supplement for First Franklin Mort. Loan Trust 2006-FFB (Form 424B5) at S-54 (Dec. 1, 2006); Prospectus Supplement for Lehman XS Trust, Series 2006-4N (Form 424B5) at S-55 (Apr. 3, 2006); Prospectus Supplement for Lehman XS Trust, Series 2006-14N (Form 424B5) at 65 (Aug. 31, 2006); Prospectus Supplement for Lehman XS Trust, Series 2006-20 (Form 424B5) at S-56 (Jan. 3, 2007); Prospectus Supplement for Lehman XS Trust 2007-8H (Form 424B5) at S-57 (Jun. 4, 2007); Prospectus Supplement for Lehman XS Trust, Series 2007-4N (Form 424B5) at S-79 (Apr. 2, 2007); Prospectus Supplement for Merrill Lynch Alt. Note Asset Trust, Series 2007-A1 (Form 424B5) at S-42 (Feb. 12, 2007); Prospectus Supplement for Merrill Lynch First Franklin Mort. Loan Trust, Series 2007-1 (Form 424B5) at S-37 (Mar. 27, 2007); Prospectus Supplement for Merrill Lynch First Franklin Mort. Loan Trust, Series 2007-2 (Form 424B5) at S-35-36 (Apr. 27, 2007); Prospectus Supplement for Merrill Lynch First Franklin Mort. Loan Trust, Series 2007-3 (Form 424B5) at S-37 (May 30, 2007); Prospectus Supplement for Merrill Lynch First Franklin Mort. Loan Trust, Series 2007-4 (Form 424B5) at S-37 (Jun. 26, 2007);

Prospectus Supplement for Merrill Lynch Mort. Investors Trust, Series 2006-AF2 (Form 424B5) at S-38 (Oct. 31, 2006); Prospectus Supplement for Merrill Lynch Mort. Investors Trust, Series 2006-HE4 (Form 424B5) at S-37, S-43 (Jul. 26, 2006); Prospectus Supplement for Merrill Lynch Mort. Investors Trust, Series 2006-HE5 (Form 424B5) at S-36 (Sep. 28, 2006); Prospectus Supplement for Merrill Lynch Mort. Investors Trust, Series 2006-HE6 (Form 424B5) at S-37, S-40 (Dec. 27, 2006); Prospectus Supplement for Merrill Lynch Mort. Investors Trust, Series 2006-OPT1 (Form 424B5) at S-37, S-39 (Sep. 26, 2006); Prospectus Supplement for Merrill Lynch Mort. Investors Trust, Series 2006-RM5 (Form 424B5) at S-36 (Oct. 27, 2006); Prospectus Supplement for Merrill Lynch Mort. Investors Trust, Series 2007-HE3 (Form 424B5) at S-50 (Jun. 8, 2007); Prospectus Supplement for Structured Asset Securities Corp. Mort. Loan Trust 2006-BC5 (Form 424B5) at 66 (Dec. 1, 2006); Prospectus Supplement for Structured Asset Securities Corp. Mort. Loan Trust 2007-BC3 (Form 424B5) at S-68 (May 31, 2007); Prospectus Supplement for Structured Asset Securities Corp. Mort. Loan Trust 2006-S1 (Form 424B5) at S-50 (Mar. 1, 2006); Prospectus Supplement for Structured Asset Securities Corp. Mort. Loan Trust 2007-OSI (Form 424B5) at S-64 (May 31, 2007); Prospectus Supplement for Structured Asset Securities Corp. Mort. Loan Trust 2006-BC4 (Form 424B5) at S-64 (Nov. 30, 2006); Registration Statement (333-133985) filed by SAS (Form S-3/A, Am. 3), at 73 (Aug. 8, 2006); Registration Statement (333-130961) filed by RBS Acceptance Corp. (Form S-3/A, Am. 3), at 283 (Mar. 31, 2006); Prospectus Supplement for Lehman XS Trust, Series 2006-10N (Form 424B5) at S-76 (Jul. 5, 2006); Registration Statement (333-129480) filed by SAS (Form S-3/A, Am. 3), at 73 (Mar. 29, 2006).

314.   The above statement of material facts was untrue when made because it failed to disclose that, in order to generate increased loan volume for securitizations, and in contravention

of Defendants' and the third party originators' underwriting guidelines, Defendants and the third

party originators allowed non-qualifying borrowers to be approved for loans under "exceptions"

to their underwriting standards, even though there were no "compensating factors" that could

possibly justify such an exception.

### D.   DEFENDANTS MADE FALSE AND MISLEADING STATEMENTS AND OMISSIONS REGARDING LOAN-TO-VALUE RATIOS AND APPRAISALS

315.   The Prospectus Supplements disseminated by Defendants in the course of selling

the Certificates, and therefore the Registration Statements of which those Prospective

Supplements formed a part, contained the following misleading statements, among others,

regarding loan-to-value ratios and appraisals of the properties securing the mortgage loans

underlying the Certificates:

> Mortgaged properties that are to secure mortgage loans generally
> are appraised by qualified independent appraisers. Such appraisers
> inspect and appraise the subject property and verify that such
> property is in acceptable condition. Following each appraisal, the
> appraiser prepares a report which includes a market value analysis
> based on recent sales of comparable homes in the area and, when
> deemed appropriate, replacement cost analysis based on the current
> cost of constructing a similar home. All appraisals are required to
> conform to the Uniform Standards of Professional Appraisal
> Practice adopted by the Appraisal Standards Board of the
> Appraisal Foundation and are generally on forms acceptable to
> Fannie Mae and Freddie Mac.

The above misstatement in identical or substantially similar language was contained in the

following Offering Documents: Prospectus Supplement for Lehman XS Trust, Series 2006-4N

(Form 424B5) at S-56 (Apr. 3, 2006); Prospectus Supplement for Lehman XS Trust, Series

2006-20 (Form 424B5) at S-57 (Jan. 3, 2007); Prospectus Supplement for Lehman XS Trust

2007-8H (Form 424B5) at S-57-58 (Jun. 4, 2007); Prospectus Supplement for Merrill Lynch

Mort. Investors Trust, Series 2006-OPT1 (Form 424B5) at S-37 (Sep. 26, 2006); Prospectus

Supplement for Merrill Lynch Mort. Investors Trust, Series 2006-RM5 (Form 424B5) at S-36

(Oct. 27, 2006); Prospectus Supplement for Structured Asset Securities Corp. Mort. Loan Trust

2007-BC3 (Form 424B5) at S-69 (May 31, 2007); Prospectus Supplement for Structured Asset

Securities Corp. Mort. Loan Trust 2006-S1 (Form 424B5) at S-50 (Mar. 1, 2006); Prospectus

Supplement for Structured Asset Securities Corp. Mort. Loan Trust 2007-OSI (Form 424B5) at

S-62 (May 31, 2007); Prospectus Supplement for Structured Asset Securities Corp. Mort. Loan

Trust 2006-BC4 (Form 424B5) at S-64 (Nov. 30, 2006); Prospectus Supplement for Lehman XS

Trust, Series 2006-10N (Form 424B5) at S-84 (Jul. 5, 2006).

> The adequacy of the mortgaged property as security for repayment of the related mortgage loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to an Originator. ***All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation*** and are on forms acceptable to Fannie Mae and/or Freddie Mac. Appraisers may be staff appraisers employed by an Originator or independent appraisers selected in accordance with pre-established appraisal procedure guidelines established by or acceptable to an Originator. The appraisal procedure guidelines generally will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed. ***The appraisal generally will have been based upon a market data analysis of recent sales of comparable properties*** and, when deemed applicable, an analysis based on income generated from the property or a replacement costs analysis.  (emphasis added)

The above misstatement in identical or substantially similar language was found in the following

Offering Documents: Prospectus Supplement for Lehman XS Trust, Series 2006-14N (Form

424B5) at S-78 (Aug. 31, 2006); Prospectus Supplement for Merrill Lynch Alt. Note Asset Trust,

Series 2007-A1 (Form 424B5) at S-40 (Feb. 12, 2007); Prospectus Supplement for Merrill Lynch

Mort. Investors Trust, Series 2006-AF2 (Form 424B5) at S-38-39 (Oct. 31, 2006); Prospectus

Supplement for Merrill Lynch Mort. Investors Trust, Series 2006-HE4 (Form 424B5) at S-35

(Jul. 26, 2006); Prospectus Supplement for Merrill Lynch Mort. Investors Trust, Series 2006-

HE5 (Form 424B5) at S-36-37 (Sep. 28, 2006); Prospectus Supplement for Merrill Lynch Mort.

Investors Trust, Series 2006-HE6 (Form 424B5) at S-38 (Dec. 27, 2006) ; Prospectus

Supplement for Lehman XS Trust, Series 2006-10N (Form 424B5) at S-75 (Jul. 5, 2006).

> Qualified independent appraisers must meet minimum standards of
> licensing and provide errors and omissions insurance in states
> where it is required to become approved to do business with the
> third party originators. Each Uniform Residential Appraisal Report
> includes a market data analysis based on recent sales of
> comparable homes in the area and, where deemed appropriate,
> replacement cost analysis based on the current cost of constructing
> a similar home.

The above misstatement in identical or substantially similar language was contained in the

following Offering Documents: Prospectus Supplement for First Franklin Mort. Loan Trust

2006-FF16 (Form 424B5) at 79 (Nov. 17, 2006); Prospectus Supplement for First Franklin Mort.

Loan Trust, Series 2007-FF1 (Form 424B5) at S-36 (Jan. 25, 2007); Prospectus Supplement for

First Franklin Mort. Loan Trust 2006-FF15 (Form 424B5) at S-56 (Oct. 27, 2006); Prospectus

Supplement for First Franklin Mort. Loan Trust 2006-FF17 (Form 424B5) at S-57 (Nov. 27,

2006); Prospectus Supplement for First Franklin Mort. Loan Trust 2006-FFA (Form 424B5) at

S-53 (Oct. 31, 2006); Prospectus Supplement for First Franklin Mort. Loan Trust 2006-FFB

(Form 424B5) at S-55 (Dec. 1, 2006); Prospectus Supplement for Merrill Lynch First Franklin

Mort. Loan Trust, Series 2007-1 (Form 424B5) at S-38 (Mar. 27, 2007); Prospectus Supplement

for Merrill Lynch First Franklin Mort. Loan Trust, Series 2007-2 (Form 424B5) at S-36-37 (Apr.

27, 2007); Prospectus Supplement for Merrill Lynch First Franklin Mort. Loan Trust, Series

2007-3 (Form 424B5) at S-38 (May 30, 2007); Prospectus Supplement for Merrill Lynch First

Franklin Mort. Loan Trust, Series 2007-4 (Form 424B5) at S-38 (Jun. 26, 2007).

316.    The above representations were materially false and misleading in that they

omitted to state that: (i) Defendants violated their stated appraisal standards and in many

instances materially inflated the values of the underlying mortgaged properties used to collateralize the Certificates; (ii) the appraisers were not independent, and Defendants in fact exerted pressure on appraisers to come back with pre-determined, inflated and false appraisal values; (iii) the inflated appraisals obtained by Defendants did not conform to USPAP, Fannie Mae or Freddie Mac standards and were not market data analyses of comparable homes in the area or analyses of the cost of construction of a comparable home; and (iv) the forms of credit enhancement applicable to certain tranches of the Certificates were affected by the total value of the underlying properties, and thus were inaccurate as stated. Defendants omitted to disclose that they subordinated proper appraisals to the goal of originating and securitizing as many mortgage loans as they could.

317. Furthermore, each Prospectus contained statements substantially similar to that below, purporting to provide data on the LTV ratios of the mortgage loans underlying the Certificates so that investors could reach their own conclusions about whether or not those loans were backed by sufficient collateral. However, the statements were materially untrue and misleading because the value data underlying the LTV calculations had been systematically skewed by fraudulent appraisals. Thus, these statements understated the true LTV ratios of the loans and the true risk inherent in the Certificates.

> [N]o Mortgage loan had a Loan-to-Value Ratio at origination exceeding 100.00%.

The above misstatement was contained in the following Offering Documents: Prospectus Supplement for Merrill Lynch Alt. Note Asset Trust, Series 2007-A1 (Form 424B5) at S-31 (Feb. 12, 2007); Prospectus Supplement for First Franklin Mort. Loan Trust, Series 2007-FF1 (Form 424B5) at S-16 (Jan. 25, 2007); Prospectus Supplement for First Franklin Mort. Loan Trust 2006-FF15 (Form 424B5) at S-14 (Oct. 27, 2006); Prospectus Supplement for First

Franklin Mort. Loan Trust 2006-FFA (Form 424B5) at S-14 (Oct. 31, 2006); Prospectus Supplement for First Franklin Mort. Loan Trust 2006-FFB (Form 424B5) at S-15 (Dec. 1, 2006); Prospectus Supplement for Lehman XS Trust, Series 2006-4N (Form 424B5) at S-12 (Apr. 3, 2006); Prospectus Supplement for Lehman XS Trust, Series 2006-14N (Form 424B5) at S-18 (Aug. 31, 2006); Prospectus Supplement for Lehman XS Trust, Series 2006-20 (Form 424B5) at S-15 (Jan. 3, 2007); Prospectus Supplement for Lehman XS Trust 2007-8H (Form 424B5) at S-15 (Jun. 4, 2007); Prospectus Supplement for Lehman XS Trust, Series 2007-4N (Form 424B5) at S-18 (Apr. 2, 2007); Prospectus Supplement for Merrill Lynch First Franklin Mort. Loan Trust, Series 2007-1 (Form 424B5) at S-16 (Mar. 27, 2007); Prospectus Supplement for Merrill Lynch First Franklin Mort. Loan Trust, Series 2007-2 (Form 424B5) at S-15 (Apr. 27, 2007); Prospectus Supplement for Merrill Lynch First Franklin Mort. Loan Trust, Series 2007-3 (Form 424B5) at S-16 (May 30, 2007); Prospectus Supplement for Merrill Lynch First Franklin Mort. Loan Trust, Series 2007-4 (Form 424B5) at S-16 (Jun. 26, 2007); Prospectus Supplement for Merrill Lynch Mort. Investors Trust, Series 2006-AF2 (Form 424B5) at S-29-30 (Oct. 31, 2006); Prospectus Supplement for Merrill Lynch Mort. Investors Trust, Series 2006-HE4 (Form 424B5) at S-15 (Jul. 26, 2006); Prospectus Supplement for Merrill Lynch Mort. Investors Trust, Series 2006-HE5 (Form 424B5) at S-16 (Sep. 28, 2006); Prospectus Supplement for Merrill Lynch Mort. Investors Trust, Series 2006-HE6 (Form 424B5) at S-16 (Dec. 27, 2006); Prospectus Supplement for Merrill Lynch Mort. Investors Trust, Series 2006-OPT1 (Form 424B5) at S-16 (Sep. 26, 2006); Prospectus Supplement for Merrill Lynch Mort. Investors Trust, Series 2006-RM5 (Form 424B5) at S-16 (Oct. 27, 2006); Prospectus Supplement for Merrill Lynch Mort. Investors Trust, Series 2007-HE3 (Form 424B5) at S-15 (Jun. 8, 2007); Prospectus Supplement for Structured Asset Securities Corp. Mort. Loan Trust 2006-BC5 (Form 424B5) at S-15 (Dec. 1,

115

2006); Prospectus Supplement for Structured Asset Securities Corp. Mort. Loan Trust 2007-BC3 (Form 424B5) at S-17 (May 31, 2007); Prospectus Supplement for Structured Asset Securities Corp. Mort. Loan Trust 2006-S1 (Form 424B5) at S-12 (Mar. 1, 2006); Prospectus Supplement for Structured Asset Securities Corp. Mort. Loan Trust 2007-OSI (Form 424B5) at S-14 (May 31, 2007); Prospectus Supplement for Structured Asset Securities Corp. Mort. Loan Trust 2006-BC4 (Form 424B5) at S-15 (Nov. 30, 2006); Prospectus Supplement for Lehman XS Trust, Series 2006-10N (Form 424B5) at S-16-17 (Jul. 5, 2006).

318.    All of the representations regarding LTV ratios, described above, were materially false and misleading because the underlying appraisals used to determine the LTVs were improperly performed.   The actual LTV ratios for numerous mortgage loans underlying the Certificates would have exceeded 100% if the underlying properties had been appraised by an independent appraiser according to USPAP, Freddie Mac or Fannie Mae as represented in the Offering Documents.

E.   **DEFENDANTS MATERIALLY MISREPRESENTED THE ACCURACY OF THE CREDIT RATINGS ASSIGNED TO THE CERTIFICATES**

319.    The Prospectus Supplements disseminated by Defendants in the course of selling the Certificates, and therefore the Registration Statements of which those Prospective Supplements formed a part, contained the following misleading statements using identical or substantially similar language, among others, touting the credit ratings assigned to the Certificates:

> It is a condition to the issuance of any class of Offered Securities that they shall have been rated not lower than investment grade, that is, in one of the four highest rating categories, by a Rating Agency.
>
> ***Ratings on asset backed securities address the likelihood of receipt by securityholders of all distributions on the underlying assets. These ratings address the structural, legal and issuer-***

> ***related aspects associated with such certificates, the nature of the
> underlying assets and the credit quality of the guarantor, if any.***
> Ratings on asset backed securities do not represent any assessment
> of the likelihood of principal prepayments by borrowers or of the
> degree by which such prepayments might differ from those
> originally anticipated. As a result, securityholders might suffer a
> lower than anticipated yield, and, in addition, holders of stripped
> interest certificates in extreme cases might fail to recoup their
> initial investments.  (emphasis added)

The above misstatements were contained in the following Offering Documents: Prospectus
Supplement for First Franklin Mort. Loan Trust 2006-FF16 (Form 424B5) at 281-82 (Nov. 17,
2006); Prospectus Supplement for First Franklin Mort. Loan Trust, Series 2007-FF1 (Form
424B5) at 115 (Jan. 25, 2007); Prospectus Supplement for First Franklin Mort. Loan Trust 2006-
FF15 (Form 424B5) at S-88 (Oct. 27, 2006); Prospectus Supplement for First Franklin Mort.
Loan Trust 2006-FF17 (Form 424B5) at S-88-89 (Nov. 27, 2006); Prospectus Supplement for
First Franklin Mort. Loan Trust 2006-FFA (Form 424B5) at S-84 (Oct. 31, 2006); Prospectus
Supplement for First Franklin Mort. Loan Trust 2006-FFB (Form 424B5) at S-86-87 (Dec. 1,
2006); Prospectus Supplement for Lehman XS Trust, Series 2006-4N (Form 424B5) at S-97
(Apr. 3, 2006); Prospectus Supplement for Lehman XS Trust, Series 2006-14N (Form 424B5) at
S-121 (Aug. 31, 2006); Prospectus Supplement for Lehman XS Trust, Series 2006-20 (Form
424B5) at S-90 (Jan. 3, 2007); Prospectus Supplement for Lehman XS Trust 2007-8H (Form
424B5) at S-90-91 (Jun. 4, 2007); Prospectus Supplement for Lehman XS Trust, Series 2007-4N
(Form 424B5) at S-141 (Apr. 2, 2007); Prospectus Supplement for Merrill Lynch Alt. Note Asset
Trust, Series 2007-A1 (Form 424B5) at 115 (Feb. 12, 2007); Prospectus Supplement for Merrill
Lynch First Franklin Mort. Loan Trust, Series 2007-1 (Form 424B5) at 117 (Mar. 27, 2007);
Prospectus Supplement for Merrill Lynch First Franklin Mort. Loan Trust, Series 2007-2 (Form
424B5) at 117 (Apr. 27, 2007); Prospectus Supplement for Merrill Lynch First Franklin Mort.
Loan Trust, Series 2007-3 (Form 424B5) at 117 (May 30, 2007); Prospectus Supplement for

Merrill Lynch First Franklin Mort. Loan Trust, Series 2007-4 (Form 424B5) at S-13 (Jun. 26, 2007); Prospectus Supplement for Merrill Lynch Mort. Investors Trust, Series 2006-AF2 (Form 424B5) at 115 (Oct. 31, 2006); Prospectus Supplement for Merrill Lynch Mort. Investors Trust, Series 2006-HE4 (Form 424B5) at 115 (Jul. 26, 2006); Prospectus Supplement for Merrill Lynch Mort. Investors Trust, Series 2006-HE5 (Form 424B5) at 115 (Sep. 28, 2006); Prospectus Supplement for Merrill Lynch Mort. Investors Trust, Series 2006-HE6 (Form 424B5) at 115 (Dec. 27, 2006); Prospectus Supplement for Merrill Lynch Mort. Investors Trust, Series 2006-OPT1 (Form 424B5) at 115 (Sep. 26, 2006); Prospectus Supplement for Merrill Lynch Mort. Investors Trust, Series 2006-RM5 (Form 424B5) at 115 (Oct. 27, 2006); Prospectus Supplement for Merrill Lynch Mort. Investors Trust, Series 2007-HE3 (Form 424B5) at 117 (Jun. 8, 2007); Prospectus Supplement for Structured Asset Securities Corp. Mort. Loan Trust 2006-BC5 (Form 424B5) at S-111 (Dec. 1, 2006); Prospectus Supplement for Structured Asset Securities Corp. Mort. Loan Trust 2007-BC3 (Form 424B5) at S-107 (May 31, 2007); Prospectus Supplement for Structured Asset Securities Corp. Mort. Loan Trust 2006-S1 (Form 424B5) at S-93-94 (Mar. 1, 2006); Prospectus Supplement for Structured Asset Securities Corp. Mort. Loan Trust 2007-OSI (Form 424B5) at S-101 (May 31, 2007); Prospectus Supplement for Structured Asset Securities Corp. Mort. Loan Trust 2006-BC4 (Form 424B5) at S-114 (Nov. 30, 2006); Registration Statement (333-130961) filed by RBS Acceptance Corp. (Form S-3/A, Am. 3), at 138 (Mar. 31, 2006); Registration Statement (333-130545) filed by MLMI (Form S-3/A, Am. 3), at 125 (Mar. 28, 2006); Registration Statement (333-140436) filed by MLMI (Form S-3/A, Am. 1), at 115 (Mar. 6, 2007) ; Prospectus Supplement for Lehman XS Trust, Series 2006-10N (Form 424B5) at S-121 (Jul. 5, 2006).

320.   The statements quoted above were false because they represented that the investment grade credit ratings of the Certificates were the product of rigorous independent analysis addressing their structural, legal and issuer-aspects,  the nature of the underlying assets and the credit quality of the guarantor, when in fact the Underwriter Defendants had colluded with the rating agencies and/or withheld information to obtain higher credit ratings than the Certificates truly deserved.   This made the Certificates appear to be safe, investment grade securities when they were actually very risky and speculative.   For further discussion of the corruption of the rating system, *see* Section VI, *supra*.

321.   By touting the ratings of the Certificates, and in making the above statements in the Offering Documents, Defendants represented that they believed that the information provided to the rating agencies to support these ratings accurately reflected the guidelines and practices of Defendants DB Home Lending and DBSI, as well as the third party originators, and the specific qualities of the underlying loans.   These representations were false because Defendants did not disclose to the rating agencies the extent of their and the third party originator's improper underwriting and appraisals and that Defendants otherwise gamed the rating agencies to ensure that they obtained the highest ratings even when those ratings were not warranted.   The falsity of these representations is further evidenced by the rapid downgrades of all of the Certificates within a few years of issuance.

### F.   DEFENDANTS MADE UNTRUE STATEMENTS REGARDING THE CREDIT ENHANCEMENTS APPLICABLE TO THE CERTIFICATES

322.   The Prospectus Supplements disseminated by Defendants in the course of selling the Certificates, and therefore the Registration Statements of which those Prospective Supplements formed a part, contained the following misleading statements, among others, in identical or substantially similar language, regarding credit enhancements.

119

> The payment structure of this securitization includes excess interest and the application of excess cashflow, overcollateralization, subordination and loss allocation features to enhance the likelihood that holders of more senior classes of certificates will receive regular distributions of interest and principal.

The above misstatement was contained in the following Offering Documents: Prospectus Supplement for Lehman XS Trust 2007-8H (Form 424B5) at S-10 (Jun. 4, 2007); Prospectus Supplement for First Franklin Mort. Loan Trust 2006-FF17 (Form 424B5) at S-10 (Nov. 27, 2006); Prospectus Supplement for First Franklin Mort. Loan Trust 2006-FFA (Form 424B5) at S-10 (Oct. 31, 2006); Prospectus Supplement for First Franklin Mort. Loan Trust 2006-FFB (Form 424B5) at S-10-11 (Dec. 1, 2006); Prospectus Supplement for Lehman XS Trust, Series 2006-4N (Form 424B5) at S-8 (Apr. 3, 2006); Prospectus Supplement for Lehman XS Trust, Series 2006-14N (Form 424B5) at S-11 (Aug. 31, 2006); Prospectus Supplement for Lehman XS Trust 2007-8H (Form 424B5) at S-10 (Jun. 4, 2007); Prospectus Supplement for Lehman XS Trust, Series 2007-4N (Form 424B5) at S-12 (Apr. 2, 2007); Prospectus Supplement for Structured Asset Securities Corp. Mort. Loan Trust 2006-BC5 (Form 424B5) at S-10 (Dec. 1, 2006); Prospectus Supplement for Structured Asset Securities Corp. Mort. Loan Trust 2007-BC3 (Form 424B5) at S-11 (May 31, 2007); Prospectus Supplement for Structured Asset Securities Corp. Mort. Loan Trust 2006-S1 (Form 424B5) at S-8 (Mar. 1, 2006); Prospectus Supplement for Structured Asset Securities Corp. Mort. Loan Trust 2007-OSI (Form 424B5) at S-9 (May 31, 2007); Prospectus Supplement for Structured Asset Securities Corp. Mort. Loan Trust 2006-BC4 (Form 424B5) at S-10 (Nov. 30, 2006); Prospectus Supplement for Lehman XS Trust, Series 2006-10N (Form 424B5) at S-10-11 (Jul. 5, 2006).

> Credit enhancement is intended to reduce the harm caused to holders of the certificates as a result of shortfalls in payments received and losses realized on the mortgage loans. The credit enhancement for the certificates will consist of excess interest,

overcollateralization, subordination and net swap payments (if any) received from the swap counterparty described in this prospectus supplement.

Excess Interest and Overcollateralization. The overcollateralization amount is the excess of the aggregate outstanding principal balance of the mortgage loans over the aggregate principal balance of the offered certificates. On the closing date, the overcollateralization amount will equal approximately 3.95% of the aggregate stated principal balance of the mortgage loans as of the cut-off date. Generally, because more interest is required to be paid by the mortgagors than is necessary to pay the interest accrued on the certificates and the expenses of the issuing entity, including any net swap payments owed to the swap counterparty, there is expected to be excess interest each month. If the overcollateralization amount is reduced below the overcollateralization target amount as a result of losses on the mortgage loans, the issuing entity will apply some or all of this excess interest as principal payments on the most senior classes of certificates then outstanding until the overcollateralization target is restored, resulting in a limited acceleration of amortization of the certificates relative to the mortgage loans. This acceleration feature is intended to restore the required level of overcollateralization. Once the required level of overcollateralization is restored, the acceleration feature will again cease, unless it becomes necessary again to maintain the required level of overcollateralization. The actual level of overcollateralization may increase or decrease over time. This could result in a temporarily faster or slower amortization of the certificates. See "Description of the Certificates--Overcollateralization Provisions" in this prospectus supplement.

Subordination.  The rights of the holders of the more junior classes of certificates to receive distributions will be subordinated to the rights of the holders of the more senior classes of certificates to receive distributions.

In general, the protection afforded the holders of more senior classes of certificates by means of this subordination will be effected in two ways:

- by the preferential right of the holders of the more senior classes to receive, prior to any distribution being made on any distribution date to the  holders of the more junior classes of certificates, the amount of interest and principal due on the more senior classes of certificates and, if necessary, by the right of the more senior holders to receive future distributions on the mortgage loans that

would otherwise have been allocated to the holders of the more junior classes of certificates; and

- by the allocation to the more junior classes of certificates (in inverse order of seniority) of losses resulting from the liquidation of defaulted mortgage loans or the bankruptcy of mortgagors prior to the allocation of these losses to the more senior classes of certificates, until their respective certificate principal balances have been reduced to zero.

The above misstatement was contained in the following Offering Documents: Prospectus Supplement for Merrill Lynch Mort. Investors Trust, Series 2006-HE4 (Form 424B5) at S-10-11 (Jul. 26, 2006); Prospectus Supplement for First Franklin Mort. Loan Trust 2006-FF16 (Form 424B5) at 9 (Nov. 17, 2006); Prospectus Supplement for First Franklin Mort. Loan Trust, Series 2007-FF1 (Form 424B5) at S-11-12 (Jan. 25, 2007); Prospectus Supplement for First Franklin Mort. Loan Trust 2006-FF15 (Form 424B5) at S-10-12 (Oct. 27, 2006); Prospectus Supplement for First Franklin Mort. Loan Trust 2006-FF17 (Form 424B5) at S-10-12 (Nov. 27, 2006); Prospectus Supplement for First Franklin Mort. Loan Trust 2006-FFA (Form 424B5) at S-10-12 (Oct. 31, 2006); Prospectus Supplement for First Franklin Mort. Loan Trust 2006-FFB (Form 424B5) at S-11-12 (Dec. 1, 2006); Prospectus Supplement for Lehman XS Trust, Series 2006-4N (Form 424B5) at S-9-10 (Apr. 3, 2006); Prospectus Supplement for Lehman XS Trust, Series 2006-14N (Form 424B5) at S-13-14 (Aug. 31, 2006); Prospectus Supplement for Lehman XS Trust, Series 2006-20 (Form 424B5) at S-10-13 (Jan. 3, 2007); Prospectus Supplement for Lehman XS Trust 2007-8H (Form 424B5) at S-10-13 (Jun. 4, 2007); Prospectus Supplement for Lehman XS Trust, Series 2007-4N (Form 424B5) at S-13-16 (Apr. 2, 2007); Prospectus Supplement for Merrill Lynch Alt. Note Asset Trust, Series 2007-A1 (Form 424B5) at S-9 (Feb. 12, 2007); Prospectus Supplement for Merrill Lynch First Franklin Mort. Loan Trust, Series 2007-1 (Form 424B5) at S-11-12 (Mar. 27, 2007); Prospectus Supplement for Merrill Lynch First Franklin Mort. Loan Trust, Series 2007-2 (Form 424B5) at S-11-12 (Apr. 27, 2007);

Prospectus Supplement for Merrill Lynch First Franklin Mort. Loan Trust, Series 2007-3 (Form 424B5) at S-11-12 (May 30, 2007); Prospectus Supplement for Merrill Lynch First Franklin Mort. Loan Trust, Series 2007-4 (Form 424B5) at S-11-12 (Jun. 26, 2007); Prospectus Supplement for Merrill Lynch Mort. Investors Trust, Series 2006-AF2 (Form 424B5) at S-9-10 (Oct. 31, 2006); Prospectus Supplement for Merrill Lynch Mort. Investors Trust, Series 2006-HE5 (Form 424B5) at S-12 (Sep. 28, 2006); Prospectus Supplement for Merrill Lynch Mort. Investors Trust, Series 2006-HE6 (Form 424B5) at S-11-12 (Dec. 27, 2006); Prospectus Supplement for Merrill Lynch Mort. Investors Trust, Series 2006-OPT1 (Form 424B5) at S-11-12 (Sep. 26, 2006); Prospectus Supplement for Merrill Lynch Mort. Investors Trust, Series 2006-RM5 (Form 424B5) at S-11-12 (Oct. 27, 2006); Prospectus Supplement for Merrill Lynch Mort. Investors Trust, Series 2007-HE3 (Form 424B5) at S-11 (Jun. 8, 2007); Prospectus Supplement for Structured Asset Securities Corp. Mort. Loan Trust 2006-BC5 (Form 424B5) at S-10-11 (Dec. 1, 2006); Prospectus Supplement for Structured Asset Securities Corp. Mort. Loan Trust 2007-BC3 (Form 424B5) at S-12-13 (May 31, 2007); Prospectus Supplement for Structured Asset Securities Corp. Mort. Loan Trust 2006-S1 (Form 424B5) at S-9-10 (Mar. 1, 2006); Prospectus Supplement for Structured Asset Securities Corp. Mort. Loan Trust 2007-OSI (Form 424B5) at S-10-11 (May 31, 2007); Prospectus Supplement for Structured Asset Securities Corp. Mort. Loan Trust 2006-BC4 (Form 424B5) at S-10-11 (Nov. 30, 2006); Prospectus Supplement for Lehman XS Trust, Series 2006-10N (Form 424B5) at S-56-59 (Jul. 5, 2006).

323.     The above statements were materially false and misleading when made because they failed to disclose that because the loan originators systematically ignored their underwriting standards and abandoned their property appraisal standards, borrowers would not be able to repay their loans, foreclosure sales would not recoup the full value of the loans, and the

aggregate expected principal payments would not, nor could they be expected to, exceed the aggregate class principal of the Certificates.  As such, the Certificates were not protected with the level of credit enhancement and overcollateralization represented to investors in the Prospectus Supplements.

### G.   DEFENDANTS MADE UNTRUE STATEMENTS REGARDING OWNER-OCCUPANCY STATISTICS

324.   Each of the Prospectus Supplements disseminated by Defendants in the course of selling the Certificates contained tables substantially similar to that below, purporting to provide data on the owner occupancy rates of mortgage loans underlying the Certificates.  However, the figures contained in these tables were materially false and misleading because Merrill, Lehman and Greenwich systematically overstated the owner occupancy rates.

325.   For example the following table appears in the Prospectus Supplement for Merrill Lynch Mortgage Investors Trust, Series 2006-OPT1, representing that 93.41% of the loans in the mortgage pool were collateralized by the borrower's primary residence.

#### OCCUPANCY TYPES

| OCCUPANCY | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF MORTGAGE POOL | WEIGHTED AVERAGE COUPON | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING | WEIGHTED AVERAGE ORIGINAL LTV | WEIGHTED AVERAGE DEBT-TO-INCOME | PERCENT FULL DOC |
|---|---|---|---|---|---|---|---|---|---|
| Primary............ | 4103 | $868,300,472 | 93.41% | 8.599% | 602 | $211,626 | 80.80% | 42.76% | 61.72% |
| Investment......... | 258 | 52,806,016 | 5.68 | 9.472 | 642 | 204,674 | 80.14 | 39.65 | 24.27 |
| Second Home........ | 32 | 8,482,603 | 0.91 | 8.870 | 610 | 265,081 | 80.51 | 43.29 | 33.51 |
| Total............ | 4,393 | $929,589,091 | 100.00% | 8.651% | 605 | $211,607 | 80.76% | 42.59% | 59.34% |

326.   However, an analysis by Allstate found that the true owner occupancy rate for the loans included in this particular mortgage pool was only 84.71%, not 93.41% as represented above.  *See* ¶¶ 297-298, *supra*.

327.   Misstatements regarding owner-occupancy rates in identical or substantially similar language were found in the following Offering Documents: Prospectus Supplement for

Merrill Lynch Mort. Investors Trust, Series 2006-OPT1 (Form 424B5) at A-II-7 (Sep. 26, 2006); Prospectus Supplement for First Franklin Mort. Loan Trust 2006-FF16 (Form 424B5) at 20 (Nov. 17, 2006); Prospectus Supplement for First Franklin Mort. Loan Trust, Series 2007-FF1 (Form 424B5) at A-II-7 (Jan. 25, 2007); Prospectus Supplement for First Franklin Mort. Loan Trust 2006-FF15 (Form 424B5) at S-A-12 (Oct. 27, 2006); Prospectus Supplement for First Franklin Mort. Loan Trust 2006-FF17 (Form 424B5) at S-A-12 (Nov. 27, 2006); Prospectus Supplement for First Franklin Mort. Loan Trust 2006-FFA (Form 424B5) at S-A-8 (Oct. 31, 2006); Prospectus Supplement for First Franklin Mort. Loan Trust 2006-FFB (Form 424B5) at 121 (Dec. 1, 2006); Prospectus Supplement for Lehman XS Trust, Series 2006-4N (Form 424B5) at S-B-6 (Apr. 3, 2006); Prospectus Supplement for Lehman XS Trust, Series 2006-14N (Form 424B5) at S-A-6 (Aug. 31, 2006); Prospectus Supplement for Lehman XS Trust, Series 2006-20 (Form 424B5) at S-A-8 (Jan. 3, 2007); Prospectus Supplement for Lehman XS Trust 2007-8H (Form 424B5) at S-A-6 (Jun. 4, 2007); Prospectus Supplement for Lehman XS Trust, Series 2007-4N (Form 424B5) at S-A-6 (Apr. 2, 2007); Prospectus Supplement for Merrill Lynch Alt. Note Asset Trust, Series 2007-A1 (Form 424B5) at A-II-4 (Feb. 12, 2007); Prospectus Supplement for Merrill Lynch First Franklin Mort. Loan Trust, Series 2007-1 (Form 424B5) at A-II-7 (Mar. 27, 2007); Prospectus Supplement for Merrill Lynch First Franklin Mort. Loan Trust, Series 2007-2 (Form 424B5) at A-II-7 (Apr. 27, 2007); Prospectus Supplement for Merrill Lynch First Franklin Mort. Loan Trust, Series 2007-3 (Form 424B5) at A-II-7 (May 30, 2007); Prospectus Supplement for Merrill Lynch First Franklin Mort. Loan Trust, Series 2007-4 (Form 424B5) at A-II-7 (Jun. 26, 2007); Prospectus Supplement for Merrill Lynch Mort. Investors Trust, Series 2006-AF2 (Form 424B5) at A-II-5 (Oct. 31, 2006); Prospectus Supplement for Merrill Lynch Mort. Investors Trust, Series 2006-HE4 (Form 424B5) at A-II-7 (Jul. 26, 2006);

Prospectus Supplement for Merrill Lynch Mort. Investors Trust, Series 2006-HE5 (Form 424B5) at A-II-7 (Sep. 28, 2006); Prospectus Supplement for Merrill Lynch Mort. Investors Trust, Series 2006-HE6 (Form 424B5) at A-II-7 (Dec. 27, 2006); Prospectus Supplement for Merrill Lynch Mort. Investors Trust, Series 2006-RM5 (Form 424B5) at A-II-6 (Oct. 27, 2006); Prospectus Supplement for Merrill Lynch Mort. Investors Trust, Series 2007-HE3 (Form 424B5) at A-II-9 (Jun. 8, 2007); Prospectus Supplement for Structured Asset Securities Corp. Mort. Loan Trust 2006-BC5 (Form 424B5) at S-A-13 (Dec. 1, 2006); Prospectus Supplement for Structured Asset Securities Corp. Mort. Loan Trust 2007-BC3 (Form 424B5) at S-A-12 (May 31, 2007); Prospectus Supplement for Structured Asset Securities Corp. Mort. Loan Trust 2006-S1 (Form 424B5) at S-B-7 (Mar. 1, 2006); Prospectus Supplement for Structured Asset Securities Corp. Mort. Loan Trust 2007-OSI (Form 424B5) at S-A-12 (May 31, 2007); Prospectus Supplement for Structured Asset Securities Corp. Mort. Loan Trust 2006-BC4 (Form 424B5) at S-A-13 (Nov. 30, 2006); Prospectus Supplement for Lehman XS Trust, Series 2006-10N (Form 424B5) at S-A-6 (Jul. 5, 2006).

328.   These representations were materially false and misleading when made because mortgages on non-owner occupied properties were known to be at a higher risk of default than those on owner-occupied properties, and a far higher percentage of borrowers did not, in fact occupy the mortgaged properties than was represented to investors such as Plaintiff ABP in the Offering Documents..

###### H.   DEFENDANTS MADE UNTRUE STATEMENTS REGARDING THE TRANSFER OF TITLE TO THE ISSUING TRUSTS

329.   The Prospectus Supplements disseminated by Defendants in the course of selling the Certificates, and therefore the Registration Statements of which those Prospective

Supplements formed a part, contained the following misleading statements, among others, regarding the transfer of title to the Issuing Trusts.

> The Mortgage Loans will be assigned by the Depositor to the Trustee, together with all principal and interest received with respect to such Mortgage Loans on and after the Cut-off Date (other than Scheduled Payments due on that date). The Trustee will, concurrently with such assignment, authenticate and deliver the Certificates. Each Mortgage Loan will be identified in a schedule appearing as an exhibit to the Trust Agreement which will specify with respect to each Mortgage Loan, among other things, the original principal balance and the Scheduled Principal Balance as of the close of business on the Cut-off Date, the Mortgage Rate, the Scheduled Payment, the maturity date, the Servicer and the Custodian of the mortgage file and the applicable Prepayment Premium provisions, if any.

> As to each Mortgage Loan, the following documents are generally required to be delivered to the applicable Custodian on behalf of the Trustee in accordance with the Trust Agreement: (1) the related original mortgage note endorsed without recourse to the Trustee or in blank, (2) the original mortgage with evidence of recording indicated thereon (or, if such original recorded mortgage has not yet been returned by the recording office, a copy thereof certified to be a true and complete copy of such mortgage sent for recording), (3) an original assignment of the mortgage to the Trustee or in blank in recordable form (except as described below), (4) the policies of title insurance issued with respect to each Mortgage Loan and (5) the originals of any assumption, modification, extension or guaranty agreements. With respect to certain Servicers, it is expected that the mortgages or assignments of mortgage with respect to each Mortgage Loan will have been recorded in the name of an agent on behalf of the holder of the related mortgage note. In that case, no mortgage assignment in favor of the Trustee will be required to be prepared, delivered or recorded. Instead, the related Servicer will be required to take all actions as are necessary to cause the Trustee to be shown as the owner of the related Mortgage Loan on the records of the agent for purposes of the system of recording transfers of beneficial ownership of mortgages maintained by the agent.

The above misstatement, in identical or substantially similar language, was found in the following Offering Documents: Prospectus Supplement for First Franklin Mort. Loan Trust 2006-FF16 (Form 424B5) at 132 (Nov. 17, 2006); Prospectus Supplement for First Franklin

Mort. Loan Trust, Series 2007-FF1 (Form 424B5) at S-78 (Jan. 25, 2007); Prospectus Supplement for First Franklin Mort. Loan Trust 2006-FF15 (Form 424B5) at S-71 (Oct. 27, 2006); Prospectus Supplement for First Franklin Mort. Loan Trust 2006-FF17 (Form 424B5) at S-71 (Nov. 27, 2006); Prospectus Supplement for First Franklin Mort. Loan Trust 2006-FFA (Form 424B5) at S-68 (Oct. 31, 2006); Prospectus Supplement for First Franklin Mort. Loan Trust 2006-FFB (Form 424B5) at S-70 (Dec. 1, 2006); Prospectus Supplement for Lehman XS Trust, Series 2006-4N (Form 424B5) at S-78-79 (Apr. 3, 2006); Prospectus Supplement for Lehman XS Trust, Series 2006-14N (Form 424B5) at S-102-03 (Aug. 31, 2006); Prospectus Supplement for Lehman XS Trust, Series 2006-20 (Form 424B5) at S-73 (Jan. 3, 2007); Prospectus Supplement for Lehman XS Trust 2007-8H (Form 424B5) at S-71 (Jun. 4, 2007); Prospectus Supplement for Lehman XS Trust, Series 2007-4N (Form 424B5) at S-119 (Apr. 2, 2007); Prospectus Supplement for Merrill Lynch Alt. Note Asset Trust, Series 2007-A1 (Form 424B5) at 32 (Feb. 12, 2007); Prospectus Supplement for Merrill Lynch First Franklin Mort. Loan Trust, Series 2007-1 (Form 424B5) at S-80 (Mar. 27, 2007); Prospectus Supplement for Merrill Lynch First Franklin Mort. Loan Trust, Series 2007-2 (Form 424B5) at S-76-77 (Apr. 27, 2007); Prospectus Supplement for Merrill Lynch First Franklin Mort. Loan Trust, Series 2007-3 (Form 424B5) at S-79-80 (May 30, 2007); Prospectus Supplement for Merrill Lynch First Franklin Mort. Loan Trust, Series 2007-4 (Form 424B5) at S-79 (Jun. 26, 2007); Prospectus Supplement for Merrill Lynch Mort. Investors Trust, Series 2006-AF2 (Form 424B5) at 32 (Oct. 31, 2006); Prospectus Supplement for Merrill Lynch Mort. Investors Trust, Series 2006-HE4 (Form 424B5) at S-82 (Jul. 26, 2006); Prospectus Supplement for Merrill Lynch Mort. Investors Trust, Series 2006-HE5 (Form 424B5) at S-83 (Sep. 28, 2006); Prospectus Supplement for Merrill Lynch Mort. Investors Trust, Series 2006-HE6 (Form 424B5) at S-82-83 (Dec. 27,

2006); Prospectus Supplement for Merrill Lynch Mort. Investors Trust, Series 2006-OPT1 (Form 424B5) at S-77-78 (Sep. 26, 2006); Prospectus Supplement for Merrill Lynch Mort. Investors Trust, Series 2006-RM5 (Form 424B5) at S-76 (Oct. 27, 2006); Prospectus Supplement for Merrill Lynch Mort. Investors Trust, Series 2007-HE3 (Form 424B5) at S-92-93 (Jun. 8, 2007); Prospectus Supplement for Structured Asset Securities Corp. Mort. Loan Trust 2006-BC5 (Form 424B5) at S-94 (Dec. 1, 2006); Prospectus Supplement for Structured Asset Securities Corp. Mort. Loan Trust 2007-BC3 (Form 424B5) at S-89-90 (May 31, 2007); Prospectus Supplement for Structured Asset Securities Corp. Mort. Loan Trust 2006-S1 (Form 424B5) at S-76-77 (Mar. 1, 2006); Prospectus Supplement for Structured Asset Securities Corp. Mort. Loan Trust 2007-OSI (Form 424B5) at S-85 (May 31, 2007); Prospectus Supplement for Structured Asset Securities Corp. Mort. Loan Trust 2006-BC4 (Form 424B5) at S-97 (Nov. 30, 2006); Prospectus Supplement for Lehman XS Trust, Series 2006-10N (Form 424B5) at S-103-104 (Jul. 5, 2006); Registration Statement (333-129480) filed by SAS (Form S-3/A, Am. 3), at S-63-64 (Mar. 29, 2006).

330.    These representations were materially false and misleading when made because Defendants routinely failed to physically deliver the original promissory notes and security instruments for the mortgage loans to the issuing trusts, as required by applicable state laws and the PSAs.  These representations were also false because Defendants routinely failed to execute valid indorsements of the documents at the time of the purported transfer, as also required by applicable state laws and the PSAs.  The Issuing Trusts therefore did not possess good title to many of the mortgage loans and lacked legal authority to enforce many of the mortgage loans against the borrowers in the event of default.

## XI.   DEFENDANTS KNEW THAT THE OFFERING DOCUMENTS CONTAINED MATERIAL MISSTATEMENTS AND OMISSIONS

331.   The allegations below are made in support of Plaintiff's claims under the Exchange Act, common-law fraud, fraudulent inducement and aiding and abetting claims, and not in support of Plaintiff's Securities Act and negligent misrepresentation claims, which are based solely on strict liability and negligence.

332.   As set forth above, at all relevant times, Defendants knew that the Offering Documents contained material misstatements and omissions.   Defendants' knowledge is evidenced by, among other things, the following:

- Merrill Lynch was the biggest underwriter of CDOs from 2005 to 2007, originating $44 billion of RMBS in 2006 alone.  To ensure a steady supply of the mortgage loans that were the raw material of these securities, Merrill Lynch instructed and exerted pressure on third-party and affiliate loan originators to reduce underwriting standards in order to increase mortgage origination quantity. The result was that loan origination exploded, but in low-quality, high-risk loans. See ¶¶ 100, *supra.*

- First Franklin was an affiliate of Merrill Lynch, as well as one of the primary originators supplying it with mortgage loans.   First Franklin's underwriting standards weakened and loan production quotas intensified after the Merrill Lynch acquisition.  First Franklin liberally granted exceptions to borrowers not qualifying for loans, systematically inflated appraisal values of mortgaged properties and misrepresented loans to subprime borrowers as 'prime' loans made to borrowers 'in good credit standing.'  See ¶¶ 261, *supra.*

- Ownit was another of the originators supplying Merrill Lynch with mortgage loans.  In 2005, Merrill Lynch purchased a 20% ownership stake in Ownit.  After acquiring this stake, Merrill Lynch pressured Ownit to loosen its underwriting standards and grant more "no income verification" loans.  See ¶¶ 90, *supra.*

- Lehman Brothers was a pioneer in the field of vertically integrated securitization, with affiliated entities involved in every step of the process from origination onwards.   Lehman Brothers required its subsidiaries to disregard their underwriting standards so as to keep the mortgage pipeline flowing.  Due to its control over its subsidiary lenders and its oversight over subprime exposure generally, Lehman Brothers was aware of the true quality of the loans that it was selling to investors such as ABP.  See  ¶¶ 100, *supra.*

- Greenwich Capital was another huge issuer of mortgage-backed securities, and underwrote more than $120 billion of RMBS in 2005. Analyses of the loans underlying dozens of Greenwich Capital RMBS have revealed that Greenwich Capital systematically misrepresented loan quality in its Offering Documents by incorporating flawed appraisal values, understating LTV ratios, and overstating owner-occupancy rates, thereby making the RMBS seem to be more attractive investments than they actually were. Greenwich Capital was either aware of these pervasive, consistent misrepresentations in its Offering Documents, or was reckless for not being so aware.

- Merrill Lynch, Lehman Brothers and Greenwich Capital collaborated with and gamed the rating agencies in order to secure the highest ratings for their RMBS. Merrill Lynch, Lehman Brothers and Greenwich Capital did not disclose the extent of their Originators' abandonment of their underwriting guidelines or the use of improper appraisals. Merrill Lynch, Lehman Brothers and Greenwich Capital collaborated with the rating agencies to structure their offerings of securities, to obtain sufficient "credit enhancement" to obtain the highest ratings possible and to prevent uncooperative analysts from rating their offerings. Merrill Lynch, Lehman Brothers and Greenwich Capital used fees as leverage to bargain for higher ratings. Where the ratings were not to their satisfaction, Merrill Lynch, Lehman Brothers and Greenwich Capital went to another rating agency to "shop" for a higher rating. See ¶¶ 7, *supra.*

- Merrill Lynch, Lehman Brothers, Greenwich Capital, and the Underwriter Defendants knew, from the due diligence that they performed on the mortgage loans being pooled for securitization, that there were significant and extensive defects in the mortgage loans. Merrill Lynch, Lehman Brothers, Greenwich Capital, and the Underwriter Defendants commissioned due diligence reports from various external parties which showed that a significant proportion of the sampled loans analyzed had defects, including breaches of the Originators' underwriting guidelines and improper appraisals. Despite this knowledge, Merrill Lynch, Lehman Brothers, Greenwich Capital, and the Underwriter Defendants waived the breaches and allowed large numbers of these defective mortgages to be included in the mortgage pools used to collateralize the Certificates sold to ABP and other investors. *See ¶¶ 8, supra.*

## XII.   PLAINTIFF ABP  RELIED ON DEFENDANTS' MISREPRESENTATIONS TO ITS DETRIMENT

333.    ABP through its agents purchased senior classes of mortgage-backed securities (*i.e.*, those rated AAA/Aaa by the rating agencies Standard & Poor's and Moody's Investors Service).  The Certificates were purchased to generate income and total return through safe

investments.  The securities were purchased with the expectation that the investments could be—and indeed some would be and were—purchased and sold on the secondary market.

334.    In making the investments, ABP and/or its agents relied upon Defendants' representations and assurances regarding the quality of the mortgage collateral underlying the Certificates, including the quality of the underwriting processes related to the underlying mortgage loans.   ABP and/or its agents received, reviewed, and relied upon the Offering Documents, which described in detail the mortgage loans underlying each offering.   Offering Documents containing the representations outlined above (or nearly identical, materially similar counterparts thereto) were obtained, reviewed, and relied upon before any purchase was made.

335.    In purchasing the Certificates, ABP and/or its agents justifiably relied on Defendants' false representations and omissions of material fact detailed above, including the misstatements and omissions in the Offering Documents.   These representations materially altered the total mix of information upon which ABP and/or its agents made its purchasing decisions.

336.    But for the misrepresentations and omissions in the Offering Documents, ABP and its agents would not have purchased or acquired the Certificates as it ultimately did, because those representations and omissions were material to its decision to acquire the Certificates, as described above.

337.    As discussed *supra*, Plaintiff is a conservative institutional investor that relied on Defendants' representations in the Offering Documents that the Certificates purchased by Plaintiff were safe, AAA-rated securities. Because ABP did not have access to the loan files, appraisals or other supporting documentation for the loans underlying the Certificates, ABP had no reasonable means or ability to conduct its own due diligence regarding the quality of the

mortgage pool. As such, ABP and its agents were forced to and did rely on the representations made by Defendants in the Offering Documents, and it was because of those representations that Plaintiff purchased the Certificates at issue in this Complaint.

## XIII.   PLAINTIFF ABP HAS SUFFERED LOSSES AS A RESULT OF ITS PURCHASES OF THE CERTIFICATES

338.   The false and misleading statements of material facts and omissions of material facts in the Offering Documents directly caused ABP damage, because the Certificates were in fact far riskier than Defendants had described them to be.   As set forth below, the loans underlying the Certificates experienced default and delinquency at very high rates due to Defendants' abandonment of or misrepresentation regarding the disclosed underwriting guidelines. The resulting downgrades to the Certificates ratings have made them unmarketable at anywhere near the prices ABP paid, thus confirming that ABP paid far more for the Certificates than the value it actually received.

339.   As set forth below, ABP has incurred substantial losses in market value, due to the poor quality of the collateral underlying the Certificates.   The income and principal payments ABP received have been lower than ABP expected.   Because of the declining collateral base, it is increasingly likely that ABP will not obtain the full payments expected under the "waterfall" provisions of the securitizations.   This is reflected in the far diminished market value for these securities, which, again, is a strong indicator that the true value of the Certificates was far less than what ABP paid.

340.   Plaintiff purchased certificates issued by Merrill Lynch Mortgage Investor's Trust Series 2006-AF2, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated B2.   At the time of filing of this complaint, the Certificates were trading at just approximately 96% of par.

341.    Plaintiff purchased Certificates issued by Merrill Lynch Mortgage Investors Trust Series 2006-HE4, when they were rated Aaa by Moody's, but the Certificates have since been downgraded three times and are currently rated Ca.  At the time of filing of this complaint, the Certificates were trading at just approximately 31% of par.

342.    Plaintiff purchased Certificates issued by Merrill Lynch Mortgage Investors Trust Series 2006-HE5, when they were rated Aaa by Moody's, but the Certificates have since been downgraded four times and are currently rated Caa3.  At the time of filing of this complaint, the Certificates were trading at just approximately 65% of par.

343.    Plaintiff purchased Certificates issued by Merrill Lynch Mortgage Investors Trust Series 2006-HE6, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated Ca.  At the time of filing of this complaint, the Certificates were trading at just approximately 30% of par.

344.    Plaintiff purchased Certificates issued by Merrill Lynch Mortgage Investors Trust Series 2006-OPT1, when they were rated Aaa by Moody's, but the Certificates have since been downgraded three times and are currently rated B2.  At the time of filing of this complaint, the Certificates were trading at just approximately 85% of par.

345.    Plaintiff purchased Certificates issued by Merrill Lynch Mortgage Investors Trust Series 2006-RM5, when they were rated Aaa by Moody's, but the Certificates have since been downgraded four times and are currently rated C.  At the time of filing of this complaint, the Certificates were trading at just approximately 20% of par.

346.    Plaintiff purchased Certificates issued by Merrill Lynch First Franklin Mortgage Loan Trust Series 2007-1, when they were rated Aaa by Moody's, but the Certificates have since

been downgraded three times and are currently rated Ca. At the time of filing of this complaint, the Certificates were trading at just approximately 49% of par.

347. Plaintiff purchased Certificates issued by Merrill Lynch First Franklin Mortgage Loan Trust Series 2007-2, when they were rated Aaa by Moody's, but the Certificates have since been downgraded three times and are currently rated Ca. At the time of filing of this complaint, the Certificates were trading at just approximately 60% of par.

348. Plaintiff purchased Certificates issued by Merrill Lynch First Franklin Mortgage Loan Trust Series 2007-3, when they were rated Aaa by Moody's, but the Certificates have since been downgraded three times and are currently rated Caa3. At the time of filing of this complaint, the Certificates were trading at just approximately 63% of par.

349. Plaintiff purchased Certificates issued by Merrill Lynch First Franklin Mortgage Loan Trust Series 2007-4 2A1, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated B1. At the time of filing of this complaint, the Certificates were trading at just approximately 99% of par.

350. Plaintiff purchased Certificates issued by Merrill Lynch First Franklin Mortgage Loan Trust Series 2007-4 2A2, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated Caa3. At the time of filing of this complaint, the Certificates were trading at just approximately 56% of par.

351. Plaintiff purchased Certificates issued by Merrill Lynch Mortgage Investor's Trust Series 2007-HE3, when they were rated Aaa by Moody's, but the Certificates have since been downgraded four times and are currently rated Ca. At the time of filing of this complaint, the Certificates were trading at just approximately 57% of par.

352.    Plaintiff purchased Certificates issued by Merrill Lynch Alternative Note Asset Trust Series 2007-A1, when they were rated Aaa by Moody's, but the Certificates have since been downgraded three times and are currently rated Ca.  At the time of filing of this complaint, the Certificates were trading at just approximately 28% of par.

353.    Plaintiff purchased Certificates issued by First Franklin Mortgage Loan Trust Series 2007-FF1, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated Caa3.  At the time of filing of this complaint, the Certificates were trading at just approximately 66% of par.

354.    Plaintiff purchased Certificates issued by First Franklin Mortgage Loan Trust Series 2006-FF15, when they were rated Aaa by Moody's, but the Certificates have since been downgraded once and are currently rated A1.  At the time of filing of this complaint, the Certificates were trading at just approximately 92% of par.

355.    Plaintiff purchased Certificates issued by First Franklin Mortgage Loan Trust Series 2006-FF17, when they were rated Aaa by Moody's, but the Certificates have since been downgraded three times are currently rated A2.  At the time of filing of this complaint, the Certificates were trading at just approximately 90% of par.

356.    Plaintiff purchased Certificates issued by First Franklin Mortgage Loan Trust Series 2006-FFA, when they were rated Aaa by Moody's, but the Certificates have since been downgraded four times and are currently rated C.  At the time of filing of this complaint, the Certificates were trading at just approximately 20% of par.

357.    Plaintiff purchased Certificates issued by First Franklin Mortgage Loan Trust Series 2006-FFB, when they were rated Aaa by Moody's, but the Certificates have since been

downgraded four times and are currently rated C.  At the time of filing of this complaint, the Certificates were trading at just approximately 16% of par.

358.    Plaintiff purchased Certificates issued by Lehman XS Trust Series 2006-4N, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated Caa2.  At the time of filing of this complaint, the Certificates were trading at just approximately 90% of par.

359.    Plaintiff purchased Certificates issued by Lehman XS Trust Series 2006-10N, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated Caa3.  At the time of filing of this complaint, the Certificates were trading at just approximately 54% of par.

360.    Plaintiff purchased Certificates issued by Lehman XS Trust Series 2006-14N, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated Caa3.  At the time of filing of this complaint, the Certificates were trading at just approximately 46% of par.

361.    Plaintiff purchased Certificates issued by Lehman XS Trust Series 2006-20, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated Caa2.  At the time of filing of this complaint, the Certificates were trading at just approximately 97% of par.

362.    Plaintiff purchased Certificates issued by Lehman XS Trust Series 2007-4N, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated Caa3.  At the time of filing of this complaint, the Certificates were trading at just approximately 55 % of par.

363.   Plaintiff purchased Certificates issued by Lehman XS Trust Series 2007-8H, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated Caa3.  At the time of filing of this complaint, the Certificates were trading at just approximately 48% of par.

364.   Plaintiff purchased Certificates issued by Structured Asset Securities Corp. Trust Series 2006-BC4 A2 when they were rated Aaa by Moody's, and are currently rated Aaa.  At the time of filing of this complaint, the Certificates were trading at just approximately 99% of par.

365.   Plaintiff purchased Certificates issued by Structured Asset Securities Corp. Trust Series 2006-BC4 A3 when they were rated Aaa by Moody's, but they have since been downgraded twice and are currently rated A3.  At the time of filing of this complaint, the Certificates were trading at just approximately 93% of par.

366.   Plaintiff purchased Certificates issued by Structured Asset Securities Corp. Trust Series 2006-BC5, when they were rated Aaa by Moody's, but the Certificates have since been downgraded three times and are currently rated A3.  At the time of filing of this complaint, the Certificates were trading at just approximately 80% of par.

367.   Plaintiff purchased Certificates issued by Structured Asset Securities Corp. Trust Series 2006-S1, when they were rated Aaa by Moody's, but the Certificates have since been downgraded three times and are currently rated Ca.  At the time of filing of this complaint, the Certificates were trading at just approximately 51% of par.

368.   Plaintiff purchased Certificates issued by Structured Asset Securities Corp. Trust Series 2007-BC3, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated Baa1.  At the time of filing of this complaint, the Certificates were trading at just approximately 92% of par.

369.    Plaintiff purchased Certificates issued by Structured Asset Securities Corp. Trust Series 2007-MN1A, when they were rated Aaa by Moody's, but the Certificates have since been downgraded twice and are currently rated A3.   At the time of filing of this complaint, the Certificates were trading at just approximately 92% of par.

370.    Plaintiff purchased Certificates issued by Structured Asset Securities Corp. Trust Series 2007-OSI, when they were rated Aaa by Moody's, but the Certificates have since been downgraded once and are currently rated Ba1.   At the time of filing of this complaint, the Certificates were trading at just approximately 87% of par.

371.    Plaintiff purchased Certificates issued by First Franklin Mortgage Loan Trust Series 2006-FF16, when they were rated Aaa by Moody's, but the Certificates have since been downgraded three times and are currently rated Caa2.  At the time of filing of this complaint, the Certificates were trading at just approximately 94% of par.

372.    As a result of the multiple and material misrepresentations contained in the Offering Documents, Plaintiff has suffered losses on its purchases of Certificates.   As of the filing of this Complaint, the mortgage loans in the pools held by the Issuing Trusts and underlying Plaintiff's Certificates have suffered escalating default rates and mounting foreclosures, resulting in across-the-board ratings downgrades and other negative actions by the rating agencies, as shown below.

| ABP Purchases | Percentage of Loans Underlying the Certificates in Foreclosure | Percentage of Loans Underlying the Certificates Delinquent by More than 90 Days | Current Moody's Ratings |
|---|---|---|---|
| MLMI 2006-AF2 | 21.64 | 35.98 | B2 |
| MLMI 2006-HE4 | 33.82 | 65.01 | Ca |
| MLMI 2006-HE5 | 24.06 | 53.04 | Caa3 |
| MLMI 2006-HE6 | 28.75 | 59.88 | Ca |
| MLMI 2006-OPT1 | 24.51 | 39.21 | B2 |
| MLMI 2006-RM5 | 33.29 | 66.23 | C |

| | | | |
|---|---|---|---|
| FFMER 2007-1 | 19.94 | 50.43 | Ca |
| FFMER 2007-2 | 22.26 | 51.54 | Ca |
| FFMER 2007-3 | 18.08 | 49.47 | Caa3 |
| FFMER 2007-4 | 19.85 | 52.97 | B1/ Caa3 |
| MLMI 2007-HE3 | 25.08 | 55.97 | Ca |
| MANA 2007-A1 | 23.68 | 47.96 | Ca |
| FFML 2007-FF1 | 15.37 | 46.47 | Caa3 |
| FFML 2006-FF15 | 14.98 | 31.77 | A1 |
| FFML 2006-FF16 | 18.42 | 51.85 | Caa2 |
| FFML 2006-FF17 | 17.62 | 34.12 | A2 |
| FFML 2006-FFA | 0.04 | 13.73 | C |
| FFML 2006-FFB | 0.27 | 14.45 | C |
| LXS 2006-4N | 14.98 | 38.73 | Caa2 |
| LXS 2006-10N | 21.18 | 44.02 | Caa3 |
| LXS 2006-14N | 17.73 | 37.79 | Caa3 |
| LXS 2006-20 | 18.08 | 37.75 | Caa2 |
| LXS 2007-4N | 19.92 | 41.77 | Caa3 |
| LXS 2007-8H | 18.76 | 38.92 | Caa3 |
| SASC 2006-BC4 | 19.25 | 43.93 | Aaa/A3 |
| SASC 2006-BC5 | 21.42 | 43.16 | A3 |
| SASC 2006-S1 | 0.00 | 6.14 | Ca |
| SASC 2007-BC3 | 19.99 | 35.56 | Baa1 |
| SASC 2007-MN1A | 35.04 | 68.41 | A3 |
| SASC 2007-OSI | 17.78 | 39.03 | Ba1 |

## XIV.   THE LIABILITY OF THE CONTROL PERSON DEFENDANTS

### A.   DEFENDANT MERRILL LYNCH

373.   Defendant Merrill Lynch was in a position to and in fact controlled each of Defendants MLMI, MLML, MLPFS, and First Franklin.

374.   Defendant Merrill Lynch operated its consolidated subsidiaries as a collective enterprise, making significant strategic decisions for its subsidiaries, monitoring enterprise-wide risk, and maximizing profit for Merrill Lynch's executives and shareholders.  As reported in Merrill Lynch's 2006 Form 10-K, in the normal course of business Merrill Lynch used special purpose entities ("SPEs") to securitize residential mortgage loans and other types of financial assets.  The Merrill Lynch 2006 Form 10-K also listed MLPFS as one of Merrill Lynch's "principal subsidiaries" and discussed the financial services and underwriting services that

MLPFS offered.  Furthermore, the front page of each Prospectus and Prospectus Supplement for the Merrill Trusts prominently featured the name, "Merrill Lynch & Co."

375.    Unlike arm's-length securitizations where the loan originator, depositor, underwriters, and issuers are unrelated third parties, here the transactions among the sponsor (MLML or First Franklin); the depositor (MLMI), the Issuing Trusts, and the underwriter (MLPFS) were not arm's-length transactions at all.  Merrill Lynch controlled every aspect of the securitization processes.

376.    The mortgage loans underlying the Certificates were originated by First Franklin, an operating subsidiary of a Merrill Lynch entity, or were acquired by MLML from the other Originators.

377.    Merrill Lynch then created MLMI, a Delaware corporation structured as a limited purpose, indirectly-owned subsidiary to acquire mortgage loans from First Franklin or MLML and to transfer the loans to the Issuing Trusts for sale to investors as RMBS.  As the depositor, MLMI was a shell corporation that had no assets of its own and operated out of Merrill Lynch offices.  It was controlled by Merrill Lynch through its appointment of Merrill Lynch executives, including Park, a managing partner of Merrill Lynch, and McGovern, a Director and Senior Counsel at Merrill Lynch, as MLMI Directors.   Through these executives, Merrill Lynch exercised actual day-to-day control over MLMI.  Revenues flowing from the issuance and sale of the Certificates were passed through to Merrill Lynch.

378.    MLMI in turn created the Issuing Trusts.  Like MLMI, the Issuing Trusts were shell entities that were established for the sole purpose of holding the pools of mortgage loans assembled by MLMI, and issuing Certificates collateralized against these mortgage pools to

underwriters for sale to the public.  Through MLMI, Merrill Lynch also exercised actual control over the Issuing Trusts.

379.    Once the Issuing Trusts issued the Certificates, the Certificates were purchased by MLPFS, the underwriter.  MLPFS was an affiliate of MLML, MLMI and First Franklin, and was similarly controlled by Merrill Lynch.

380.    Merrill Lynch also participated in creating the Offering Documents and Merrill Lynch executives signed the Offering Documents.

381.    In sum, Merrill Lynch maintained a high level of day-to-day scrutiny and control over its subsidiaries, and controlled the entire process leading to the sale of the Certificates to ABP.

382.    Merrill Lynch culpably participated in the violations of MLMI and MLPFS discussed below.  Merrill Lynch approved the manner in which it sold the loans it elected to securitize and controlled the disclosures made in connection with those securitizations.  Among other misconduct, Merrill Lynch oversaw the actions of its subsidiaries and allowed them, including Defendants MLMI and MLPFS, to misrepresent the mortgage loans' characteristics in the Offering Documents.

### B.    DEFENDANT GREENWICH CAPITAL

383.    Defendant Greenwich Capital was in a position to and in fact controlled each of Defendants FAS, GCA, GCFP, and GCM.  Defendant Greenwich Capital operated its consolidated subsidiaries as a collective enterprise, making significant strategic decisions for its subsidiaries, monitoring enterprise-wide risk, and maximizing profit for Greenwich Capital's executives and corporate parent.

384.    Unlike arm's-length securitizations where the loan originator, depositor, underwriters, and issuers are unrelated third parties, here the transactions among the sponsor

(GCFP); the depositor (FAS), the Issuing Trust, and the underwriter (GCM) were not arm's-length transactions at all.  Greenwich Capital controlled every aspect of the securitization processes.

385.    The mortgage loans underlying the Certificates were originated by First Franklin and acquired by the sponsor, GCFP.  Greenwich Capital then created FAS, a Delaware corporation structured as a limited purpose subsidiary to acquire mortgage loans from GCFP and to transfer the loans to the Issuing Trusts for sale to investors as RMBS.  As the depositor, FAS was a shell corporation that had no assets of its own and had the same directors and officers (Anderson, Esposito, McGinnis, Mathis, and Walsh among others) as other Greenwich Capital entities.  Through these executives, Greenwich Capital exercised actual day-to-day control over FAS.  Revenues flowing from the issuance and sale of the Certificates were passed through to Greenwich Capital.

386.    FAS in turn created the Issuing Trusts.  Like FAS, the Issuing Trusts were shell entities that were established for the sole purpose of holding the pools of mortgage loans assembled by FAS, and issuing Certificates collateralized against these mortgage pools to underwriters for sale to the public.  Through FAS, Greenwich Capital also exercised actual control over the Issuing Trusts.

387.    Once the Issuing Trusts issued the Certificates, the Certificates were purchased by GCM, the underwriter.  GCM was an affiliate of FAS, GCA, and GCFP, and was similarly controlled by Greenwich Capital.

388.    Greenwich Capital also participated in creating the Offering Documents. In sum, Greenwich Capital maintained a high level of day-to-day scrutiny and control over its subsidiaries, and controlled the entire process leading to the sale of the Certificates to ABP.

389.    Greenwich Capital culpably participated in the violations of FAS and GCM discussed below.  Greenwich Capital approved the manner in which it sold the loans it elected to securitize and controlled the disclosures made in connection with those securitizations.  Among other misconduct, Greenwich Capital oversaw the actions of its subsidiaries and allowed them, including Defendants FAS and GCM, to misrepresent the mortgage loans' characteristics in the Offering Documents.

### C.    INDIVIDUAL DEFENDANTS

#### 1.    McGovern

390.    As a Director of MLMI, McGovern had power to direct MLMI's policies relating to securitization.  McGovern was concurrently a Director and Senior Counsel of Merrill Lynch, MLMI's corporate parent.  McGovern was also a culpable participant in the securitizations at issue, as evidenced by his signature on the MLMI registration statement dated March 28, 2006 and March 7, 2007.

#### 2.    Park

391.    As President and Chairman of the Board of Directors of MLMI, Park was involved in the day-to-day affairs of this primary violator and had power to direct MLMI's policies relating to securitization.  Park was concurrently a managing partner at Merrill Lynch, MLMI's corporate parent.  Park was also a culpable participant in the securitizations at issue, as evidenced by his signature on the MLMI registration statement dated March 7, 2007.

#### 3.    Puglisi

392.    As a Director of MLMI, Puglisi had power to direct MLMI's policies relating to securitization.  According to a May 27, 2010 Reuters article, "For Some People, CDOs Aren't A Four-Letter Word," Puglisi serves as the sole independent director on the Delaware-based corporations behind more than 200 mostly subprime-backed CDOs, and "figures that he has

served as an independent director on more of these mortgage-linked securities than any other person[.]" Puglisi was also a culpable participant in the securitizations at issue, as evidenced by his signature on the MLMI registration statements dated March 28, 2006 and March 7, 2007.

### 4.    B. Sullivan

393.    As Vice President, Treasurer (Principal Financial Officer) and Controller of MLMI, B. Sullivan was involved in the day-to-day affairs of this primary violator, had power to direct MLMI's policies relating to securitization, and had intimate knowledge and control over the enterprise's finances, including revenue generation from securitizations.  B. Sullivan was also a culpable participant in the securitizations at issue, as evidenced by his signature on the MLMI registration statements dated March 28, 2006 and March 7, 2007.

### 5.    Whalen

394.    As President and Chairman of the Board of Directors of MLMI, Whalen was involved in the day-to-day affairs of this primary violator and had power to direct MLMI's policies relating to securitization.  According to a May 24, 2007 Bloomberg article, "Merrill Lynch Mortgage-Bond Managing Directing Resigns," at MLMI's parent and controlling company Merrill Lynch, Whalen was "responsible for providing lines of credit to mortgage lenders and turning their loans into bonds," and was "part of a group that helped New York-based Merrill become the largest creator of subprime mortgage bonds just as delinquencies soared."  Whalen was also a culpable participant in the securitizations at issue, as evidenced by his signature on the MLMI registration statement dated March 28, 2006.

### 6.    Franks

395.    As Principal Executive Officer, President, and Chairman of the Board of Directors of SAS, Franks was involved in the day-to-day affairs of this primary violator and had had power to direct SAS's policies relating to securitization.  According to the examiner's report

in *In re Lehman Brothers Holding Inc.,* No. 08-13555 (S.D.N.Y. Filed Mar. 11, 2010), Franks was also the Chief Administrative Officer of the Mortgage Capital Division of SAS's parent and controlling corporation, Lehman Brothers, and was responsible for matters including making presentations on the subprime market to the Lehman Brothers Board of Directors.  Franks also had responsibility for subprime securitizations.   Lehman Brothers' mortgage origination operations, including Aurora and BNC, were a part of the Mortgage Capital Division where Franks was an officer.  Franks was a culpable participant in the securitizations at issue, as evidenced by her signature on the SAS registration statement dated February 23, 2007.

### 7.    Grieb

396.    As Chief Financial Officer of SAS, Grieb was involved in the day-to-day affairs of this primary violator, had power to direct SAS's policies relating to securitizations, and had intimate knowledge and control over the enterprise's finances, including revenue generation from securitizations.  Grieb was also the Director of Investor Relations at SAS's parent and controlling corporation, Lehman Brothers.   Grieb was also a culpable participant in the securitizations at issue, as evidenced by his signature on the SAS registration statements dated March 29, 2006 and February 23, 2007.

### 8.    McKinney

397.    As a Director of SAS, McKinney had power to direct SAS's policies relating to securitization.  According to an August 21, 2008 NEW YORK TIMES article, "Lehman Executives to Leave," McKinney was the head of American securitized products at SAS's parent and controlling corporation, Lehman Brothers, where was responsible for prime and Alt-A securitizations.  According to a September 4, 2008 press release from the D.E. Shaw Group, McKinney had a 15-year career at Lehman Brothers, where he managed multiple trading groups within the mortgage and asset-backed areas.  McKinney was also a culpable participant in the

securitizations at issue, as evidenced by his signature on the SAS registration statement dated February 23, 2007.

### 9.      Smith

398.    As Controller and Principal Accounting Officer of SAS, Smith was involved in the day-to-day affairs of this primary violator, had power to direct SAS's policies relating to securitization, and had intimate knowledge and control over the enterprise's finances, including revenue generation from securitizations.  Smith was also a Senior Vice President of Accounting Policy at SAS's parent and controlling corporation, Lehman Brothers.  Smith was also a culpable participant in the securitizations at issue, as evidenced by her signature on the SAS registration statements dated March 29, 2006 and February 23, 2007.

### 10.     J. Sullivan

399.    As a Director of SAS, J. Sullivan had power to direct SAS's policies relating to securitizations.  J. Sullivan also had control over the securitizations at issue, as evidenced by his signature on the SAS registration statements dated September 16, 2005, March 29, 2006, and February 23, 2007.

### 11.     Tabet

400.    As President, Managing Director, Director, and Chairman of the Board of Directors of SAS, Tabet was involved in the day-to-day affairs of the primary violator and had power to direct SAS's policies relating to securitization.  Tabet was also a culpable participant in the securitizations at issue, as evidenced by his signature on the SAS registration statements dated September 16, 2005 and March 29, 2006.

### 12.     Zusy

401.    As President, Managing Director, Director, and Chairman of the Board of Directors of SAS, Zusy was involved in the day-to-day affairs of the primary violator and had

power to direct SAS's policies relating to securitization.  Zusy was also a Managing Director at SAS's parent and controlling corporation, Lehman Brothers, where he had a 21-year career. According to his online biography, Zusy founded and managed a CDO banking group at Lehman Brothers and held senior positions in the Lehman Brothers Real Estate Mortgage Industries Group, where he held "senior roles in managing and structuring securitizations of performing, sub-performing and non-performing commercial and residential mortgage loans."  Zusy was also a culpable participant in the securitizations at issue, as evidenced by his signature on the SAS registration statement dated September 16, 2005.

### 13.    Anderson

402.    As a Director and Managing Director of FAS, Anderson was involved in the day-to-day affairs of this primary violator and had power to direct FAS's policies regarding securitization.  Anderson was concurrently a Director and Managing Director of FAS affiliate GCA, and a Managing Director and Head of Asset-Backed Principal Finance of FAS affiliate GCM.  Anderson was also a culpable participant in the securitizations at issue, as evidenced by his signature on the FAS/GCA registration statement dated March 31, 2006.

### 14.    Esposito

403.    As a Director, Managing Director and General Counsel of FAS, Esposito was involved in the day-to-day affairs of this primary violator and had power to direct FAS's policies regarding securitization.  Esposito was concurrently a Director, Managing Director, General Counsel, and Secretary of FAS affiliate GCA.  Esposito was also a culpable participant in the securitizations at issue, as evidenced by his signature on the FAS/GCA registration statement dated March 31, 2006.

### 15.    Mathis

404.    As Chief Financial Officer and Managing Director of FAS, Mathis was involved in the day-to-day affairs of this primary violator, had power to direct FAS's policies relating to securitization, and had intimate knowledge and control over the enterprise's finances, including revenue generation from securitizations.  Mathis was concurrently the Chief Financial Officer and Managing Director of FAS affiliates GCA and GCM.  Mathis was also a culpable participant in the securitizations at issue, as evidenced by her signature on the FAS/GCA registration statement dated March 31, 2006.

### 16.    McGinnis

405.    As President and Director of FAS, McGinnis was involved in the day-to-day affairs of this primary violator, had power to direct FAS's policies relating to securitization, and had intimate knowledge and control over FAS's securitizations.  McGinnis was concurrently a President and Director of FAS affiliate GCA, and the Managing Director and Head of Securitized Products of FAS affiliate GCM.  McGinnis was also a culpable participant in the securitizations at issue, as evidenced by his signature on the FAS/GCA registration statement dated March 31, 2006.

### 17.    Walsh

406.    As a Director and Managing Director of FAS, Walsh was involved in the day-to-day affairs of this primary violator, had power to direct FAS's policies relating to securitization, and had intimate knowledge and control over FAS's securitizations.  Walsh was concurrently a Director and Managing Director of FAS affiliate GCA, and Managing Director and Head of Mortgage Trading, Originations and Finance of FAS affiliate GCM.  Walsh was also a culpable participant in the securitizations at issue, as evidenced by his signature on the FAS/GCA registration statement dated March 31, 2006.

## XV.    TOLLING OF THE SECURITIES ACT OF 1933 CLAIMS

407.    The statutory claims raised by Plaintiff herein are currently the subject of class action lawsuits.  ABP is a putative class member of two Class Action lawsuits for its purchases of Certificates from the following trusts:

> MLMI 2006-AF2; MLMI 2006-HE4; MLMI 2006-HE5; MLMI 2006-HE6; MLMI 2006-OPT1; MLMI 2006-RM5; FFMER 2007-1; FFMER 2007-2; FFMER 2007-3; FFMER 2007-4; MLMI 2007-HE3; MANA 2007-A1; FFML 2006-FFB; LXS 2006-14N; and SASC 2007-OSI

408.    The Lehman Brothers Class Action.  On June 19, 2008, a class action was filed against several Lehman Brothers entities and certain former Lehman Brothers officers and directors on behalf of a class of investors who purchased or otherwise acquired specific certificates that Lehman Brothers issued, underwrote or sold.  *See Alaska Electrical Pension Fund v. Lehman Brothers Holdings Inc.*, et al Case No. 011341/08 (Sup. Ct. Nassau Cty. 2008.)  The case was later consolidated and transferred to the United States District Court for the Southern District of New York into *In re: Lehman Brothers Securities and ERISA Litigation*, Case No. 09-md-02017-LAK.  The Lehman Brothers Class Action complaint alleges claims under Sections 11, 12(a)(2), and 15 of the Securities Act.

409.    Plaintiff ABP was originally included in the defined class in the Lehman Brothers action with respect to its investments in: FFML 2006-FFB; LXS 2006-14N; and SASC 2007-OSI.  On February 17, 2010, Judge Kaplan dismissed all offerings from which no named plaintiff had purchased securities.  However, the Public Employment Retirement System of Mississippi and the Iowa Public Employees' Retirement System filed motions to intervene with respect to FFML 2006-FFB and SASC 2007-OSI Certificates, respectively, therefore tolling the statute of limitations as to these Certificates.

410.   <u>The Merrill Lynch Class Action</u>.  On December 5, 2008, a class action was filed against several Merrill Lynch entities, and certain present and former Merrill Lynch officers and directors on behalf of a class of investors who purchased or otherwise acquired specific certificates that Merrill Lynch issued, underwrote or sold.  *See* Complaint, *Conn. Carpenters Pension Fund vs. Merrill Lynch & Co.*, Case No. BC403282 (Cal. Super. Ct. L.A. Cty., Dec. 5, 2008).

411.   The case was later consolidated and transferred to the United States District Court for the Southern District of New York, Case No. 08-10841.  The Merrill Lynch Class Action complaint alleges claims under Sections 11, 12(a)(2), and 15 of the Securities Act.

412.   Plaintiff ABP was originally included in the defined class in the Merrill Lynch action with respect to its investments in: MLMI 2006-AF2; MLMI 2006-HE4; MLMI 2006-HE5; MLMI 2006-HE6; MLMI 2006-OPT1; MLMI 2006-RM5; FFMER 2007-1; FFMER 2007-2; FFMER 2007-3; FFMER 2007-4; MLMI 2007-HE3; and MANA 2007-A.  On June 1, 2010, Judge Jed S. Rakoff dismissed 65 offerings from which no named plaintiff had purchased securities.  However, the first complaint in this action was filed on August 19, 2010, therefore tolling the statute of limitations as to these Certificates.

413.   Plaintiff ABP reasonably and justifiably relied on the class action tolling doctrines of *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) and *In re WorldCom Securities Litigation*, 496 F.3d 245, 256 (2d Cir. 2007) to toll the statute of limitations on its 1933 Act claims. Under *American Pipe*, all putative class members are treated as if they filed their own individual actions until they either opt out or until a certification decision excludes them.  *American Pipe*, 414 U.S. at 255.  As the Second Circuit stated in *WorldCom* "because Appellants were members of a class asserted in a class action complaint, their limitations period

was tolled under the doctrine of *American Pipe* until such time as they ceased to be members of the asserted class." *WorldCom*, 496 F.3d at 256; *see also In re Morgan Stanley Mortgage Pass-Through Certificates Litig.,* No. 09 Civ. 2137 (LTS) (MHD), 2011 WL 4089580 (S.D.N.Y. Sept. 15, 2011) (rejecting defendants' argument that *American Pipe* tolling does not apply when the original plaintiffs did not purchase the same certificates as the new plaintiffs and therefore did not have standing to bring the new plaintiffs' claims).

414.    Defendants Merrill Lynch, MLPFS and MLMI in this Complaint are also defendants in the Merrill Lynch Class Action, for the same statutory causes of action asserted herein.

415.    Plaintiff ABP has chosen to file this separate action and to assert its 1933 Act claims, which have been tolled by the pendency of the Class Actions.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### (Against the Corporate Defendants)

416.    Plaintiff realleges each and every allegation above as if fully set forth herein.

417.    This claim is brought under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, against the Corporate Defendants.  The Corporate Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiff, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

418.    The Corporate Defendants promoted and sold the Certificates purchased by ABP pursuant to the defective Prospectuses and Prospectus Supplements.  The Prospectuses and

Prospectus Supplements contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts.

419.    The Corporate Defendants each had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth by failing to ascertain and to disclose such facts even though such facts were available to them, or deliberately refrained from taking steps necessary to discover whether the material facts were false or misleading.

420.    As a result of the Corporate Defendants' dissemination of materially false and misleading information and their failure to disclose material facts, Plaintiff was misled into believing that the Certificates were more creditworthy investments than they really were.

421.    Plaintiff purchased the Certificates without knowledge that the Corporate Defendants had misstated or omitted material facts.  In purchasing the Certificates, Plaintiff relied directly or indirectly on false and misleading statements and omissions made by the Corporate Defendants.  Plaintiff was damaged as a result of its reliance on the Corporate Defendants' false statements and misrepresentations and omissions of material facts.

422.    At the time of the Corporate Defendants' false statements, misrepresentations and omissions, ABP was ignorant of their falsity and believed them to be true.  Plaintiff would not have purchased or otherwise acquired the Certificates had it known the truth about the matters discussed above.

423.    Plaintiff is filing this action within two years following discovery of the facts constituting the violation, including facts establishing scienter and other elements of Plaintiff's claims, and within five years after the violations with respect to their investments.

424.    By virtue of the foregoing, the Corporate Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

425.    As a direct and proximate result of the Corporate Defendants' wrongful conduct, Plaintiff has suffered damages in connection with its purchases of the Certificates.

**SECOND CAUSE OF ACTION**
**Violation of Section 20(a) of the Exchange Act**
**(Against Merrill Lynch, MLML, First Franklin, GCFP, and the Individual Defendants)**

426.    Plaintiff realleges each and every allegation contained above as if fully set forth herein.

427.    This count is asserted against Defendants Merrill Lynch, MLMI, First Franklin, GCFP, and the Individual Defendants (collectively, the "Section 20(a) Defendants"), and is based upon Section 20(a) of the Exchange Act.

428.    Each of the Section 20(a) Defendants by virtue of its control, ownership, offices, directorship, and specific acts was, at the time of the wrongs alleged herein and as set forth herein, a control person of the Corporate Defendants and/or the Lehman Entities within the meaning of Section 20(a) of the Exchange Act.

429.    As a result of their control of the Corporate Defendants and/or the Lehman Entities, the Section 20(a) Defendants reviewed, or had the opportunity to review the Offering Documents for the Certificates prior to their issuance and therefore knew or should have known that those Offering Documents contained misrepresentations and omissions. The Section 20(a) Defendants could have prevented the issuance of the Offering Documents or caused them to be corrected. As a result, the Section 20(a) Defendants did not act in good faith.

430.    As set forth above, the Corporate Defendants and/or the Lehman Entities each violated Section 10(b) of the Exchange act and Rule 10b-5 promulgated thereunder. By virtue of

their positions as control persons, the Section 20(a) Defendants are jointly and severally liable pursuant to Section 20(a) of the Exchange Act.

431. As a direct and proximate result of the Section 20(a) Defendants' wrongful conduct, Plaintiff suffered damages in connection with its purchase of the Certificates.

### THIRD CAUSE OF ACTION
### Common Law Fraud
### (Against the Corporate Defendants)

432. Plaintiff realleges each and every allegation contained above as if fully set forth herein.

433. This claim is brought against the Corporate Defendants.

434. The Corporate Defendants promoted and sold the Certificates purchased by Plaintiff pursuant to the defective Offering Documents. The Offering Documents contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts.

435. Each of the Corporate Defendants knew their representations and omissions were false and/or misleading at the time they were made. Each of the Corporate Fraud Defendants made the misleading statements with an intent to defraud the Plaintiff.

436. Plaintiff justifiably relied on the Corporate Defendants' false representations and misleading omissions.

437. Had Plaintiff known the true facts regarding the loans underlying the Certificates, including the Corporate Defendants' and the Third-Party Originators' abandonment of their underwriting practices, the Corporate Defendants' and Third-Party Originators' improper appraisal methods, the inaccuracy of the ratings assigned by the rating agencies, and the failure to convey to the Issuing Trusts legal title to the underlying mortgages, Plaintiff would not have purchased the Certificates.

438.    As a result of the Corporate Defendants' false and misleading statements and omissions, Plaintiff suffered damages in connection with its purchase of the Certificates.

## FOURTH CAUSE OF ACTION
### Fraudulent Inducement
### (Against the Corporate Defendants)

439.    Plaintiff realleges each and every allegation contained above as if fully set forth herein.

440.    This is a claim for fraudulent inducement against the Corporate Defendants.

441.    As alleged above, in the Offering Documents, the Corporate Defendants made fraudulent and false statements of material fact, and omitted material facts necessary in order to make their statements, in light of the circumstances under which the statements were made, not misleading.

442.    The Issuing and Underwriter Defendants knew at the time they sold and marketed each of the Certificates that the foregoing statements were false, or, at the very least, made recklessly, without any belief in the truth of the statements.

443.    The Corporate Defendants made these materially misleading statements and omissions for the purpose of inducing Plaintiff to purchase the Certificates.

444.    The Corporate Defendants knew that Plaintiff was relying on their expertise, and they encouraged such reliance through the Offering Documents, as described herein.   The Corporate Defendants knew that Plaintiff would rely upon their representations in connection with Plaintiff's decision to purchase the Certificates.   The Corporate Defendants were in a position of unique and superior knowledge regarding the true facts concerning the foregoing material misrepresentations and omissions.

445.    It was only by making such representations that the Corporate Defendants were able to induce Plaintiff to buy the Certificates.   Plaintiff would not have purchased or otherwise

acquired the Certificates but for the Corporate Defendants' fraudulent representations and omissions about the quality of the Certificates.

446. Plaintiff, justifiably, reasonably and forseeably relied on the Corporate Defendants' representations and false statements regarding the quality of the Certificates.

447. By virtue of the Corporate Defendants' false and misleading statements and omissions, as alleged herein, Plaintiff has suffered substantial damages.

### FIFTH CAUSE OF ACTION
### Aiding & Abetting Fraud
### (Against All Defendants)

448. ABP repeats and realleges each and every allegation contained above as if fully set forth herein.

449. This is a claim against the above-named aiding and abetting Defendants  (the "Aiding and Abetting Defendants") for aiding and abetting the fraudulent and reckless misrepresentations by all Defendants and/or the Lehman Entities.  Each of these Defendants aided and abetted the fraud committed by all of the other Defendants

450. As alleged in detail above, the Corporate Defendants knowingly promoted and sold Certificates to ABP pursuant to materially misleading Offering Documents, thereby damaging ABP.  The Aiding and Abetting Defendants knew of the fraud perpetrated on ABP by the Corporate Defendants. The Aiding and Abetting Defendants directed, supervised and otherwise knew of the abandonment of underwriting practices and the utilization of improper appraisal methods; the inaccuracy of the ratings assigned by the rating agencies; and the failure to convey to the Issuing Trusts legal title to the underlying mortgages.

451. The Aiding and Abetting Defendants provided the Corporate Fraud Defendants with substantial assistance in perpetrating the fraud.  The Aiding and Abetting Defendants participated in the violation of mortgage loan underwriting and appraisal standards; made false

157

public statements about mortgage loan underwriting and appraisal standards; provided false information about the mortgage loans underlying the Certificates to the rating agencies; provided false information for use in the Offering Documents; and/or participated in the failure to properly endorse and deliver the mortgage notes and security documents to the Issuing Trusts.

452.    It was foreseeable to the Aiding and Abetting Defendants at the time they actively assisted in the commission of the fraud that ABP would be harmed as a result of their assistance.

453.    As a direct and natural result of the fraud committed by the Corporate Defendants, and the knowing and active participation by the Aiding and Abetting Defendants, Plaintiff has suffered substantial damages.

### SIXTH CAUSE OF ACTION
### Violation of Section 11 of the Securities Act
### (Against All Defendants)

454.    Plaintiff repeats and realleges each and every allegation above as if set forth fully herein.

455.    This Cause of Action is brought pursuant to Section 11 of the Securities Act against all Defendants.  This Cause of Action is predicated upon Defendants' strict liability and/or negligence for making untrue statements and omissions in the Offering Documents.  For purposes of this Cause of Action, Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional misconduct.

456.    The Registration Statements for the Certificate offerings were materially misleading, contained untrue statements of material fact and omitted to state other facts necessary to make the statements not misleading.  Each Defendant issued and disseminated, caused to be issued or disseminated, and/or participated in the issuance and dissemination of the material statements and omissions that were contained in the Offering Documents.

457.   Defendants MLMI and FAS, as the depositors, were "issuers" within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(4), and are strictly liable to Plaintiff for making the misstatements and omissions in issuing the Certificates.

458.   The Individual Defendants were executive officers and representatives of the respective companies responsible for the contents and dissemination of the Shelf Registration Statements.  Each of the Individual Defendants was a director of their respective companies at the time the Shelf Registration Statement became effective as to each Certificate.   Each Individual Defendant signed the relevant Registration Statements, or documents incorporated by reference, in their capacities as officers or directors of their respective companies, and caused and participated in the issuance of the Registration Statements.   By reasons of the conduct alleged herein, each of these Individual Defendants violated Section 11 of the Securities Act.

459.   The Underwriter Defendants each acted as an underwriter in the sale of Certificates issued by the Issuing Trusts, directly and indirectly participated in the distribution of the Certificates, and directly and indirectly participated in drafting and disseminating the Offering Documents for the Certificates.

460.   Defendants MLML, First Franklin and GCFP directly and indirectly participated in the distribution of the Certificates, and directly and indirectly participated in drafting and disseminating the Offering Documents for the Certificates, and therefore also acted as underwriters in the sale of Certificates issued by the Issuing Trusts.

461.   Defendants owed to Plaintiff the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of

material facts required to be stated in order to make the statements contained therein not misleading.

462.    Defendants failed to possess a reasonable basis for believing, and failed to make a reasonable investigation to ensure, that statements contained in the Offering Documents were true and/or that there was no omission of material facts necessary to make the statements contained therein not misleading.

463.    By reason of the conduct alleged herein, each of the Defendants violated Section 11 of the Securities Act, and are liable to Plaintiff.

464.    Plaintiff acquired Certificates pursuant to the Registration Statements.  At the time Plaintiff obtained the Certificates, it did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

465.    Plaintiff has sustained damages as a result of the wrongful conduct alleged and the violations of the Defendants.

466.    By virtue of the foregoing, Plaintiff is entitled to damages, jointly and severally from each of the Defendants, as set forth in Section 11 of the Securities Act.

**SEVENTH CAUSE OF ACTION**
**Violation of Section 12(a)(2) of the Securities Act**
**(Against the Underwriter Defendants)**

467.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

468.    This Cause of Action is brought pursuant to Section 12(a)(2) of the Securities Act against the Underwriter Defendants from whom Plaintiff acquired the Certificates.  For purposes of this Cause of Action, Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional misconduct.  This Cause of Action is based solely on claims of strict liability and/or negligence under the Securities Act.

469.     The Underwriter Defendants promoted and sold the Certificates pursuant to the defective Prospectuses and Prospectus Supplements.

470.     The Prospectuses and Prospectus Supplements contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts.

471.     Plaintiff purchased Certificates in the Offerings from the Underwriter Defendants pursuant to the Offering Documents which contained untrue statements and omissions, as reflected in ¶ 64.  Defendants sold these Certificates for their own financial gain.

472.     The Underwriter Defendants owed to Plaintiff the duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses and Prospectus Supplements, to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  The Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the Prospectuses and Prospectus Supplements as set forth above.

473.     Plaintiff purchased or otherwise acquired Certificates pursuant to the defective Prospectuses and Prospectus Supplements.   Plaintiff did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Prospectuses and Prospectus Supplements.

474.     By reason of the conduct alleged herein, the Underwriter Defendants violated Section 12(a)(2) of the Securities Act.  As a direct and proximate result of such violations, Plaintiff sustained material damages in connection with its purchases of the Certificates. Plaintiff has the right to rescind and recover the consideration paid for its Certificates, and

hereby elects to rescind and tender its securities to the Underwriter Defendants, except as to any Certificates that Plaintiff has sold, as to which Plaintiff seeks damages to the extent permitted by law.

## EIGHTH CAUSE OF ACTION
### Violation of Section 15 of the Securities Act
### (Against Merrill Lynch, MLML, First Franklin, GCFP, and the Individual Defendants)

475.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein, except any allegations that the Defendants made any untrue statements and omissions intentionally or recklessly.  For the purposes of this Count, ABP expressly disclaims any claim of fraud or intentional misconduct.

476.    This Cause of Action is asserted against Merrill Lynch, MLML, First Franklin, GCFP, and the Individual Defendants under Section 15 of the Securities Act.

477.    Each of Merrill Lynch and the Individual Defendants by virtue of its control, ownership, offices, directorship, and specific acts was, at the time of the wrongs alleged herein and as set forth herein, a controlling person of the Issuing Defendants within the meaning of Section 15 of the Securities Act.  Merrill Lynch and the Individual Defendants had the power and influence and exercised the same to cause the Issuing Defendants to engage in the acts described herein.

478.    Merrill Lynch and the Individual Defendants' control, ownership and position made them privy to and provided them with knowledge of the material facts concealed from Plaintiff.

479.    By virtue of the conduct alleged herein, Merrill Lynch and the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff for damages suffered as a result.

## NINTH CAUSE OF ACTION
### Negligent Misrepresentation
### (Against All Defendants)

480.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein, except any allegations that the Defendants made any untrue statements and omissions intentionally or recklessly.  For the purposes of this Count, ABP expressly disclaims any claim of fraud or intentional misconduct.

481.   Defendants were aware that Plaintiff relied on Defendants' expertise and experience and depended upon Defendants for accurate and truthful information.  Defendants also knew that the facts regarding whether or not the Originators of the underlying loans complied with their stated underwriting standards and appraisal methods were exclusively within Defendants' knowledge.

482.   Defendants had a duty to provide Plaintiff complete, accurate, and timely information regarding the underwriting standards and appraisal methods used.  Defendants breached their duty to provide such information to Plaintiff.

483.   Plaintiff reasonably relied on the information Defendants did provide and was damaged as a result of Defendants' misrepresentations.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.   Rescission;

B.   Awarding compensatory damages against Defendants in favor of Plaintiff for damages sustained as a result of Defendants' wrongdoing;

C.   Awarding Plaintiff its costs and disbursements in this suit, including reasonable attorneys' fees and expert fees; and

D.   Awarding such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: October 7, 2011

Respectfully submitted,

GRANT & EISENHOFER P.A.
Jay W. Eisenhofer
Geoffrey C. Jarvis
Deborah A. Elman
Robert D. Gerson
485 Lexington Ave., 29th Floor
New York, NY  10017
Tel:  (646) 732-8500
Fax:  (646) 732-8501

*Counsel for Plaintiff Stichting Pensioenfonds ABP*